## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1: 21-cv-05162 |
| | ) | |
| DOORDASH, INC. AND | ) | |
| CAVIAR, LLC, | ) | Magistrate Judge Jeffrey T. Gilbert |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff City of Chicago ("Plaintiff" or "the City") has filed a Motion for
Protective Order [ECF No. 110] ("Motion") as to certain discovery served by
Defendants DoorDash, Inc. and Caviar, LLC ("Defendants" or "DoorDash"). The
Motion is granted in part and denied in part without prejudice for the reasons
discussed below.

## I. LEGAL STANDARD

A district court has broad discretion in matters relating to discovery. *Patterson
v. Avery Dennison Corp.*, 281 F.3d 676 (7th Cir. 2002). Rule 26 permits the discovery
of any "nonprivileged matter that is relevant to any party's claim or defense and
proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). When determining
the scope of discovery, Rule 26(b)(1) requires consideration of:

> the importance of the issues at stake in the action, the amount in
> controversy, the parties' relative access to relevant information, the
> parties' resources, the importance of the discovery in resolving the
> issues, and whether the burden or expense of the proposed discovery
> outweighs its likely benefit.

*Id.* Rule 26(b)(1) also recognizes that information within the scope of discovery does not need to be admissible at trial. *Id.* Despite the strong public policy in favor of disclosure of relevant materials, the district court also has broad authority to enter a protective order to limit discovery "for good cause shown ... to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1).

Discovery also may be limited if it is unreasonably cumulative or duplicative, can be obtained from some other source that is more convenient, less burdensome, or less expensive, the party seeking the discovery has had ample opportunity to obtain it, or it is not relevant or is otherwise disproportional to the needs of the case within the meaning of Rule 26(b)(1). FED. R. CIV. P. 26(b)(2)(C). As the 2015 amendments to Rule 26 emphasize, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." FED. R. CIV. P. 26, Advis. Comm. Notes for 2015 Amendments.

## II. ANALYSIS

The City seeks a protective order from certain discovery related to DoorDash's selective prosecution defense (the "Fourteenth Affirmative Defense") arguing DoorDash does not have a colorable basis to assert that defense and, therefore, it is not entitled to discovery on it, particularly the wide-ranging discovery DoorDash is seeking. The City says the discovery sought by DoorDash encompasses three broad categories embodied in multiple requests for production and interrogatories:

o Internal City deliberations about the City's investigation of DoorDash and its decision to file an enforcement action (RFP Nos. 6, 11, 41);

o Evidence of the City's motive in pursuing this action against DoorDash (Interrogatory No. 2, RFP Nos. 8, 42, 43, 50, 54, 65);

o Documents related to the City's investigation of other third-party meal delivery companies (Interrogatory No. 7 and RFP Nos. 7, 12, 23, 69, 70).

[ECF No. 110] at 1-2.

DoorDash acknowledges it is seeking discovery on its selective prosecution defense and contends it satisfies the colorable basis standard, but it also argues its discovery requests are relevant to other claims and defenses in the case as to which the colorable basis standard does not apply. Defendant's Opposition to Plaintiff's Motion for Protective Order [ECF No. 121] ("Response") at 1-2. According to the City, the discovery that is the subject of its Motion is "principally" relevant to DoorDash's selective prosecution defense even if it also may be relevant to other claims and defenses. [ECF No. 110] at 1-2. But the City says it has produced documents responsive to those discovery requests at issue as relevant to such other claims and defenses.

The Court addresses all the proffered justifications for DoorDash's discovery requests in this Memorandum Opinion and Order and whether the City has shown good cause for the protective order it is seeking.

### A. Discovery Related to DoorDash's Fourteenth Affirmative Defense for Selective Prosecution

#### 1) DoorDash is not entitled to the discovery it is seeking simply because it has pled a selective prosecution defense.

As a preliminary matter, DoorDash claims the City's Motion "is little more than a request for reconsideration of arguments Judge Gettleman rejected in denying the City's motion to strike [DoorDash's Fourteenth Affirmative Defense]," though it also seems to admit the question for decision today is different than the narrow pleading issue Judge Gettleman decided. *See* [ECF No. 121] at 1 ("the only question is whether DoorDash has made a sufficient showing for discovery"); [*Id.*] at 12 ("[t]o obtain discovery related to an equal protection defense, a party must present a 'colorable basis' of both discriminatory intent and discriminatory effect").

Judge Gettleman, the then-assigned District Judge, addressed only whether DoorDash could rely on a constitutional equal protection argument to support its selective prosecution defense. He concluded that an affirmative defense pled in that way did not fail as a matter of law. Memorandum Opinion and Order [ECF No. 76] at 6 ("Defendants cite persuasive authority that rejects the argument that equal protection cannot form the basis of an affirmative defense."). Judge Gettleman did not address whether DoorDash has adequately pled the elements of a selective prosecution defense or whether DoorDash has a colorable basis upon which to pursue discovery on that defense under controlling Seventh Circuit law. In fact, DoorDash argued in response to the City's motion to strike its equal protection defense that "it is premature to address the merits of DoorDash's defense at the pleadings stage." Defendants' Opposition to Plaintiff's Motion to Strike Affirmative Defenses [ECF No.

64] at 8. The question for decision today is whether DoorDash has a colorable basis upon which to pursue the wide-ranging discovery it is seeking against the City on its selective prosecution defense and, contrary to what DoorDash says, that is not something Judge Gettleman decided.

**2) The colorable basis standard.**

The parties agree that the "colorable basis" standard controls whether DoorDash is entitled to discovery related to its selective prosecution defense in this case and the Court will analyze the issue within that framework. *See* [ECF No. 121] at 12; [ECF No. 158] (Plaintiff's Reply in Support of its Motion for Protective Order) ("Reply") at 2. DoorDash does not dispute the City's case authority holding the colorable basis standard developed in the context of criminal cases applies in civil enforcement actions like this one. [ECF No. 110] at 3 (citing cases).

To obtain discovery on a selective prosecution claim, the Seventh Circuit has said a defendant "need only show a 'colorable basis' for the claim." *See United States v. Mitchell*, 778 F.2d 1271, 1277 (7th Cir. 1985) (internal citations omitted). To do so, a defendant must introduce "'some evidence tending to show the existence of the essential elements of the defense.'" *See id.*, 778 F.2d at 1277 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)). *See United States v. Armstrong*, 517 U.S. 456, 468 (1996) ("The parties, and the Courts of Appeals which have considered the requisite showing to establish entitlement to discovery, describe this showing with a variety of phrases, like 'colorable basis,' 'substantial threshold showing,' 'substantial and concrete basis,' or 'reasonable likelihood'. However, the many labels for this showing conceal the degree of consensus about the evidence necessary to meet

5

it. The Courts of Appeals 'require some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent.") (internal citations omitted). The Seventh Circuit has described this as a "'relatively low burden' on defendants" recognizing "the government holds most of the relevant evidence." *United States v. Utecht*, 238 F.3d 882, 887–88 (7th Cir. 2001) (quoting *United States v. Heidecke*, 900 F.2d 1155, 1159 (7th Cir. 1990)).

The Supreme Court has articulated the burden a bit differently, seeming to place a somewhat heavier burden on a defendant seeking discovery, explaining, ". . . the showing necessary to obtain discovery" related to a selective prosecution defense "should itself be a significant barrier to the litigation of insubstantial claims," and further noting "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 463–64, 468. But this may be a difference in articulation and not in substance. The Seventh Circuit also has recognized the important gatekeeper function performed by courts when considering a selective prosecution defense. *See Heidecke*, 900 F.2d at 1158–59 (colorable basis requirement guards against "allowing claims of vindictive prosecution to mask abusive discovery tactics by defendants"); *Utecht*, 238 F.3d at 887–88 (adopting colorable basis requirement in criminal cases involving alleged abuse of IRS civil summons power and noting it "prevents defendants from unnecessarily imposing

enormous administrative costs and delays in tax evasion prosecutions by engaging in extended fishing expeditions to support frivolous challenges").[1]

The essential elements of a selective prosecution defense are discriminatory intent and discriminatory effect. *Armstrong*, 517 U.S. at 463–64. In order to obtain discovery in furtherance of a selective prosecution defense, a defendant must make a colorable showing of discriminatory intent, *i.e.* an improper motive for prosecution. *See United States v. Goulding*, 26 F.3d 656, 662 (7th Cir. 1994) (to support claim of discriminatory intent, defendant must show government acted with improper motive); *Att'y Gen. of U.S. v. Irish People, Inc.*, 684 F.2d 928, 933 (D.C. Cir. 1982) ("evidence cited by the district court did not entitle defendant to discovery since it did not demonstrate a colorable showing of improper motivation"). "[S]elective enforcement . . . in itself, does not violate the Equal Protection Clause. Enforcement of local ordinances is a prosecutorial decision, which entails selectivity. So an exercise of prosecutorial discretion, unless based on some invidious discrimination, is not typically a basis for a class-of-one challenge." *Van Dyke v. Vill. of Alsip*, 819 F. App'x 431, 432 (7th Cir. 2020) (internal citations omitted). To satisfy the discriminatory effect element of the defense, a "defendant must make a 'credible showing' that 'similarly situated individuals . . . were not prosecuted.'" *United States v. Bass*, 536 U.S. 862, 863 (2002) (quoting *Armstrong* at 465, 470).

---

[1] A colorable basis is less than a prima facie case but more than the minimal allegations that otherwise might be sufficient for federal notice pleading. *See Mitchell*, 778 F.2d at 1277 (on a discovery motion related to a selective prosecution claim, "the defendant need not make a complete prima facie case; rather, he need only show a 'colorable basis' for the claim"); *see also Armstrong*, 517 U.S. at 468; *Heidecke*, 900 F.2d at 1159 (evidence showing a colorable basis "must rise beyond the level of unsupported allegations").

### 3) Factual background relevant to DoorDash's Selective Prosecution Defense.

On April 28, 2020, shortly after the start of the COVID 19 pandemic, the City issued a Third-Party Delivery Regulation Brief (the "Third-Party Delivery Brief") addressing "immediate action the City of Chicago can take to provide purchase transparency to Chicago consumers when engaging with third-party food delivery companies." *See* Ex. D to Declaration of Elizabeth K. McCloskey In Support of DoorDash's Opposition to Plaintiff's Motion for a Protective Order ("McCloskey Decl.") [ECF No. 124].[2] The Third-Party Delivery Brief noted "[t]hird-party food delivery companies charge a commission to a restaurant from which food is being delivered" that "is reported to be anywhere from 10% to 30% of the menu price" and stated "[t]he restaurant industry has previously requested government take stronger regulation, and most recently, members of the City Council have introduced legislative measures attempting to regulate third-party food delivery services by placing caps on commissions imposed by these companies." [*Id.*] To address the need for transparency to consumers, the Third-Party Delivery Brief stated, "There is a place for regulation in this area to promote transaction transparency to customers because the customer may believe that the restaurant is receiving the full menu price of the food. This may be material to a customer, especially a customer intending to 'Shop Local' . . .." [*Id.*] Accordingly, the City stated its Department of Business Affairs

---

[2] Although some of DoorDash's exhibits were initially the subject of its motion to seal, *see* [ECF No. 135], those exhibits were subsequently unsealed after the City filed a response stating "The City has now had the opportunity to review Exhibits D, E, G, H, J, R, and V, and has determined that they do not meet the standard for filing under seal. Accordingly, the City's view is that they should be filed and accessible on the public docket." [ECF No. 150].

and Consumer Protection ("BACP") "will promulgate rules under BACP's existing Code authority over consumer protection to require transaction transparency from third-party delivery services at the time the order is placed and on the transaction receipt." [*Id.*]

The Third-Party Delivery Brief also addressed "the City's ability to cap the commission fee the third-party delivery companies charge the restaurants" which it described as "more relevant now during the COVID-19 crisis because of the hardship on restaurants and their reliance on the delivery of food to reach customers," noting other jurisdictions such as San Francisco and New York had implemented or were considering such caps. [*Id.*] The Third-Party Delivery Brief concluded with "Next Steps" including BACP's promulgation of "rules requiring transparency from third-party meal delivery services" and further stating "BACP will research best practices and recommend long-term policy goals for the City of Chicago which will require ongoing dialogue with affected parties." [*Id.*]

On May 12, 2020, the City published its Third-Party Food Delivery Services Rules (the "Third-Party Rules") requiring third-party meal delivery companies like DoorDash to disclose certain commissions and fees charged to restaurants. Ex. C to McCloskey Decl. [ECF No. 134-3]. In describing the "Purpose of the Rules," then Commissioner of the BACP, Rosa Escareño, described the practice of third-party delivery services charging commissions to restaurants that may not be disclosed to consumers. [*Id.*] The Third-Party Rules included requirements for disclosure of fees and prices charged to the consumer, *see* [*id.*] at Rules 1.01 and 1.02, as well as

specifically related to commission amounts, *see* [*id.*] at Rule 1.03. Rule 1.03(3) required "[i]f feasible, the total commission actually attributable to the specific transaction should be disclosed," included provisions addressing when such commission disclosure may not be feasible, and the potential for alternative methods of disclosure. [*Id.*] at Rule 1.03(5) and (6).

In a June 11, 2020, letter to DoorDash, the City addressed Rule 1.03 of the Third-Party Rules as to the feasibility of DoorDash's disclosure of the actual commission amounts charged to restaurants, noting DoorDash's website only stated a range of potential commission amounts (*i.e.*, "This restaurant pays up to 30% of the subtotal to Doordash to offer delivery."). Ex. E to McCloskey Decl. [ECF No. 125]. The City's letter stated "[w]hile this disclosure may be facially compliant with Rule 1.03(5), that rule states that an estimated commission may be disclosed as an alternative 'if it is not feasible for the third-party food delivery service to calculate the total commission actually attributable to the specific transaction.'" [*Id.*]

The City and DoorDash exchanged correspondence in June and July 2020, and also met on July 7, 2020, to address DoorDash's compliance with the commission disclosure requirements and specifically the "position that Door Dash may comply with the Rules through the provisions outlined in Rule 1.03(5)." *See* the City's June 19, 2020 letter, at Ex. G and calendar invitation for July 7, 2020 meeting, at Ex. H to McCloskey Decl. [ECF Nos. 127 and 128]; *see also* DoorDash's correspondence to the City in response, at Exs. F and I to McCloskey Decl. [ECF Nos. 126 and 129]. Other than the City's June 11, 2020 and June 19, 2020 letters addressing DoorDash's

compliance with Rule 1.03, DoorDash did not provide the Court with any other correspondence from the City related to DoorDash's compliance with either Rule 1.03 or the Third-Party Rules more generally.

On September 29, 2020, Consumer Reports published an article titled "Consumer Reports Investigates Fee Transparency With Food Delivery Apps." Ex. K to McCloskey Decl. [ECF No. 134-11]. The article described Consumer Reports' investigation into the issue of fee transparency which focused on the disclosure practices of "four food delivery companies with the highest share of US consumer spending – DoorDash, Grubhub, Postmates, and Uber Eats. . ." in seven cities, ultimately narrowing in on compliance with Chicago's Third-Party Rules. [*Id.*] As to the issue of commission fee disclosure, Consumer Reports concluded "DoorDash's and UberEats's disclosures that commissions range 'up to' 15% or 30% are vague and also potentially noncompliant." [*Id.*] The article quoted the BACP as saying it had initially issued citations to ChowNow, EatStreet, ezCater, Grubhub, and Postmates, which "had not taken any steps to comply" and since then had been working closely with the companies to evaluate their compliance. [*Id.*] The article also quoted BACP as stating "[a]t this point, 'Doordash (*sic*) and Beyond Menu have proven to BACP that they are substantially compliant" and further stated "[w]e continue to work with all companies to bring about compliance. . ." [*Id.*]

On November 23, 2020, about two months after the Consumer Reports article, the City enacted a temporary pandemic-era cap on the commissions third-party meal delivery platforms could charge certain restaurants for their delivery services (the

"Commission Cap Ordinance"). *See* Ex. L to McCloskey Decl. [ECF No. 134-12]. In

response to the Commission Cap Ordinance, DoorDash instituted an additional $1.50

fee on all delivery orders from Chicago restaurants, which it styled the "Chicago Fee."

[ECF No. 121] at 3, 12-13; [ECF No. 61] (Answer) at ¶ 57. A statement on the

DoorDash app described the Chicago Fee as follows:

> Chicago has temporarily capped the fees that [DoorDash] may charge
> local restaurants. To continue to offer you convenient delivery while
> ensuring that Dashers are active and earning, you will now see a charge
> added to Chicago orders.

Complaint [ECF No. 1-1] at ¶ 63. DoorDash also published a blog post on November

25, 2020 with a section titled "What's the impact of commission caps?" which read, in

part:

> . . . [o]ver the last few months, we've seen a number of jurisdictions
> debate and pass price controls – or what some have called "commission
> caps" – which limit the amount that restaurants can choose to pay in
> exchange for services from third-party delivery platforms. These efforts
> ultimately restrict restaurant choice, precisely when restaurants need
> the full range of options to help their businesses survive and thrive. . .

Ex. AA to and ¶ 32 of McCloskey Decl. [ECF No. 134] and [ECF No. 134-27]; *see also*

[ECF No. 121] at 3, 12-13. The blog also stated, "Because of the range of costs that we

have to cover for delivery, when a government jurisdiction imposes price controls, it

may cause us to increase the fees we charge to consumers." Ex. AA to McCloskey Decl.

[ECF No. 134-27].

Alderman Scott Waguespack, a member of the City Council, publicly criticized

DoorDash's initiation of the Chicago Fee. The City Council is the legislative branch

of the City's government and had passed the Commission Cap Ordinance. *See*

https://www.chicago.gov/city/en/about/council.html; Ex. O to McCloskey Decl. [ECF

No. 134-15]. In a December 9, 2020, article published in the Chicago Eater, Alderman Waguespack was quoted as saying "The ordinance intent was to stop the price gouging by these companies" and "If you find its being done on all bills: then it's a disgraceful DoorDash fee, and an evasion of the ordinance in order to pad their contemplated IPO valuation of $3 billion. Their fee just piles more of the pandemic pain on restaurants and customers." Ex. O to McCloskey Decl. [ECF No. 134-15]; *see also* Ex. P to McCloskey Decl. [ECF No. 134-16] (December 8, 2020 Chicago Tribune article). As quoted in the City's Complaint, Alderman Waguespack also said DoorDash's "intention [was] to stick it to the city" when it imposed the Chicago Fee that added $1.50 to meal deliveries in Chicago. Complaint [ECF No. 1-1] at ¶ 59.

In March 2021, four months after DoorDash instituted the Chicago Fee and explained why it had done so, the City retained Cohen Milstein, its outside counsel in this action, "to provide legal services to assist the City in investigating and, if agreed by Cohen Milstein and City, pursuing litigation against and/or settlement with companies that provide meal delivery services to Chicago addresses [], through orders placed via the Internet, smartphone and tablet applications, and/or telephone numbers. The scope of this contract includes Grubhub, Door Dash, Uber Eats, Postmates, and their subsidiaries and affiliates (the 'Defendants'), and potentially other meal delivery companies." Ex. Q to McCloskey Decl. [ECF No. 134-17].

On June 28, 2021, the City sent DoorDash a cease and desist letter asserting various violations of sections 2-25-090, 4-8-300, and 4-276-470 of the Municipal Code of Chicago, and copying several attorneys from Cohen Milstein. Ex. Y to McCloskey

Decl. [ECF No. 134-25]. The City filed this enforcement action on August 27, 2021. [ECF No. 121] at 4.

### 4) DoorDash's discriminatory intent theory is weak

As to the discriminatory intent element of its selective prosecution defense, DoorDash relies on the timeline of events that preceded the City's filing of this lawsuit, arguing it shows the City targeted and retaliated against DoorDash for exercising its First Amendment rights and that the City's lawsuit was motivated by the vindictiveness of Alderman Waguespack toward DoorDash. [ECF No. 121] at 12-13.[3] DoorDash says the City's decision to pursue this enforcement action "coincide[d]" with DoorDash's protected First Amendment activity – namely, DoorDash's institution of an additional fee on meal deliveries in Chicago which it named the "Chicago Fee" and its explanations about why it imposed that fee.

DoorDash also says the City abruptly changed its attitude toward DoorDash in retaliation for what DoorDash characterizes as its protected First Amendment activity. According to DoorDash, starting in April 2020 and continuing through July 2020, the City's communications with DoorDash about its compliance with the Third-Party Rules were cooperative, and without any suggestion that the City thought DoorDash was violating any other laws or ordinances. [ECF No. 121] at 2-3, 12-13. DoorDash points to the Consumer Reports on September 29, 2020, and its quote from the BACP that "[a]t this point, 'Doordash (*sic*) and Beyond Menu have proven to

---

[3] DoorDash says Alderman Waguespack's statements quoted above are circumstantial evidence of the City's animus towards DoorDash, and that the City "endorsed" Alderman Waguespack's animus toward DoorDash by quoting his comments in its Complaint. [ECF No. 121] at 13.

BACP that they are substantially compliant" with the Third-Party Rules." Ex. K of McCloskey Decl. [ECF No. 134-11]. DoorDash says the City suddenly changed its tune after DoorDash instituted the Chicago Fee, retaining Cohen Milstein to pursue legal action against DoorDash. [ECF No. 121] at 2-4.

DoorDash argues this timeline shows that its imposition of the Chicago Fee and statements about it, and its criticism of the City's Commission Cap Ordinance, prompted the City to cease working "cooperatively" with DoorDash and, instead, to investigate it and ultimately to file this enforcement action. [ECF No. 121] at 2-4, 12-13. Along with the City's quotation of Alderman Waguespack's public comments about DoorDash's Chicago Fee in its Complaint, this is the basis for the discriminatory intent element of DoorDash's selective prosecution defense.

In the Court's view, DoorDash has not shown a colorable basis for the intent element of its selective prosecution defense. Further, whether or not DoorDash has made or can make the requisite colorable basis showing, the broad, wide-ranging discovery DoorDash is seeking from the City in support of its selective prosecution defense – essentially production of the entire universe of the City's investigation materials relating to DoorDash and other third-party meal delivery companies, including all of the City's internal and external communications and deliberations about the investigation – is far from proportional to the discovery needs of this case.

DoorDash's theory rests heavily on the City's supposed change in its relationship with DoorDash after it criticized the Commission Cap Ordinance and instituted the Chicago Fee to support its theory of discriminatory animus. This is a

stretch. The City did not give DoorDash a clean bill of health covering all of its business operations in Chicago in connection with the BACP investigation, and DoorDash overreads the quoted statements from the BACP in the Consumer Reports article to make that inference. The City's correspondence with DoorDash in June 2020 does not state DoorDash was in full compliance with the Third-Party Rules, nor does DoorDash provide evidence that the City made any such representation during the parties' meeting on July 7, 2020. The focus of the City's enforcement of the Third-Party Delivery Rules was the commission that third-party meal delivery companies could charge to Chicago customers, and that also was the focus of the City's correspondence with DoorDash during the summer of 2020. DoorDash seems to argue, in effect, that it had a 'golden ticket' from the City based on the BACP finding quoted in the Consumer Reports article that it was "substantially compliant" with the Third-Party Rules which warrants an inference that the City changed its position after DoorDash engaged in alleged First Amendment activity related to the Commission Cap Ordinance in the fall of 2020 and the City's animus toward DoorDash as a result of its First Amendment activity prompted this lawsuit. There is no basis for that inference nor is it supported by the evidence upon which DoorDash tries to build a colorable basis for its selective prosecution theory.

For instance, DoorDash asserts the Third-Party Rules (the subject of the BACP finding quoted in the Consumer Reports article) are "related directly to the City's claims in this action" because those Rules required "platforms to disclose all fees to consumers" and were "promulgated . . . under . . . the same statutes underlying this

lawsuit" (*i.e.*, the Chicago Municipal Code). [ECF No. 121] at 2, 10. DoorDash, however, fails to acknowledge that the City's Complaint in this case alleges misconduct by DoorDash beyond fee disclosures, including unauthorized restaurant listings, menu price markups, misrepresenting promotions, and claims about drivers' pay. [ECF No. 158] at 4; *see*, *e.g.*, Complaint at ¶¶ 197, 204. Moreover, the much broader variety of alleged deceptive acts and conduct alleged in the Complaint go far beyond the narrow issue of commission disclosures that DoorDash addressed with the City in June and July 2020 and as to which it was reportedly compliant.[4]

In addition, the regulatory climate was not static during this time. It changed and so did DoorDash's response to it. Even if the City determined DoorDash was substantially complying with the Third-Party Rules that predated the Commission Cap Ordinance, as DoorDash says the Consumer Reports article reported the BACP had concluded at a distinct point in time, nothing prevented the City from investigating DoorDash's imposition of the Chicago Fee or continuing to investigate its conduct after that Ordinance was enacted. Indeed, the Consumer Reports article also quotes the BACP as saying "[w]e continue to work with all companies to bring about compliance," implying that the City's monitoring of third-party meal delivery platforms was ongoing. *See* Ex. K to McCloskey Decl. [ECF No. 134-11]. This is also

---

[4] DoorDash's citation to *Bober v. Glaxo Wellcome PLC* is inapposite in this context, as that decision addresses the inapplicable principle that the Illinois Consumer Fraud and Deceptive Business Practices Act should not be read to "impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations." 246 F.3d 934, 941 (7th Cir. 2001). Contrary to what DoorDash suggests, *Bober* does not provide any basis to conclude the City's purported interpretation of the Third-Party Rules as related to DoorDash's commission disclosures constrains the City's broader application of the Municipal Code (beyond the Third-Party Delivery Rules) to the alleged misconduct alleged in the Complaint.

consistent with the City's statements in the Third-Party Delivery Brief (made in the Spring of 2020 well before DoorDash's alleged First Amendment activity) that BACP's efforts to address concerns related to third-party delivery companies "will require ongoing dialogue with affected parties." Ex. D to McCloskey Decl. [ECF No. 124]. And, in fact, two months later, the City enacted the Commission Cap Ordinance which altered the regulatory framework for meal delivery companies' operation in Chicago.

DoorDash also suggests the tenor of the City's interactions with it changed after it criticized the Commission Cap Ordinance and imposed the Chicago Fee, pointing to prior correspondence in which DoorDash says "[t]he City never suggested that DoorDash was violating any of its Rules." [ECF No. 121] at 2-3 (citing Exs. D-I to McCloskey Decl.). The correspondence between the City and DoorDash in mid-2020, however, does not bear the weight DoorDash wants to place on it. While the City does not say in those letters that it believed DoorDash was violating other provisions of the Municipal Code, the City was under no obligation to do so. DoorDash's compliance or noncompliance with the Municipal Code generally does not appear to have been the subject of the City's discussions with DoorDash about the disclosures concerning the commission it charged and DoorDash has not presented any evidence to the contrary.[5] The City's letters addressed a narrow issue: whether DoorDash's disclosure of a commission range paid by restaurants of "up to 30%" of the transaction subtotal complied with Rule 1-03 of the Third-Party Rules. *See* Exs.

_____

[5] *See* [ECF No. 158] at 4-5 (City did not "offer all-purpose assurances" that DoorDash was "in compliance with the Municipal Code").

E - I to McCloskey Decl. [ECF Nos. 125-129]; *see* [ECF No. 158] at 3-4 ("BACP later engaged in back-and-forth with DoorDash over whether DoorDash's commission disclosures—that '[t]his restaurant pays up to 30% of the subtotal to DoorDash'— complied with the Food Delivery Services Rules."). The City did not address the entire Municipal Code with DoorDash or the full panoply of issues involved in this litigation. DoorDash's attempt to characterize the City as making a 180 degree reversal in its position after DoorDash criticized the Commission Cap Ordinance and imposed the Chicago Fee is not a reasonable inference from the evidence DoorDash uses to make that argument.

DoorDash has brought forth nothing beyond its own speculation to show the City's decision to pursue an enforcement action against it after DoorDash imposed the Chicago Fee, even if the City previously found DoorDash in compliance with Rule 1.03 of the Third-Party Rules, was not rationally based and instead was the product of invidious discrimination. That is not enough to meet the colorable basis standard. *See Heidecke*, 900 F.2d at ("existence of a rational reason" . . . for the government's decision to pursue a federal indictment after the state indictment was dismissed "further suggests that there is no reasonable likelihood of vindictiveness"; "we will not presume actual vindictiveness, and in the absence of a colorable showing of animus, we must find that [defendant] is not entitled to discovery on his claim of vindictive prosecution."); *Van Dyke*, 819 F. App'x at 432 (". . . an exercise of prosecutorial discretion, unless based on some invidious discrimination, is not typically a basis for a class-of-one challenge").

DoorDash also overstates the significance of the City's retention of Cohen Milstein in its timeline. DoorDash says the City retained Cohen Milstein "to pursue legal action against DoorDash," *see* [ECF No. 121] at 2-3, but the City's retention agreement, on its face, is broader than that and it specifically includes within the scope of the law firm's retention investigation and potential litigation against "Grubhub, DoorDash, Uber Eats, Postmates . . . and potentially other meal delivery companies." Ex. Q to McCloskey Decl. [ECF No. 134-17]. The retention letter does not support the inference that the City retained Cohen Milstein to target DoorDash because of any assertedly protected speech by DoorDash. Rather, DoorDash concedes "[t]he BACP memo requesting this action, the Cohen Milstein retainer agreement, and the City's own description of its investigation show that the City investigated the 'meal-delivery industry.'" *See* [ECF No. 121] at 8. It is difficult to see how the City's retention of counsel to investigate DoorDash as well as other meal delivery companies evidences the City's supposed animus towards DoorDash because DoorDash voiced opposition to the Commission Cap Ordinance or instituted the Chicago Fee.

Further, the City retained counsel to investigate DoorDash *and other meal delivery services* four months after DoorDash instituted its Chicago Fee and the City sued Door Dash *and another meal delivery company* nearly nine months after DoorDash imposed its Chicago Fee. This does not raise a credible inference of discriminatory intent by the City towards DoorDash. Moreover, if this timing could support an inference of discriminatory intent, and the Court does not believe it does, then it is a very weak inference on this record and the discovery DoorDash has served

20

in support of a defense based on this inference is overbroad and not proportional to the needs of this case.

In addition, even if DoorDash's "change in course" theory of animus (*i.e.*, the City "proffered no reason for the abrupt shift" in its dealings with DoorDash, [ECF No. 121] at 13)) was supported by the cited evidence, the Court notes the absence of authority that such a purported reversal in position by a government agency is cognizable evidence of the discriminatory intent necessary to establish a colorable basis for broad discovery into what motivated the City in this action on the record before it. DoorDash relies on a single decision, *United States v. Heidecke*, 900 F.2d 1155 (7th Cir. 1990), to support this change of position theory. [ECF No. 121] at 12-13. *Heidecke* does not support DoorDash's argument. In *Heidecke*, the U.S. Attorney's Office had initially declined to pursue corruption charges against the defendant, but subsequently changed course after a state court indictment against that defendant was dismissed on technical grounds. *See id.*, 900 F.2d at 1158-59. The defendant asserted a vindictive prosecution defense, arguing "more serious federal charges were brought against him for exercising his statutory and constitutional rights" to obtain the state court dismissal. *Id.* The district court did not allow the defendant any discovery on this defense (applying the same colorable basis standard applicable here), and the Seventh Circuit affirmed, concluding the defendant was *not* entitled to any discovery because there was a "rational reason" for the federal indictment – namely, the dismissal of the state charge and the government's interest in addressing corruption. *See id.*, at 1159–60. Thus, the Seventh Circuit *rejected* the defendant's

21

theory in that case that the government's change in course to pursue federal charges sufficiently evidenced discriminatory intent. *Id.*

Here, as in *Heidecke*, the playing field changed between the time DoorDash says it enjoyed open communications with the City and when the City decided to prosecute it following the enactment of the Commission Cap Ordinance and DoorDash's imposition of the Chicago Fee. The rules governing third-party meal delivery companies were the subject of public comment and concern during the pandemic. There was a significant gap in time between DoorDash's imposition of the Chicago Fee and its comments about why it needed to impose that fee, and the City's lawsuit. The City also is asserting broader and different claims in this case than were the subject of the BACP investigation under the Third-Party Rules. Against this background, it is difficult to show the City had no rational basis to investigate DoorDash and file this lawsuit.[6]

In *United States v. Sanders*, the Second Circuit rejected a similar (and perhaps stronger) argument than the one DoorDash makes here, "that the chronology of events leading up to [defendants'] indictment was evidence of the government's animus." *See id.*, 211 F.3d 711, 718–19 (2d Cir. 2000) (affirming denial of discovery on a vindictive prosecution defense applying the "some evidence" standard). The court

---

[6] The City was not alone in its attention to regulating third-party meal delivery companies. *See, e.g.*, [ECF No. 158] at 5 (citing recent Illinois statute addressing similar conduct as the City alleges in its Complaint, 815 Ill. Comp. Stat. Ann. 338/10); Third-Party Delivery Brief, Ex. D to McCloskey Decl. [ECF No. 124] (describing actions taken during early days of the pandemic in various jurisdictions); DoorDash's November 25, 2020 blog post, Ex. AA to McCloskey Decl. [ECF No. 134-27] (referencing commission cap regulations passed by various jurisdictions).

found the fact that the government's "aggressive investigation commenced immediately following publication" of a newspaper article describing the defendants' theories and accusing the FBI and NTSB of wrongdoing was not sufficient evidence to meet the colorable basis standard. *Id.* The court reasoned, "[e]ven assuming that the defendants were a thorn in the government's side, it does not follow that they were punished because they may have drawn blood." *Id.* The court also noted the article had indicated the defendants there potentially had violated the law (by taking unauthorized samples from the plane wreckage) and thus "the government's decision to investigate cannot give rise to an inference of impropriety." *Id. See also Wayte v. United States*, 470 U.S. 598, 610 (1985) ("petitioner has not shown that the Government prosecuted him because of his protest activities").

DoorDash acknowledges that the Commission Cap Ordinance was "controversial and debated in public." [ECF No. 121] at 3. This shows the City may have had rational reasons to investigate DoorDash's imposition of the Chicago Fee or its other conduct given the substantial public interest at the time in the fees charged by third party food delivery companies regardless of what DoorDash said about the Chicago Fee or the new City ordinance. *See* Ex. N to McCloskey Decl.[ECF No. 134-14] (discussing efforts in April 2020 by Chicago Mayor Lightfoot and the Illinois Restaurant Association to address the commission fees charged to restaurants by third-party delivery platforms); *see also* Ex. K to McCloskey Decl. [ECF No. 134-11] (Consumer Reports article finding, notwithstanding the quote attributed to BACP, that DoorDash's commission disclosure in a range up to 30% was "vague and also

potentially noncompliant" with Chicago's rules, and noting "[w]ith DoorDash . . . fee line items like 'service fees and taxes' are bundled together with an inconspicuous user interface (UI) element where users have to click 'information icons' to see more," concluding "[a]ll companies can do better to improve fee transparency and increase company accountability by avoiding dark design patterns"). The City also alleges DoorDash's "Chicago Fee" was deceptive and misleading to consumers by suggesting the City (rather than DoorDash) imposed the fee, which also can be seen as a rational prosecutorial theory and not an irrational, invidiously discriminatory allegation regardless of the ultimate merit of that claim. [ECF No. 110] at 6 (citing Complaint at ¶ 58).

The Court also is not persuaded by DoorDash's focus on Alderman Waguespack's comments. Chicago Alderpersons do not have authority to investigate or file enforcement actions on the City's behalf. *See* [ECF No. 110] at 6. *See also Goulding,* 26 F.3d at 662 (even if defendant showed agents harbored ill-will towards him, defendant "failed to demonstrate that these agents had any influence on the bringing of this prosecution"). City Council members are part of the legislative branch of the City's government, not the executive branch. *See* https://www.chicago.gov/city/en/about/council.html. DoorDash does not argue that Alderman Waguespack was part of the decision-making process that culminated in the City filing this lawsuit. So, it is a leap to say that Alderman Waguespack's alleged discriminatory animus infected the City's prosecutorial discretion when the Alderman was not in that chain of command. It appears the City quoted Alderman

Waguespack's public comments about the Chicago Fee in its Complaint to support its allegation that the Chicago Fee could be interpreted as having been imposed by the City. *See* Complaint at ¶ 59. That the Alderman made public statements about matters the City characterized in its Complaint as deceptive or unlawful conduct does not show the Alderman had a hand in the City's filing of this case. Nor is it evidence of the City law department's alleged discriminatory animus.

For those reasons, the circumstantial evidence of animus present in *United States v. McGraw-Hill Companies, Inc.*, No. CV 13-779-DOC JCGX, 2014 WL 1647385, at *12 (C.D. Cal. Apr. 15, 2014), relied on by DoorDash, is entirely distinguishable from what DoorDash proffers here. *See* [ECF No. 121] at 12. In that case, the court found defendant Standard & Poor's Financial Services LLC (S&P) had presented sufficient evidence of discriminatory intent to justify discovery as to the government's motivations for targeting S&P (and not the other two major credit rating agencies) with a complaint alleging it improperly rated certain mortgage-backed securities. *Id.* at *1-2, 12. The circumstantial evidence in that case included communications by then Secretary of the Treasury Timothy Geithner in response to S&P's downgrade of its credit rating of United States debt criticizing "S&P's history of errors and promising that its conduct would be 'looked at very carefully'" all "levied . . . just minutes after speaking to other executive officials, including President Obama." *Id.* at *12. While the court noted "Secretary Geithner's statements are susceptible to several interpretations and it is unclear whether there is a nexus between his displeasure and the Department of Justice's litigation decisions," this

evidence met the colorable basis standard by tending to show the existence of an improper purpose. *Id.* Here, statements by a non-decisionmaker outside the executive branch of government criticizing DoorDash are hardly akin to the circumstantial evidence in *McGraw-Hill Companies*, where a Treasury Secretary with substantial influence in the executive branch threatened to look carefully at a defendant's misconduct minutes after meeting with the President of the United States, the head of the executive branch of the government. *Compare Heidecke*, 900 F.2d at 1160 ("Beyond certain common personnel in the state and federal prosecutorial offices and the possibility that some of these personnel may have spoken with the United States attorney regarding a potential indictment, Heidecke offers no hard facts indicating a realistic likelihood of governmental misconduct.").

For all these reasons, the Court is not persuaded that DoorDash is entitled to a colorable inference of discriminatory intent, a necessary element of its selective prosecution theory, based on the arguments it has presented in opposition to the City's Motion. Moreover, again, even if such an inference on the evidence of record, could be seen as justified, it is extremely weak and cannot justify the broad discovery DoorDash is seeking from the City. (The breadth of DoorDash's discovery requests is discussed more fully below in Section II.B of this Memorandum Opinion and Order.)

**5) DoorDash theory of discriminatory effect also is unavailing.**

Even if the Court were to credit DoorDash with having made a colorable showing as to the City's discriminatory intent, DoorDash also must demonstrate a colorable basis of the discriminatory effect of the City's enforcement action to support its selective prosecution theory. In order to do so, DoorDash must show the City did

not take enforcement action against other companies similarly situated to DoorDash. Perhaps recognizing that it cannot make such a showing given that the City investigated and took action against other large meal delivery platforms like Grubhub and Uber Eats, DoorDash argues it is entitled to the discovery it is seeking based solely on its showing of discriminatory intent. Alternatively, DoorDash seeks to reshape the similarity situated analysis, arguing that the proper comparator to DoorDash for these purposes is Beyond Menu, a much smaller company which, like DoorDash, the BACP ostensibly found was complying with the Third-Party Rules but which, unlike DoorDash, the City did not sue. Neither of these approaches is persuasive.

DoorDash argues it need not show disparate treatment in a one-to-one comparison with other meal delivery companies because the City's "animus is readily obvious." [ECF No. 121] at 14. As explained above, though, the Court disagrees with that hypothesis. In addition, DoorDash's circumstantial evidence of animus here is not analogous to or as strong as the direct evidence of hostility in the cases DoorDash cites for the proposition that discriminatory intent is enough to justify the discovery it seeks. *See Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (reversing grant of summary judgment on equal protection claim; finding evidence of direct animus against plaintiffs was sufficient to state a "class-of-one equal protection claim" without additional evidence of disparate treatment where mayor, who lived next door to plaintiffs, objected to plaintiffs' home renovations and "abused his powers as mayor in order to pursue his vendetta against plaintiffs"); *Olson v. California*, 62

F.4th 1206, 1219 (9th Cir. 2023) (reversing dismissal of equal protection claim where plaintiffs plausibly alleged "the primary impetus for the enactment of" a statute regarding employee classification status "was the disfavor with which the architect of the legislation viewed Uber, Postmates, and similar gig-based business models"). The facts in these cases were much different than the facts here, the cases arose in a different procedural context, and neither addressed the standard for seeking discovery on a selective prosecution defense.

Here, the City pursued enforcement measures against other third-party meal delivery companies, such as Grubhub and Uber Eats, that are similarly situated to DoorDash. It filed an enforcement action against Grubhub on the same day it filed this action against DoorDash and it settled with Uber Eats for $10 million. [ECF No. 110] at 5. DoorDash, however, argues this is the wrong metric by which to measure the City's actions. DoorDash says that Grubhub and Uber Eats are not similarly situated to it "in terms of compliance with [the City's] statutes," [ECF No. 121] at 14, pointing again to the September 2020 Consumer Reports article in which the BACP was quoted as saying only DoorDash and a smaller meal delivery platform, Beyond Menu, were in compliance with the City's earlier regulations on commission disclosures (and, presumably, GrubHub and Uber Eats were not). [ECF No. 121] at 14. DoorDash says the disparate impact analysis, if necessary for it to pursue the discovery it is seeking, should center on why the City pursued this action only against it after the BACP determined that both it and Beyond Menu were substantially in compliance with those regulations.

This convoluted argument also does not hold water. Critically, DoorDash does not argue that it and Beyond Menu are similarly situated in ways that matter in the context of the City's claims in this lawsuit. That the City sued DoorDash as one of two meal delivery companies the BACP was quoted by Consumer Reports as being in substantial compliance with the Third-Party Rules, in a lawsuit alleging that DoorDash was violating other laws and regulations than were the subject of the BACP investigation at that time, makes no sense from a discriminatory effect standpoint. Nowhere does DoorDash allege that Beyond Menu is or was susceptible to the same kind of allegations the City has leveled against it in this lawsuit. The same goes for DoorDash's argument that the City treated it dissimilarly from other smaller companies, such as ezCater, EatStreet, and ChowNow, that the City found were not complying with the Third-Party Rules. [ECF No. 121] at 4. The City alleges DoorDash engaged in deceptive conduct beyond the matters that were the subject of the BACP investigation during the summer of 2020 and DoorDash does not argue these other companies are similarly situated to DoorDash in that respect.

Simply stated, DoorDash does not argue that other similarly situated companies were not prosecuted despite engaging in similar conduct allegedly in violation of the law that DoorDash is accused of violating. And that is the critical basis of comparison for purposes of discrimination. *See United States v. Monsoor*, 77 F. 3d 1031, 1034 (7th Cir. 1996) (selective prosecution defense "requires a showing that the defendant '(1) … [was] singled out for prosecution while other violators similarly situated were not prosecuted . . .'") (internal citations omitted) (affirming

decision that defendant was not similarly situated "vis-a-vis the federal charges" to other non-charged parties because the government lacked evidence supporting the interstate transport element of the federal Lacey Act as to those parties, while the government was able to link the defendant to such interstate transportation).

Further, even if the City decided not to sue smaller companies it found to be in violation of the Third-Party Rules (*e.g.*, ezCater, EatStreet, and ChowNow), or a smaller company that it had found to be in compliance with those Rules (*e.g.*, Beyond Menu), and to instead sue DoorDash in the instant case because it allegedly is a larger, wealthier company with a greater share of the Chicago market, that is not something that moves this case into the realm of a colorable basis for an unlawful selective prosecution defense. *See* [ECF No. 158] at 2-3 (noting Beyond Menu delivers from only 61 restaurants, compared to the 850 restaurants from which DoorDash delivers). In *Esmail v. Macrane*, the Seventh Circuit explained there was no basis for a selective prosecution claim under equal protection law based on the government's "effort . . . to get the most bang for the prosecutorial buck by concentrating on the most newsworthy lawbreakers," notwithstanding that such enforcement decisions may result in "dramatically unequal legal treatment." *Id.*, 53 F.3d 176, 178-79 (7th Cir. 1995). Accordingly, DoorDash has failed to make a colorable showing of discriminatory effect on the ground that the City did not pursue an enforcement action against Beyond Menu, a company that DoorDash does not contend is violating any laws, or other smaller companies that DoorDash says did not comply with the

Third-Party Rules on commission disclosures which DoorDash, in any event, is not charged with violating in this case.

For all these reasons, the Court concludes DoorDash has not made the requisite colorable basis showing here to justify its wide-ranging discovery requests to the City. Moreover, again, it is important to note that to the extent the Court were to credit DoorDash's theory as presenting a colorable basis for its selective prosecution defense, that showing is extremely weak and does not in any event justify the very broad discovery DoorDash is seeking. As noted above, the Court addresses the breadth of DoorDash's discovery requests more fully in the next section of this Memorandum Opinion and Order. That analysis of the scope of DoorDash's discovery requests, in the context of DoorDash's argument that its discovery requests are relevant to other claims and defenses, applies equally to the discovery DoorDash is seeking on its selective prosecution defense because DoorDash acknowledges the same interrogatories and requests for production seek information about that defense and its other defenses as well. [ECF No. 121] at 1, 5.

Moreover, as Judge Gettleman recognized in *United States v. Paxton*, No. 13 CR 103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014) (relied on by DoorDash, *see* [ECF No. 121] at 12, 15), additional restrictions on the scope of discovery can be necessary even where the colorable basis threshold requirement is satisfied. *See id.*, 2014 WL 1648746, at *5-6 (quoting *Armstrong*, 517 U.S. at 468, noting although defendants met their burden to make "a sufficient showing to entitle them to discovery" the scope of the discovery was "broader than necessary" and ordering the

parties to further meet and confer). That is certainly the case here, where DoorDash's discovery related to its selective prosecution defense is vastly overbroad, seeking disclosure of all the City's documents and internal investigation files related to DoorDash as well as any third-party delivery company, including all internal communications within the City's legal department, a category of documents that is likely to be largely or significantly insulated from production by the attorney client privilege and work product doctrine. *See*, *e.g.*, Brian E. Bowcut Declaration in Support of Motion for Protective Order [ECF No. 110-1] ("Bowcut Decl.") at Exs. 1, 5, 7, 9 (RFP No. 6 (all documents "related to [the City's] decision to file this action against DoorDash"); RFP No. 11 (all documents related to investigations of DoorDash); RFP No. 8 (all communications relating to DoorDash); RFP No. 50 (all communications and public statements by the City regarding third party meal delivery companies). This discovery is extremely broad given the Court's assessment of the basis for DoorDash's selective prosecution defense. DoorDash's broad discovery requests cannot be said to be proportional to the needs of this case within the meaning of Federal Rule of Civil Procedure 26(b)(1). Therefore, the City has shown good cause for the protective order it is seeking at least as to its selective prosecution defense. FED.R.CIV.P 26(c) and 26(b)(2)(C).

Finally, the Court recognizes that its analysis of whether DoorDash has shown a colorable basis for the broad discovery it is seeking on its selective prosecution affirmative defense overlaps to some extent with whether DoorDash can succeed on that defense as a matter of law, an analysis that is beyond the scope of this discovery

referral and this decision on the City's motion for a protective order. But the Court's analysis today also is different in critical respects from a full merits analysis. The Court's ruling today in the context of a discovery dispute is not intended to dispose of the merits of DoorDash's selective prosecution defense as a matter of law, and that issue is not before the Court at this time. In addition, the Court notes that nothing in today's ruling is intended to foreclose DoorDash from using documents it may obtain in discovery on its other affirmative defenses to support its selective prosecution defense to the extent it can do so. The Court's ruling today is only that DoorDash has not shown a colorable basis for its selective prosecution defense on the record now before the Court, and thus it cannot pursue the discovery it is seeking on that defense. The Court will address below whether DoorDash can proceed with its discovery requests as potentially relevant to other claims, defenses, and issues in the case as it argues it should be able to do.[7]

## B. Relevance of DoorDash's Discovery Requests to Other Claims, Issues, and Defenses

As noted above, DoorDash argues it need not satisfy the colorable basis standard because its discovery is relevant to other claims, issues, and defenses. [ECF

---

[7] DoorDash also argues the City failed to show it will be harmed if it is required to respond to discovery related to the selective prosecution defense. [ECF No. 121] at 14-15. This argument fails because the colorable basis standard is a threshold requirement that must be satisfied before DoorDash is entitled to *any* discovery on its selective prosecution defense. Moreover, as alluded to above and discussed more fully below, DoorDash's far-reaching discovery into the City's deliberations about and decision to file an enforcement action, its motive in pursuing DoorDash, and its investigation of other third-party delivery companies is very broad and, in the Court's view, burdensome and disproportionate to the discovery needs of this case given DoorDash's failure to produce convincing threshold evidence of the City's alleged discriminatory intent and discriminatory effect, essential elements of the selective prosecution defense DoorDash asserts.

No. 110] at 2. The dispute centers on the City's refusal to produce categories of documents it says are relevant "principally" to the selective prosecution defense and thus not significantly relevant to other issues in the case, including (1) the City's internal investigation communications and documents related to this enforcement action against DoorDash; (2) requests related to the City's motive in bringing this action; and (3) documents related to the City's investigation and enforcement decisions regarding third-party delivery companies. [ECF No. 110] at 1-2. The City does not seem to dispute that these requests are relevant to other claims or defenses in this case, but it contends it has already produced sufficient relevant and proportional information in response to many of DoorDash's discovery requests (referencing the City's responses to Interrogatory No. 2, and RFP Nos. 6, 11, 41, 8, 42, 43, 50, 54, and 65). [ECF No. 110] at 9-11.

DoorDash, in turn, acknowledges the City has produced some responsive documents relevant to its other defenses, but contends the City's production is incomplete because it does not include (1) the City's "full investigatory file" with "records of interviews" with restaurants, a privilege log for withheld investigation documents, and communications between City employees and with third parties regarding DoorDash; (2) documents related to the City's investigations of other third-party meal delivery platforms; (3) discovery regarding the City's 2020 Third-Party Food Delivery Services Rules and Commission Cap Ordinance; and (4) documents related to the City's motive in investigating DoorDash. [ECF No. 121] at 6-11. The Court addresses each of these categories below (first as to categories (2) and (3), and

then categories (1) and (4) together, regarding the DoorDash investigation). The Court also notes, however, that while DoorDash justifies some of its discovery requests as relevant to other affirmative defenses and claims made by the City, the bulk and thrust of DoorDash's arguments in briefing the City's Motion [ECF No. 121] are about justifying its selective prosecution defense.

### 1) Discovery regarding the City's investigations and enforcement actions as to other third-party delivery companies.

The Court first addresses the relevance of DoorDash's discovery requests concerning the City's investigations and enforcement decisions involving other third-party delivery platforms (Interrogatory No. 7 and RFP Nos. 7, 12, 23, 50, 69, and 70). The City has refused to produce its investigation materials related to other third-party delivery companies in response to these requests. *See* [ECF No. 110] at 9-12; [ECF No. 134-20] at Ex. T (at Interrogatory No. 7 and RFP Nos. 7; 12; 23; 69; and 70); [ECF No. 121] at 8 (also identifying RFP No. 50). DoorDash first says it is entitled to such discovery because "the City's investigation of DoorDash was combined with its investigation of other third-party platforms," suggesting the City is withholding documents that do not "mention DoorDash" [ECF No. 121] at 8, thus leaving the Court with the understanding that the City has produced documents that do reference DoorDash. This explanation, however, begs the question of why documents discussing the investigation of companies other than DoorDash are relevant to the claims and defenses in this case.

DoorDash then contends this discovery, particularly with respect to the fees charged by other meal delivery companies, is relevant to whether DoorDash's fees are

deceptive to the reasonable consumer. [ECF No. 121] at 8-9. The City responds that industry-wide misconduct is not a defense to consumer protection claims and further notes DoorDash has access to publicly available information about how other meal delivery companies do business, making DoorDash's requests for all investigation materials "extraordinarily overbroad and burdensome" if the issue is consumer knowledge of industry practices. [ECF No. 110] at 14; [ECF No. 158] at 11-12.

The Court finds DoorDash has not sufficiently articulated how the City's investigation of other meal delivery companies is relevant to the issue of consumer knowledge in this case or proportional to the discovery needs of this case. Whether other industry players are or are not doing what DoorDash is accused of doing is largely irrelevant to whether what DoorDash is doing violates the law. The decision upon which DoorDash primarily relies for this argument, *Fuchs v. Menard, Inc.*, No. 17-CV-01752, 2017 WL 4339821, at *4 (N.D. Ill. Sept. 29, 2017), involved more than just whether "other industry players do the same." [ECF No. 121] at 9. Rather, the court found, among other relevant factors, the lumber labels at issue were not deceptive as a matter of law because the National Institute of Standards and Technology, the federal agency tasked with developing industry standards for the lumber industry, endorsed the use of labels bearing the "customary trade names" for lumber (*i.e.*, a "4 x 4"), notwithstanding that those dimensions were not the actual size of the lumber after finishing. *Fuchs*, 2017 WL 4339821, at *4. That is a markedly different fact situation than in this case.

DoorDash also argues discovery about other third-party platforms is relevant to its Eleventh Affirmative Defense as to the "appropriate amount" of any potential penalties in this case. [ECF No. 121] at 9. DoorDash's Eleventh Affirmative Defense alleges "the penalties and fines sought" by the City are unconstitutional under the Excessive Fines clause of the Eighth Amendment and the Due Process clause of the Fourteenth Amendment. The City says fines levied against other companies or the nature of other companies' conduct are not typically among the factors courts consider in determining whether civil penalties like those at issue here are proportional to the offenses at issue. Instead, courts analyze that issue under the Excessive Fines clause of the Eighth Amendment in terms of proportionality, not comparability. *See Grashoff v. Adams*, 65 F.4th 910, 917 (7th Cir. 2023) (in case involving fraudulent claim for unemployment benefits where amount of penalty was claimed to be in violation of the Excessive Fines clause, court considered factors including "the 'essence of the [offense] and its relation to other criminal activity'"; "whether the sanctioned person 'fit[s] into the class of persons for whom the statute was principally designed'": "the 'maximum sentence and fine that could have been imposed' for like conduct; and "'the nature of the harm caused by the ... conduct'" to determine whether a government sanction "is 'grossly disproportional to the gravity of [the] ... offense'") (internal citations omitted), 12; *see also* [ECF No. 158] at 7.

DoorDash argues courts do consider the amounts of compensatory or punitive damages awarded in other cases, citing decisions considering a remittitur of a jury's damages award or analyzing punitive damages awards for excessiveness under the

Due Process clause. *See* [ECF No. 121] at 9 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996) (when analyzing whether punitive damage award was excessive under Due Process clause, courts should compare the award to the amount of civil or criminal penalties that could be imposed for comparable misconduct, noting "a reviewing court . . . should 'accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue'"); *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995) (reviewing compensatory damages award, including "whether the award is roughly comparable to awards made in similar cases") (citing *Littlefield v. McGuffey*, 954 F.2d 1337, 1348 (7th Cir. 1992) for proposition that damages award cannot be vacated "for excessiveness unless it is 'monstrously excessive' or there is 'no rational connection between the evidence on damages and the verdict......'"); *Williams v. Patel*, 104 F. Supp. 2d 984, 999 (C.D. Ill. 2000) ("awards of punitive damages in similar cases serve as a guideline for courts in determining whether to order a remittitur," citing *Bogan v. Stroud*, 958 F.2d 180, 186 (7th Cir. 1992)).

There are differences between the fines the City seeks to collect from DoorDash in this case and the awards of compensatory or punitive damages in the cases DoorDash cites.[8] But the Court does not need to decide whether the relief the City is seeking in this case opens up discovery into all the fines the City has assessed in other enforcement contexts because DoorDash does not explain why the information the

---

[8] The Court recognizes the City also is seeking restitution and disgorgement of profits in its Second Cause of Action in its Complaint but the parties do not mention that in their briefs on the City's Motion.

City already has produced is not sufficient for its purposes, or why that information does not enable it to make more focused requests for information about fines levied in other enforcement actions. The City says it has produced sufficient responsive information on this topic: a spreadsheet with over 17,000 entries detailing administrative actions where fines were assessed or awarded under specific MCC provisions identified by DoorDash, as well as a spreadsheet describing all fines imposed on meal delivery companies under MCC § 2-25-090. *See* [ECF No. 158] at 7, 12-13; [ECF No. 158-1] at ¶¶ 5 & 12, and Ex. 6. The City notes there is no discoverable information about fines as to its investigations against Grubhub and Uber Eats given the procedural posture of those disputes. [ECF No. 158] at 13.[9]

Finally, even if additional information about the City's investigatory actions against other delivery companies might be seen as relevant in some way, DoorDash's discovery requests are very broad and all-inclusive which renders them disproportional to the discovery needs of this case. For example, even if fines levied against other meal delivery companies could be seen to be of some relevance here, the Court finds it difficult to believe that production of all of the City's investigative materials for the "meal-delivery industry" would be proportional to the needs of this case, but that is what DoorDash is asking the City to produce. *See* [ECF No. 121] at 8 (arguing the City should produce its investigation files on the "meal-delivery

---

[9] DoorDash finally claims the City "conceded the relevance" of this discovery because the City requested DoorDash's internal documents comparing DoorDash's fees to those of its competitors. [ECF No. 121] at 9. The Court does not view the City's request for DoorDash's internal analysis of its own fees as analogous to DoorDash's overly broad demand for all of the City's investigation materials related to any third-party delivery company, regardless of the nature of the conduct at issue in those investigations.

industry" because "the City's investigation of DoorDash was combined with its investigations of other third-party platforms"). It also appears to the Court that some information about the business practices of other companies including their fees would be publicly available which means there likely is a less burdensome way for DoorDash to obtain at least some of the information it is seeking within the meaning of Federal Rule of Civil Procedure 26(b)(2)(C). There is no indication that DoorDash has tried to do so. DoorDash also does not explain why it needs access to the City's complete investigation materials of other companies for such information, simply standing on its broad requests for production as proper. As discussed, the Court disagrees those requests are proportional to the needs of this case.[10]

For these reasons, the Court agrees DoorDash has not adequately shown additional discovery about the City's investigation of other meal delivery companies, including the "full scope and factual findings of the City's investigation" of "the 'meal-delivery industry'", *see* [ECF No. 121] at 8, or additional information regarding fines imposed by the City on other third-party delivery companies beyond that which the City has already produced, is proportional to the needs of this case, particularly given

---

[10] The City asserts that it does not have an "investigative file" that "exists in a single folder in a Law Department cabinet" that it could readily produce. [ECF No. 158] at 9. Rather, the City says it has information it collected during its investigation of DoorDash (and presumably of other third-party delivery companies), as well as internal communications related to those investigations. [ECF No. 110] at 9-14. The City says it has produced non-privileged documents responsive to DoorDash's specific requests for information related to the City's investigation of DoorDash. [*Id.*] at 9-10. As discussed below in Sections II.B.3 & II.B.4 of this opinion, the City has not produced internal communications related to that investigation that the City says are not relevant to the merits of the allegations in the Complaint and are likely to be privileged. [*Id.*] at 9-10 & 15.

the apparent limited relevance of this information at this stage of the case. Therefore, the City's Motion is granted in this respect.

## 2) Discovery regarding the Third-Party Food Delivery Service Rules and the Commission Cap Ordinance (RFP No. 42).

DoorDash says the City's productions regarding the Third-Party Food Delivery Service Rules (previously identified herein as the Third-Party Rules) and the Commission Cap Ordinance is incomplete. [ECF No. 121] at 9-10. The underlying request, however, RFP No. 42, as written, is exceptionally broad, seeking "[a]ll documents related to [the City's] proposed and actual regulations, rules, or policies related to the fees, charges, and commissions third party food delivery companies can charge to restaurants." [ECF No. 110-1] at Ex. 6. But DoorDash characterizes this request as seeking only discovery relating to the City's Third-Party Rules and the Commission Cap Ordinance, claiming this discovery is relevant in part to DoorDash's waiver and laches defenses. [ECF No. 121] at 9-10. Still, the request as written, which DoorDash appears to stand on, seeks all documents relating even to the request as limited by DoorDash.

In its Reply, the City states it "will agree to conduct a reasonable search for documents related to BACP's investigation into Defendants' compliance with the Food Delivery Service Rules." [ECF No. 158] at 7. *See also* Joint Status Report filed July 28, 2023 [ECF No. 200] at 2 (the City agrees to "produce documents related to BACP's 2020 investigation of DoorDash as it relates to the Food Delivery Service Rules"). If the City is willing to produce documents related to the BACP's investigation of DoorDash in 2020, that may moot at least part of the dispute as to

the scope of RFP No. 42 regarding the Third-Party Rules, or it at least suggests the dispute may not be ripe for court resolution. *See also* [ECF No. 134-20] at Ex. T (DoorDash's summary of discovery requests, noting "the parties should negotiate as to an appropriate search methodology" for documents responsive to RFP No. 42).

Regardless, however, it still is not clear to the Court that expansive discovery into the City's investigation of how or whether other third-party meal delivery services complied with the Third-Party Rules, which the City does not accuse DoorDash of violating in this lawsuit, is relevant or proportional to the needs of this case. But the parties appear to be engaged in an ongoing effort potentially to right-size DoorDash's discovery requests in this area and those efforts should continue.

As to broad discovery about the Commission Cap Ordinance, [ECF No. 121] at 10, DoorDash also has not demonstrated the relevance or proportionality of that discovery. DoorDash claims restaurant commissions are "the basis for the City's claims related to menu pricing," [*id.*] (citing Complaint ¶¶ 8, 74), but the City does not allege that DoorDash violated the Commission Cap Ordinance. [ECF No. 158] at 14. DoorDash also argues such discovery is relevant to whether DoorDash's conduct is "unfair" under the Illinois Consumer Fraud Act, claiming its prior compliance with the Third-Party Rules could insulate it from the City's current claims about DoorDash's conduct. [ECF No. 121] at 9-10. For many of the same reasons as discussed in Section I above, this is a reach. Finally, even if DoorDash could show some limited relevance of discovery related to the Commission Cap Ordinance, its request for "all documents related to" this Ordinance is overbroad and not

proportional to the needs of this case.[11] For these reasons, the City's Motion as to RFP No. 42 is granted in part and denied in part without prejudice.

### 3) Discovery regarding the City's investigation of DoorDash, including internal communications and communications with third parties, and regarding the City's motive.

The City also seeks a protective order against discovery of the City's internal communications related to the DoorDash investigation and other documents regarding the City's motive in pursuing this action. [ECF No. 110] at 9-10. The discovery requests at issue include:

- RFP No. 6 (all documents "related to [the City's] decision to file this action against DoorDash")
- RFP No. 11 (all documents related to investigations of DoorDash)
- RFP No. 41 (all documents related to Business Affairs and Consumer Protection ("BACP") Commissioner determinations regarding DoorDash)
- Interrogatory No. 2 (identify all third parties the City communicated with regarding the DoorDash investigation)
- RFP No. 8 (all communications relating to DoorDash)
- RFP No. 43 (all communications and public statements by the City regarding the Chicago Fee)
- RFP No. 50 (all communications and public statements by the City regarding third party meal delivery companies)
- RFP No. 54 (all communications regarding DoorDash's December 2020 IPO)
- RFP No. 65 (all documents relating to BACP's correspondence with DoorDash in 2020 regarding compliance with the City's regulations)[12]

---

[11] Although DoorDash recognizes that the City does not claim DoorDash violated the Commission Cap Ordinance, DoorDash asserts this discovery is nonetheless relevant because in correspondence from June 2021, the City had claimed DoorDash violated the Ordinance *before* filing this lawsuit, [ECF No. 121] at 10. DoorDash fails to articulate why that makes documents related to this Ordinance relevant to the claims actually asserted in this case against which DoorDash must defend, and the Court does not see the connection either.

[12] Although DoorDash identifies three additional requests as relevant to the City's investigation of DoorDash (*see* [ECF No. 121] at 6), these requests are primarily related to the City's investigations of other third-party meal delivery companies (or appear duplicative

The City acknowledges "some evidence that the City collected during its investigation is relevant to the City's case-in-chief," but asserts the City's internal communications are not, claiming they do not prove or disprove any allegations about DoorDash's conduct. [ECF No. 110] at 9-10; [ECF No. 158] at 10. DoorDash responds it is entitled to the City's "full investigatory file" including records of interviews with restaurants and internal communications between City employees related to the investigation. [ECF No. 121] at 6-7. In addition, DoorDash says its requests for motive discovery are also relevant to its First Amendment and Due Process defenses (not only its selective prosecution defense) and it is entitled to discovery into the City's statements regarding DoorDash's Chicago Fee and IPO. [*Id.*] at 10-11.

It is difficult to justify such broad discovery in the context of this case. Some of DoorDash's requests are facially overbroad. *See* RFP Nos. 6, 8, 11, 50. *See Craigville Tel. Co. v. T-Mobile USA, Inc.*, No. 19 CV 7190, 2022 WL 17740419, at *2 (N.D. Ill. Dec. 16, 2022) ("even if the general subject matter of a request 'arguably might be relevant to the claims or defenses in this case, either in whole or in part,' requests that 'cover too much territory with language requiring [an entity] to produce 'all documents' 'that refer or relate to' a particular topic, or 'all communications' to the same effect' are facially overbroad.") (citing *Art Akiane LLC v. Art & SoulWorks LLC*,

---

of requests directed specifically to the DoorDash investigation). *See* [ECF No. 110] at 13 (describing Interrogatory No. 7, RFP No. 7, and RFP No. 12). These requests are addressed above. In addition, although DoorDash suggests RFP No. 42 is related to the City's motives as to its investigation of DoorDash, [ECF No. 121] at 6, 10, RFP No. 42 as written seeks discovery of any City proposed or actual regulations of third-party meal delivery companies. In that respect, RFP No. 42 is addressed above; to the extent it seeks discovery related to the City's DoorDash investigation, it is redundant of other requests. *See, e.g.*, RFP Nos. 6, 11.

2021 WL 5163288, *3 (N.D. Ill. 2021) and *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 2018 WL 4356594, at *3 (N.D. Ill. 2018)). Courts routinely prevent blanket discovery seeking "all" documents when producing the entire universe is clearly burdensome and cannot be said to be proportional to the needs of the case. Those cases are on point with this case. *See, e.g.*, *Jenkins v. White Castle Mgmt. Co.*, No. 12 C 7273, 2013 WL 5663644, at *3 (N.D. Ill. Oct. 17, 2013) (denying plaintiff's motion to compel in Fair Labor Standards Act for all "communications that discuss Jenkins's claims or White Castle's defenses" as "vague and overbroad"). "Language such as 'any and all' or 'including but not limited to' raise a red flag that the request is too broad." *Heckler & Koch, Inc. v. German Sport Guns GmbH*, No. 1:11-CV-1108-SEB-TAB, 2013 WL 5915196, at *2 (S.D. Ind. Nov. 1, 2013); (holding requests for "the production of 'any and all communications with Defendants' and 'any and all communications with third-parties related to investigations of Defendants []'" were overbroad and noting "[i]f such a request was appropriately narrowed (which would involve more than just deleting the 'any and all' language), discovery may be relevant, but even then it would be tangential.")

Nevertheless, on the record before it, the Court cannot conclude there are no categories of relevant and proportional discovery encompassed within DoorDash's broad requests identified above. The City does not dispute (nor could it) that documents and communications collected during its investigation of DoorDash are relevant; instead, it contends repeatedly, and convincingly, that the scope of DoorDash's requests is just too broad. [ECF No. 110] at 9 ("To be sure, some evidence

that the City collected during its investigation is relevant to the City's case-in-chief."). *See U.S. E.E.O.C. v. Source One Staffing, Inc.*, No. 11 C 6754, 2013 WL 25033, at *4 (N.D. Ill. Jan. 2, 2013) (noting deposition topic seeking information obtained by the EEOC during its investigation of defendant was "proper" but "[a]t this point in this case . . . the request for all information obtained during the EEOC's investigation of Source One in Topic No. 1 is overbroad" and referencing defendant's limit on this request to only non-privileged information).[13]

The City says it has produced some categories of responsive documents related to its investigation, including all non-privileged documents on which the Complaint was based (such as "news reports, information from Defendants' platforms, surveys, academic studies, and market data"); documentation of test orders by City investigators using the DoorDash platform; the City's communications with

---

[13] DoorDash argues *In re Marriott Int'l Customer Data Sec. Breach Litig.*, No. MDL 19 AND 2879, 2020 WL 6064589, at *1 (D. Md. Oct. 14, 2020) supports its requests for all investigation-related documents. [ECF No. 121] at 7. That case was a multidistrict litigation involving claims against Marriott concerning a data breach; the City of Chicago was one of the plaintiffs and sought relief under a local ordinance. *See City of Chicago v. Marriott Int'l, Inc.*, No. 19-2879, 2019 WL 6829101, at *1 (D. Md. Dec. 13, 2019). During discovery, the court ordered the City to produce all non-privileged documents responsive to defendant's requests seeking "all documents and communications related to the Data Security Incident, including but not limited to the 'communications sent to or received from the City of Chicago's Department of Business Affairs'" and "all documents and communications related to any investigation you conducted into the Data Security incident". *Id.* In its Reply, the City contends the circumstances in *Marriott* are distinguishable because the requests related to the defendant's affirmative defense that the City had failed to conduct a pre-suit investigation and there were no burden or relevance objections in dispute; instead, the issue was clarification of whether the City had withheld any documents on privilege grounds. [ECF No. 158] at 9. As this Court sees it, the circumstances in *Marriott* appear distinguishable and do not clearly support the proportionality of DoorDash's broad requests for all communications related to the City's investigation here, including to the extent a significant amount of any responsive documents are likely to be privileged. *See* [ECF No. 110] at 15. The Court separately addresses the privilege log issue below.

restaurants during the investigation; complaints about DoorDash submitted to the City; and Commissioner Escareño's request that Corporation Counsel file this action. [*Id.*]; *see also* [ECF No. 158] at 8. DoorDash, in response, says the City has not produced all responsive documents related to its investigation, including the City's records of interviews with restaurants, or "*virtually any* relevant communications between City employees." [ECF No. 121] at 7 (emphasis in original).

As to the investigation-related documents, it is unclear to the Court precisely what has been produced, whether there are additional relevant documents or information that yet may be produced by the City, or whether further discussion between the parties could appropriately narrow the scope of some of the requests. For example, as to restaurant interviews, the City does not appear to dispute these are relevant and responsive, but rather contends it does not have any "transcripts or audio recordings" of those interviews and that it "already told Defendants" any other responsive documents related to the interviews are privileged work product (such as notes taken by the City's legal team). [ECF No. 158] at 10. Among other things, it is not clear what, if any, documents the City has produced in response to this request, or whether the City has produced a log of material being withheld on the basis of the attorney client privilege or work product doctrine that satisfies its burden to assert any privilege against production in a way that DoorDash can understand and evaluate. FED. R. CIV. P. 26(b)(5).

The City also appears to have agreed to produce at least some third-party communications related to DoorDash (*see* Joint Status Report filed August 18, 2023

[ECF No. 202] at 2 ("The City is also in the process of searching for and reviewing communications between the City and certain third parties . . ."), but DoorDash says it "believes" the City communicated with additional third parties, including "certain restaurant groups and public relations agencies." *See* [ECF No. 134-20] at Ex. T (RFP No. 8 and Interrogatory No. 2). Again, it is unclear whether or to what extent the City is refusing to produce responsive communications with other third parties or whether the parties have satisfied their Local Rule 37.2 obligations in this area.

As to RFP No. 43, regarding the Chicago Fee, the City says it "offered to conduct a targeted search for internal and external BACP communications about the 'Chicago Fee'." [ECF No. 110] at 11. While DoorDash does not acknowledge this offer in its Response, DoorDash also describes a dispute as to which custodians' accounts should be searched for documents responsive to RFP No. 43 in its supporting declarations and exhibits. McCloskey Decl. at ¶ 5 [ECF No. 134]; Ex. T to McCloskey Dec. [ECF No. 134-20]. This issue is not addressed in the Motion, however, perhaps because, as noted above, the briefing was focused primarily on the selective prosecution defense, and it appears the parties may need to meet and confer further on this request.

Beyond these BACP communications, DoorDash argues that the City should also produce, in response to RFP No. 43, "statements that may show the City investigated and prosecuted DoorDash because of DoorDash's speech regarding the Commission Cap Ordinance and the Chicago Fee," even if it does not satisfy the colorable basis standard, because this discovery is independently relevant to its First

Amendment and due process affirmative defenses. [ECF No. 121] at 11. DoorDash does not explain how its First Amendment defense is meaningfully distinct from the selective prosecution defense, which also is premised on the exercise of its First Amendment rights. *See* [ECF No. 158] at 6. In the Court's view, DoorDash's ability to take discovery related to the First Amendment defense as it is framed in this case thus still requires a colorable basis showing. *See Wayte*, 470 U.S. at 604, 608 (applying a colorable basis standard for discovery in case involving a claim that "'vocal' opponents" of Selective Service registration "had been impermissibly targeted . . . for prosecution on the basis of their exercise of First Amendment rights"). The Court also does not agree that the discovery sought in RFP No. 43 is independently relevant to DoorDash's due process affirmative defense. *See* [ECF No. 121] at 11. That defense, as pled, addresses whether "the City has failed to adequately safeguard against the biasing effect of the contingency fee relationship," [ECF No. 61] at 143, and that is also how DoorDash explained this defense in its Motion to Compel. *See* [ECF No. 94]. DoorDash has not articulated how communications regarding the Chicago Fee are relevant to this defense and the Court does not see the connection. *See also* [ECF No. 158] at 7-8.

With respect to RFP No. 65 (which seeks BACP's correspondence with DoorDash in 2020 regarding the Third-Party Rules), the City initially only agreed to produce responsive communications with DoorDash. *See* [ECF No. 110] at 11; [ECF No. 134-20] at Ex. T. In its Reply, however, the City now also has agreed to a "reasonable search for documents related to BACP's investigation into Defendants'

compliance with the Food Delivery Service Rules." [ECF No. 158] at 7; *see also* Joint Status Report filed on August 18, 2023 [ECF No. 202] at 2 (stating the City's August 11, 2023 production included "correspondence between DoorDash and [BACP] regarding compliance with the City's requirements for consumer disclosures by third-party meal delivery companies" responsive to RFP No. 65); [ECF No. 121] at 7 n.1 (noting the City agreed to produce communications with Consumer Reports regarding DoorDash but only on the afternoon DoorDash's response brief was due). Accordingly, it is unclear whether any dispute remains as to RFP No. 65 and, if so, the parameters of that dispute. Therefore, the City's Motion is denied without prejudice as to these discovery requests.

### 4) Proportionality of DoorDash's discovery regarding the City's investigation of DoorDash and the City's motive.

Even if DoorDash has established some additional subset of documents related to the City's investigation may be relevant to the claims or defenses in this case, that discovery must also be proportional to the needs of the case. Nothing in this Memorandum Opinion and Order should be construed as preventing the parties from continuing to meet and confer about DoorDash's discovery requests or from limiting those requests more than DoorDash seems to have done to date. For reasons that should be plain by now, however, Court is not inclined to give DoorDash the extensive leeway it wants to pursue the type of broad discovery it seems intent on pursuing – including, for example, production of the City's investigation files for any other third-party meal delivery company, or production of all of the City's documents related to the City's proposed and actual regulations, rules, or policies related to the fees

charged by third-party food delivery companies to restaurants, or, for that matter, although somewhat more targeted, all documents related to the institution of the Commission Cap Ordinance. But it is up to DoorDash, or the City and DoorDash in their Local Rule 37.2 discussions, and not the Court in the first instance, to right-size the discovery requests that are that are the subject of the City's Motion.

With particular respect to the burden posed by DoorDash's broad discovery requests, the City focuses on the largely privileged nature of most of the documents sought in DoorDash's requests. The City argues requiring it to search and log every internal communication its legal staff had regarding the DoorDash investigation would be overly burdensome. [ECF No 110] at 9, 15 ("[a] test search in the files of four City attorneys . . . returned more than 5,700 documents, which would take an estimated 176-286 attorney hours to review and log"). DoorDash does not appear to dispute the City's assertion that "the vast majority of such documents will be privileged communications and/or work product," [ECF No. 110] at 15, but DoorDash nonetheless contends the City should be required to produce a privilege log for all such communications, characterizing this as "nothing more than ordinary litigation costs attendant with any civil action." [ECF No. 121] at 6-7, 15.

The City is of course obligated to produce a privilege log in compliance with Rule 26(b)(5), but requiring a log of all the City's internal legal department communications related to this investigation does not strike the Court as "ordinary" discovery, *see* [ECF No. 158] at 15, and the Court shares the City's concern with the likely burden of such an endeavor. In its Reply, the City proposes another option,

stating it should be allowed to provide a privilege "log appropriate for categorically privileged materials" to the extent it is obligated to produce internal communications. [ECF No. 158] at 11. The Court agrees that may be an appropriate way to proceed to the extent the City is suggesting it can produce a privilege log as to categories of documents that identifies the type of documents and their content sufficiently for DoorDash (and the Court if necessary) to understand what is being withheld. The parties should meet and confer about a categorical privilege log the City may be obliged or able to produce in the wake of the rulings in this Memorandum Opinion and Order.[14]

## III. CONCLUSION

Accordingly, for all these reasons, Plaintiffs' Motion for Protective Order [ECF No. 110] is granted in part and denied, without prejudice, in part. The Motion is granted as to discovery related solely to the selective prosecution affirmative defense and the First Amendment defense; and granted as to any additional discovery related to the City's investigation of other third-party meal delivery companies and the Commission Cap Ordinance beyond what the City already has produced or agreed to produce in response to Interrogatory No. 7 and RFP Nos. 7, 12, 23, 42, 50, 69, and 70. The Motion is denied in part, without prejudice, as to certain of the additional

---

[14] DoorDash also claims any burden on the City is mitigated because investigatory documents have already been collected, citing *Paxton*, 2014 WL 1648746, at *5, but the circumstances in that case are distinguishable. There, the government had already produced "some of the same discovery materials" that were sought in another pending case, thus "somewhat mitigat[ing]" production costs. *Id.* DoorDash does not explain why that reasoning would apply in this case in which, as far as the Court can tell, there is no other pending case in which the City previously produced the material DoorDash is seeking here. *See* [ECF No. 158] at 15.

categories of discovery related to the City's investigation of DoorDash addressed in the second part of this Memorandum Order and Opinion as to which it is unclear whether the parties have completed the Local Rule 37.2 process, including as to RFP Nos. 6, 8, 11, 41, 42 (as to the Third-Party Rules), 43, 50, 54, 65 and Interrogatory No. 2. The parties are directed to file a joint status report within 21 days of the date of this Memorandum Opinion and Order that provides an update on any continuing meet and confer efforts by the parties concerning those matters the Court has flagged that might benefit from such conferral, including but not limited to the matter of the City's privilege log(s) for withheld documents, the parties' progress in that regard, and any disputes that still need to be ruled upon.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge


Dated: August 23, 2023