**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| City of Chicago, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:21-cv-05162 |
| DoorDash, Inc. and Caviar, LLC, | Honorable Jeremy C. Daniel |
| *Defendants*. | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON DEFENDANTS' FIFTEENTH AFFIRMATIVE DEFENSE
(DUE PROCESS)**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

BACKGROUND................................................................................................... 3

ARGUMENT ....................................................................................................... 6

    I.      The Contract Does Not Violate Defendants' Due-Process Rights....................... 6

            A.      The Contract Does Not Implicate Due Process....................................... 8

            B.      The City Controls Cohen's Work As A Matter Of Law. ........................ 11

            C.      Additional Discovery Is Unwarranted.................................................... 14

    II.     Defendants' Ethics Theory Fails As A Matter Of Law...................................... 18

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bankers Mgmt. Co. v. Heryford*,
885 F.3d 629 (9th Cir. 2018) ....................................................................*passim*

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009)........................................................................................ 11

*City & Cnty. of S.F. v. Philip Morris, Inc.*,
957 F. Supp. 1130 (N.D. Cal. 1997)............................................................... 16

*City of Chi. v. Purdue Pharma L.P.*,
2015 WL 920719 (N.D. Ill. Mar. 2, 2015)...................................................*passim*

*People ex rel. Clancy v. Superior Court*,
705 P.2d 347 (Cal. 1985) ......................................................................... 16, 17

*Cnty. of Santa Clara v. Atl. Richfield Co.*,
235 P.3d 21 (Cal. 2010) ...............................................................................*passim*

*Conant v. Robins, Kaplan, Miller & Ciresi, L.L.P.*,
603 N.W.2d 143 (Minn. Ct. App. 1999)......................................................... 20

*Dotty's Cafe v. Ill. Gaming Bd.*,
143 N.E.3d 173 (Ill. App. Ct. 2019) ................................................................ 6

*People ex rel. Fahner v. Walsh*,
461 N.E.2d 78 (Ill. App. Ct. 1984).................................................................. 16

*United States ex rel. Fallon v. Accudyne Corp.*,
921 F. Supp. 611 (W.D. Wis. 1995) ................................................................ 10

*Friedman v. Rite Aid Corp.*,
152 F. Supp. 2d 766 (E.D. Pa. 2001).............................................................. 10

*Illinois v. Philip Morris*,
759 N.E.2d 906 (Ill. 2001) ........................................................................... 6, 7

*Int'l Paper Co. v. Harris Cnty.*,
445 S.W.3d 379 (Tex. App. 2013)................................................... 7, 12, 13, 16

*Lincoln Nat'l Life Ins. v. TCF Nat'l Bank*,
2011 WL 13119407 (N.D. Ill. Dec. 12, 2011) ................................................ 18

*M & R Amusements Corp. v. Blair*,
    142 F.R.D. 304 (N.D. Ill. 1992)..................................................................... 17

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980)........................................................................... 11, 13

*Merck Sharp & Dohme Corp. v. Conway*,
    861 F. Supp. 2d 802 (E.D. Ky. 2012)............................................................ 16

*Merck Sharp & Dohme Corp. v. Conway*,
    947 F. Supp. 2d 733 (E.D. Ky. 2013)................................................... 7, 15, 17

*Midwest Television, Inc. v. Champaign Urbana Commc'ns, Inc.*,
    347 N.E.2d 34 (Ill. App. Ct. 1976)................................................................. 20

*New Hampshire v. Actavis Pharma, Inc.*,
    167 A.3d 1277 (N.H. 2017).................................................... 7, 12, 14, 18

*New Hampshire v. Actavis Pharma, Inc.*,
    2016 WL 1463904 (N.H. Super. Ct. Mar. 8, 2016)...................................... 20

*Oasis Legal Fin. Operating Co. v. Chodes*,
    454 F. Supp. 3d 724 (N.D. Ill. 2020).............................................................. 6

*In re Opioid Litig.*,
    2018 WL 4827863 (N.Y. Sup. Ct. May 15, 2018) ......................................... 7

*Orozco v. Dart*,
    64 F.4th 806 (7th Cir. 2023)......................................................................... 12

*PawChak v. Long*,
    234 N.E.2d 85 (Ill. App. Ct. 1968)................................................................ 20

*People v. Mun. Ct. (Byars)*,
    143 Cal. Rptr. 491 (Ct. App. 1978)............................................................... 11

*Philip Morris Inc. v. Glendening*,
    709 A.2d 1230 (Md. 1998)........................................................................... 8

*Priceline.com v. City of Anaheim*,
    103 Cal. Rptr. 3d 521 (Ct. App. 2010) ...................................................... 7, 16

*Rhode Island v. Lead Indus., Ass'n*,
    951 A.2d 428 (R.I. 2008) ........................................................................... 7, 8

*U.S. ex rel. Robinson v. Northrop Corp.*,
    824 F. Supp. 830 (N.D. Ill. 1993) ................................................................ 10

*South Carolina v. Eli Lilly & Co.*,
   2009 WL 6058383 (S.C. Ct. Com. Pl. Sept. 22, 2009) ...................................................... 7

*Seipler v. Cundiff*,
   2011 WL 4954224 (N.D. Ill. Oct. 18, 2011) ...................................................... 18

*Sherwin-Williams Co. v. City of Columbus*,
   2007 WL 2079774 (S.D. Ohio July 18, 2007) ...................................................... 7

*United States v. Kelly*,
   9 F.3d 743 (9th Cir. 1993) ...................................................... 9, 10

*Wargo v. Indus. Comm'n*,
   317 N.E.2d 519 (Ill. 1974) ...................................................... 20

*West Virginia ex rel. Discover Fin. Servs., Inc. v. Nibert*,
   744 S.E.2d 625 (W. Va. 2013) ...................................................... 7, 14, 16, 20

**Statutes**

20 ILCS 2505/2505-400(a) ...................................................... 7

**Other Authorities**

David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of "Substitute" Attorneys General*, 2010 MICH. ST. L. REV. 423, 431 (2010) ...................................................... 7

Fed. R. Civ. P. 56(a) ...................................................... 6

## INTRODUCTION

State and local governments have for decades retained outside counsel on a contingency-fee basis to help enforce their laws against, and protect their residents from, corporate wrongdoers. These retentions have been extraordinarily successful, enabling resource-strapped governments to hold accountable even large corporations that could otherwise use their superior resources to evade liability. Despite this long history, Defendants asserted an affirmative defense that the City violated their due-process rights by retaining Cohen Milstein on a contingency-fee basis to help litigate this civil-enforcement action. Defendants base their theory on baseless allegations—made on information and belief—suggesting that Cohen Milstein cares only about monetary relief rather than the public interest, and that the City has failed to control against the firm's purported motive.

Every one of the many courts to address Defendants' due-process theory has rejected it, including Judge Alonso in a case challenging the City's materially identical retention of Cohen Milstein in the opioid litigation. For good reason: contingency-fee counsel do not affect the procedures that protect civil litigants' rights. To begin with, ethical rules obligate City and Cohen Milstein lawyers alike to advance only the City's interests. Regardless, Defendants will have every opportunity to defend themselves, as the three law firms that Defendants retained have done thus far with unusual aggressiveness. And critically, Defendants' rights are protected by a neutral third party: this Court. Although that is enough to satisfy due process in civil litigation, some courts have invoked a state-law test that focuses on whether the government controls the litigation. The retainer at issue here satisfies that test too, giving City lawyers—who lack a financial interest in the outcome—control over the litigation and supervisory authority over Cohen Milstein.

No additional discovery is needed to resolve this motion. The City produced its retainer, which is typically the only document that courts review in resolving similar defenses. Although

unnecessary, the City also averred in a sworn interrogatory response that it controls this litigation in practice, explaining the ways in which it does so. Defendants have nevertheless demanded more and more discovery into the City's relationship with its counsel. Judge Gilbert has thus far rejected Defendants' demands but—bound by the existence of the due-process defense in the pleadings—has not foreclosed more document discovery and suggested that deposing a City lawyer about the City's supervision of Cohen Milstein may be necessary. This Court's intervention is therefore needed to end this sideshow and focus on the actual merits of the City's claims.

Defendants' theory is particularly perverse because City lawyers have publicly directed this litigation in ways that are unusual in government-enforcement actions involving outside counsel. For example, as Judge Gilbert can attest, a City lawyer has taken the lead at most hearings. Defendants themselves know full well who is in charge: their counsel call City lawyers directly, without involving Cohen Milstein. Although that level of involvement is unnecessary to satisfy due process, it underscores just how far-fetched Defendants' theory is. If Defendants can obtain discovery based only on "information and belief" allegations, then companies will ***always*** be able to obtain invasive discovery into government-counsel relationships. That result would embolden many companies—particularly those with weak merits defenses but resources to burn on a never-before-successful theory—to use the theory as a basis for harassing discovery. That could serve only as yet another barrier to governmental investigations into corporate misconduct.

Accordingly, as the International Municipal Lawyers Association explains in its amicus brief, this motion raises an issue that is important to all governments that retain contingency-fee counsel. With the proliferation of arbitration clauses and class-action bans in consumer contracts, government-enforcement actions are one of the few remaining tools to stop consumer fraud. Yet Defendants' theory may prevent small governments from retaining contingency-fee counsel

because they sometimes lack *any* in-house lawyers, much less the staff needed to engage in the sort of active litigation participation that Defendants apparently demand. The City files enforcement actions against smaller businesses using only in-house lawyers, but the City's five-person affirmative litigation division needs contingency-fee counsel to help level the playing field against massive corporations like Defendants. Defendants' theory thus could perversely excuse the biggest wrongdoers from answering for their misconduct. The Court should reject that result and grant summary judgment for the City on Defendants' due-process defense.

## BACKGROUND

Defendants assert their due-process affirmative defense based on two theories, both alleged "[u]pon information and belief." Dkt. 61 at 142-43. First, Defendants allege that "the City has failed to adequately safeguard against the biasing effect of the contingency fee relationship with Cohen Milstein." *Id.* at 143. Second, Defendants allege that Cohen Milstein "is improperly acting as a City official or employee exercising the City's prosecutorial powers." *Id.*

Judge Gettleman denied the City's motion to strike this defense. Judge Gettleman "decline[d] to apply *Twombly* and *Iqbal*'s plausibility standard to affirmative defenses" and thus did not consider whether Defendants adequately pled facts supporting a due-process violation. Dkt. 76 at 2. As for the City's argument that the defense lacks legal merit, Judge Gettleman held that this "require[d] an examination into the merits of these constitutional issues that the Court is not required to reach on a motion to strike." *Id.* at 7. Rather, the City "raises substantial questions of law that are better decided after factual development." *Id.*

Following Judge Gettleman's ruling, the City produced its retainer with Cohen Milstein (the "Contract") to Defendants. Stmt. of Material Facts ("SMF") ¶ 13. The Contract states: "The City retains Cohen Milstein to provide legal services to assist the City in investigating and …

3

pursuing litigation against and/or settlement with" Defendants and other specified meal-delivery companies. *Id.* ¶ 24. Cohen Milstein "will be paid on a contingent fee basis, only upon a recovery," at a rate ranging from 15% to 28% depending on when the matter resolves. *Id.* The firm must "advance all reasonable costs and expenses of the litigation," subject to reimbursement "out of any recovery." *Id.*

The Contract makes clear that "[t]he City will maintain control of the [case] and will make all key decisions, including whether and how to proceed with litigation, which claims to advance, which Defendants to sue, what relief to seek, and whether and on what terms to settle." *Id.* ¶ 25. To carry out its authority, "[t]he City will designate a point of contact who will supervise the [case]," and Cohen Milstein must "provide regular reports to the City." *Id.*

The City also produced its guidelines governing outside counsel. *Id.* ¶ 14. The guidelines confirm that "the City remains responsible for making all substantive decisions." *Id.* ¶ 15.

The City's production was not enough for Defendants, which moved to compel the City to answer discovery seeking "to test whether the City has taken the proper oversight measures *in practice*." Dkt. 94 at 2. Defendants demanded "[a]ll documents … related to the retention of Cohen Milstein" and "[a]ll non-privileged communications" between the City and firm. Dkt. 94-1, Ex. A at 10, Ex. B at 7. They also demanded that the City answer an interrogatory describing its "relationship" with the firm. *Id.*, Ex. C at 7. In their motion to compel, Defendants suggested that Cohen Milstein leveraged corrupt "personal relationships" with the City to obtain the retention, impeding the City's ability to control the firm. Dkt. 94 at 10. Defendants principally based this accusation on Cohen Milstein's lawful contributions to, and communications with, officials in other jurisdictions—not Chicago. *Id.* at 8-9; *see* Dkt. 98 at 7-10 (refuting Defendants' accusation).

4

The City responded that the Contract precluded Defendants' due-process theory. Alternatively, and although declaring it unnecessary, the City served a verified interrogatory response confirming the City's control over Cohen Milstein. The response identified City lawyers currently responsible for supervising Cohen Milstein and stated that City lawyers:

> (1) "ha[ve] maintained control of this matter from its inception"; (2) "have made and continue to make all key decisions"; (3) "have retained control over case strategy and maintained a deep knowledge of the facts of the case"; (4) "review, edit and/or contribute to the drafting of, and approve all substantive correspondence; discovery requests, responses, objections, and compromises; and filings in this matter"; and (5) "regularly confer with outside counsel … regarding case strategy and matters that arise in the day-to-day litigation."

SMF ¶ 23.

Judge Gilbert denied Defendants' motion as to due-process discovery. Judge Gilbert first held that Defendants could not obtain the City's communications with Cohen Milstein unrelated to this case. Dkt. 163 at 4-6. Judge Gilbert rejected as "speculative and built on conjecture" Defendants' argument that these communications "could reveal" corrupt "relationships" between the City and firm. *Id.* at 4-5. Judge Gilbert also rejected Defendants' request for communications between the City and firm that are related to this case, stating that the request "is not sufficiently calibrated to obtain relevant, non-privileged information proportional to the needs of this case." *Id.* at 6. In doing so, Judge Gilbert suggested that deposing the City's counsel about the City's relationship with its outside counsel "may be" a better way to obtain the requested information. *Id.*

Following Judge Gilbert's ruling, Defendants served requests for "all" non-privileged documents relating to the City's supervision of Cohen Milstein. SMF ¶ 27. Defendants also demanded documents sufficient to identify (1) all meetings between City and Cohen Milstein related to Defendants, meal-delivery companies generally, and the practices challenged in the complaint; (2) "the date, time, form, and recipients" of reports by Cohen Milstein to the City about this case; and (3) time spent by firm and City personnel on this case. *Id.* Defendants next asked the

City to identify each law department employee responsible for supervising Cohen Milstein. *Id.* ¶ 29. Finally, Defendants persist in demanding that the City answer requests to admit that Cohen Milstein or its attorneys made political contributions to City officials. *Id.* ¶¶ 31-33.

In response to Defendants' discovery requests, the City identified its lawyers who have supervised Cohen Milstein. *Id.* ¶ 30. The City also explained that, based on Cohen Milstein's research, it is unaware of any contributions by the firm or its partners to City officials since 2018. *Id.* ¶ 32. Defendants have conceded that they lack contrary evidence. *Id.* ¶ 34. The City declined to answer Defendants' remaining requests based on relevance and other objections. *Id.* ¶ 28.

## ARGUMENT

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To defeat summary judgment on an affirmative defense, defendants must offer evidence that would allow a reasonable jury to find for them … ." *Oasis Legal Fin. Operating Co. v. Chodes*, 454 F. Supp. 3d 724, 737 (N.D. Ill. 2020). "If defendants fail to do so—and if 'plaintiff otherwise shows that it is entitled to judgment as a matter of law'—'then the affirmative defense is extinguished.'" *Id.*

Defendants assert their defense under the Illinois and U.S. Constitutions. Illinois courts "generally analyze federal and state due process claims using the same standards," *Dotty's Cafe v. Ill. Gaming Bd.*, 143 N.E.3d 173, 184 (Ill. App. Ct. 2019), so the City does the same here.

## I.    The Contract Does Not Violate Defendants' Due-Process Rights.

Contingency-fee arrangements between governments and private counsel "are deeply entrenched as a legitimate and sometimes prudent method of delegating risk in … civil litigation." *Cnty. of Santa Clara v. Atl. Richfield Co.*, 235 P.3d 21, 62 n.14 (Cal. 2010). The Illinois Attorney General's Office has explained that it retains contingency-fee counsel when "[w]e don't have the resources" to litigate "alone." *Illinois v. Philip Morris*, 759 N.E.2d 906, 909 (Ill. 2001).

Government retention of outside counsel is particularly important when defendants "have deep pockets and are capable of hiring the best legal talent money can buy to wear down their opponents." David B. Wilkins, *Rethinking the Public-Private Distinction in Legal Ethics: The Case of "Substitute" Attorneys General*, 2010 MICH. ST. L. REV. 423, 431 (2010). And in an era of tight government budgets, "contingent fee agreements … remove from the client's shoulders the risk of being out-of-pocket for attorney fees upon a zero recovery." *Philip Morris*, 759 N.E.2d at 913.

State and local governments have repeatedly retained contingency-fee counsel to sue manufacturers of products such as tobacco and guns as well as to litigate a wide array of consumer-protection cases like this one. *See, e.g.*, Wilkins, 2010 MICH. ST. L. REV. at 430-31. Recently, many states and hundreds of local governments worked with contingency-fee counsel to recover billions of dollars for use in addressing the opioid epidemic. *E.g.*, *City of Chi. v. Purdue Pharma L.P.*, 2015 WL 920719 (N.D. Ill. Mar. 2, 2015); *New Hampshire v. Actavis Pharma, Inc.*, 167 A.3d 1277 (N.H. 2017). Governments retain contingency-fee counsel in more-mundane matters too. For example, the City retains multiple law firms on a contingency-fee basis to recover outstanding debt. SMF ¶ 11; *see* 20 ILCS 2505/2505-400(a) (similar authority for State).

Companies have repeatedly challenged governments' contingency-fee agreements, but no court "has held that such agreements violate due process." *Am. Bankers Mgmt. Co. v. Heryford*, 885 F.3d 629, 633 n.3 (9th Cir. 2018).[1] In doing so, courts have recognized that government

---

[1] Additional cases rejecting due-process challenges to government contingency-fee agreements include *In re Opioid Litig.*, 2018 WL 4827863, at *6 (N.Y. Sup. Ct. May 15, 2018); *Actavis Pharma*, 167 A.3d at 1284-85; *Purdue Pharma*, 2015 WL 920719, at *4-6; *Int'l Paper Co. v. Harris Cnty.*, 445 S.W.3d 379, 387-95 (Tex. App. 2013); *West Virginia ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625, 630 n.20 (W. Va. 2013); *Merck Sharp & Dohme Corp. v. Conway*, 947 F. Supp. 2d 733, 739-52 (E.D. Ky. 2013); *Priceline.com v. City of Anaheim*, 103 Cal. Rptr. 3d 521, 536 (Ct. App. 2010); *South Carolina. v. Eli Lilly & Co.*, 2009 WL 6058383 (S.C. Ct.

contingency-fee contracts may "lead to results that will be beneficial to society—results which otherwise might not have been attainable." *Lead Indus.*, 951 A.2d at 475.

Defendants nevertheless ask the Court to become the first to find a due-process violation in a government's retention of contingency-fee counsel. Defendants principally assert that the Contract incentivizes Cohen Milstein to focus on recovering fines rather than the public interest—an incentive that the City allegedly "has failed to adequately safeguard against." Dkt. 61 at 142-43. This theory fails for two independent reasons. First, there are no relevant due-process limits on a government's right to retain the counsel of its choice in civil litigation. Second, the City has demonstrated as a matter of law that it controls Cohen Milstein.

### A.    The Contract Does Not Implicate Due Process.

In *American Bankers*, a district attorney contracted with private law firms to "assist in the investigation ... and prosecution" of a lawsuit filed "on behalf of 'the People of California'" against several companies, seeking civil penalties under a consumer-protection statute. 885 F.3d at 632. The agreement entitled the firms to 30% of any recovery and gave the firms "'authority and responsibility to control and direct the performance and details' of their work," subject to the district attorney's "final authority" and "general right" to inspect the firms' work. *Id.* The district attorney publicly stated that the lawsuit "was 'not going to be additional work for [the district attorney's] staff' because the Law Firms were 'going to handle the litigation.'" *Id.* at 632-33.

The companies sued the district attorney, alleging that the contingency-fee agreement violated the companies' due-process rights. *Id.* at 633. The district court dismissed the suit because "the agreement provides that [the district attorney] controls the litigation." 190 F. Supp. 3d 947,

---

Com. Pl. Sept. 22, 2009); *Rhode Island v. Lead Indus., Ass'n*, 951 A.2d 428, 468-80 (R.I. 2008); *Sherwin-Williams Co. v. City of Columbus*, 2007 WL 2079774, at *1-3 (S.D. Ohio July 18, 2007); *Philip Morris Inc. v. Glendening*, 709 A.2d 1230, 1237-44 (Md. 1998).

958 (E.D. Cal. 2016). Acknowledging public statements by the district attorney and law firms suggesting that the district attorney would perform little (if any) work on the litigation, the court stated that "nonparticipation in the legwork of a case does not mean a lack of control." *Id.*

The Ninth Circuit affirmed. In doing so, however, the court declined to address the district attorney's argument that the retainer satisfied due process by giving the district attorney "ultimate authority over the litigation." 885 F.3d at 637 n.10. The court clarified: "Our holding does not turn on [the district attorney's] exercise of control" or "how much actual day-to-day supervision [the district attorney] exerts." *Id.* The court instead held that the government's retention of private counsel "cannot be meaningfully distinguished from a private relator's pursuit of civil penalties under the qui tam provisions of the False Claims Act." *Id.* at 631.

The Ninth Circuit explained that the False Claims Act "allow[s] private plaintiffs—often called 'relators'—to bring a civil action to recover damages and civil penalties 'for the person and for the United States Government,' though any such action is 'brought in the name of the Government.'" *Id.* at 634. "The Government may choose to take over the litigation, but the relator otherwise 'ha[s] the right to conduct the action' alone." *Id.* (citation omitted). Relators suing alone generally receive 25-30% of any recovery, giving relators a "financial incentive to seek as much in civil penalties as possible." *Id.* at 634-35. The Ninth Circuit had nevertheless previously held that "'qui tam litigation does not implicate due process concerns.'" *Id.* at 635 (quoting *United States v. Kelly*, 9 F.3d 743 (9th Cir. 1993)).

The court held that "*Kelly* controls this case." 885 F.3d at 635. Just as the law firms representing the district attorney appear as "representatives of the public" and "have a financial incentive to seek as much in civil penalties as possible," "the same is true of private relators bringing qui tam actions." *Id.* "Indeed, nothing meaningfully distinguishes the situation here from

a hypothetical one in which California has amended the UCL to allow private plaintiffs to pursue civil penalties—and *Kelly* leaves no doubt that California could, consistent with federal due process, do just that." *Id.* at 637. Nor was *Kelly* distinguishable because the law firms "have prosecutorial tools that qui tam plaintiffs lack." *Id.* at 635. "To the contrary," the agreement required the law firms to "hire any personnel needed to litigate" and to "front the costs." *Id.*

The result should be the same here. Like *Kelly*, courts in this Circuit and elsewhere have held that *qui tam* suits under the False Claims Act do not violate due process. *E.g.*, *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 771 (E.D. Pa. 2001); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623-24 (W.D. Wis. 1995); *U.S. ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830, 838 (N.D. Ill. 1993). Judge Moran explained: "Plaintiffs in civil cases are allowed to be biased, and to argue zealously for their cause, because the tribunal hearing the case is impartial. The defendant's rights are protected by the tribunal—this court." *Robinson*, 824 F. Supp. at 838. As the Ninth Circuit observed in *American Bankers*, "nothing meaningfully distinguishes" this precedent from a government's retention of contingency-fee counsel. 885 F.3d at 637.

To be sure, in determining whether a government's contingency-fee counsel should be disqualified under state law, the California Supreme Court adopted a multi-factor test that focuses on the government's control over outside counsel. *See Santa Clara*, 235 P.3d at 40. Some pre-*American Bankers* courts employed that test in analyzing whether a government's retention of contingency-fee counsel violated due process. *E.g.*, *Purdue Pharma L.P.*, 2015 WL 920719, at *6. Those courts upheld the contingency-fee contracts under *Santa Clara*, so there was no need to address whether the Due Process Clause requires satisfaction of *Santa Clara*'s state-law test. And to be fair, the governments in those cases (including the City in *Purdue Pharma*) did not contest *Santa Clara*'s applicability to the due-process analysis.

10

Regardless, *Santa Clara* was "based not on federal due process principles, but on 'the courts' general authority 'to disqualify counsel when necessary.'" *Am. Bankers*, 885 F.3d at 638 n.12. The Ninth Circuit thus correctly "decline[d] to constitutionalize" *Santa Clara*'s "state-law test." *Id.* Even in the judicial realm—where neutrality is required—"most matters relating to judicial disqualification do not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009). "'The Due Process Clause demarks only the outer boundaries of judicial disqualification,'" while "codes of judicial conduct provide more protection than due process requires." *Id* at 889-90. Because prosecutors "need not be entirely 'neutral,'" *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980), "[d]isqualification of a prosecutor for a conflict of interest or appearance of impropriety alone is not a matter of due process." *People v. Mun. Ct. (Byars)*, 143 Cal. Rptr. 491, 495 (Ct. App. 1978). Thus, even if even if Illinois common law requires the City to control Cohen Milstein's work—and Defendants do not assert that defense—the Due Process Clause does not.

## B. The City Controls Cohen's Work As A Matter Of Law.

Even if due process requires that the City "control" Cohen Milstein, cases applying that standard confirm that the City does so. In *Purdue Pharma*, opioid manufacturers moved to invalidate the City's contingency-fee contract with Cohen Milstein on the ground that "Cohen's pecuniary interest in the outcome of the suit creates a conflict of interest that violates defendants' right to due process." 2015 WL 920719, at *2. To resolve that due-process argument, Judge Alonso employed *Santa Clara*'s state-law test requiring that contingency-fee retainers provide:

> '(1) that the public-entity attorneys will retain complete control over the course and conduct of the case; (2) that government attorneys retain a veto power over any decisions made by outside counsel; and (3) that a government attorney with supervisory authority must be personally involved in overseeing the litigation.'

*Id.* at \*4 (quoting *Santa Clara*, 235 P.3d at 40). Based solely on his review of the retention agreement, Judge Alonso concluded that the agreement "contains the safeguards identified in … *Santa Clara*" and similar cases because "the City retains control over the investigation and litigation." *Id.* at \*5-6. Accordingly, the retention "does not violate … due process." *Id.* at \*6.

Opioid manufacturers also argued that the Due Process Clause precluded Cohen Milstein from representing New Hampshire on a contingency-fee basis. The New Hampshire Supreme Court affirmed the trial court's conclusion—based solely on a review of the retainer—that the retention satisfied due process because the State Attorney General "supervises outside counsel and retains control over all critical decisions." *Actavis Pharma*, 167 A.3d at 1280, 1284.

The retainers at issue in *Actavis Pharma* and *Purdue Pharma* are identical to the Contract in all material respects. Like those retainers, the Contract states that "[t]he City will maintain control" of the case, "will make all key decisions," and "must approve any settlements." SMF ¶¶ 24-25; *see Purdue Pharma*, 2015 WL 920719, at \*1; *Actavis Pharma*, 167 A.3d at 1284. Like the retainers in *Actavis Pharma* and *Purdue Pharma*, therefore, the Contract satisfies *Santa Clara*.

The result is the same under the general test governing procedural due-process theories like this, which requires Defendants to show "'(1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation.'" *Orozco v. Dart*, 64 F.4th 806, 814 (7th Cir. 2023). Defendants' pleading does not identify any "protected interest." For example, Defendants "have neither alleged nor established that the [City's] lawsuit threatens the continued operation of their businesses." *Int'l Paper*, 445 S.W.3d at 395.

Nor does the City's retention of Cohen Milstein somehow preclude a "constitutionally sufficient process." *Orozco*, 64 F.4th at 818. Defendants suggest that Cohen Milstein will ignore the City's interests and instead "focus single-mindedly on maximizing the amount of monetary

penalties," while City lawyers will abdicate their responsibility to advance "the public interest." Dkt. 161 at 143. Defendants' suggestion is offensive and lacks any basis. Lawyers "are presumed to comport themselves with ethical integrity and to abide by all rules of professional conduct." *Santa Clara*, 235 P.3d at 38. Courts likewise "presume[] that government attorneys will honor their obligation to place the interests of their client above the personal, pecuniary interest of the subordinate private counsel they have hired." *Id.* After working closely opposite City and Cohen Milstein lawyers for two years, Defendants have no evidence to overcome these presumptions.

Defendants' suggestion that Cohen Milstein will focus solely on fines to increase the firm's compensation also ignores that the Contract obligates the City to "use its best efforts to seek attorneys' fees" equal to Cohen Milstein's lodestar if the case is resolved through "substantial injunctive or in-kind relief." SMF ¶ 24. Even if Defendants were right about Cohen Milstein's incentives, "a profit-motivation should encourage attorneys to pursue the litigation efficiently and to conclude a case quickly if it is not meritorious." *Int'l Paper*, 445 S.W.3d at 396. In fact, lawyers paid by the hour presumably have a greater financial incentive to engage in what Defendants call "overzealous litigation" by litigating *ad nauseam* regardless of the merits. Dkt. 61 at 143.

Even the sole case that Defendants cite in their affirmative defense confirms that a neutral judiciary protects their due-process rights. *See* Dkt. 61 at 142. In *Marshall*, an agency administrator found that an employer violated federal law and assessed civil penalties. 446 U.S. at 240. The employer challenged the administrator's action, arguing that the governing statute created "an impermissible risk of bias" in violation of the Due Process Clause by allocating civil penalties to the agency in which the administrator worked. *Id.* at 241. The Supreme Court rejected this argument, explaining that the administrator's role was more "akin to that of a prosecutor or civil plaintiff" than "a judge." *Id.* at 247. While the Court requires "neutrality" by "judicial" officials—

13

"whose impartiality serves as the ultimate guarantee of a fair … proceeding"—prosecutors "are necessarily permitted to be zealous in their enforcement of the law." *Id.* at 242, 248.

*Marshall* acknowledged that there may be "'limits on the partisanship' of prosecutors," but did not identify those limits because the risk of bias was "exceptionally remote." *Id.* at 249-50. Like the agency administrator in *Marshall*, the City lawyers who control this litigation earn fixed salaries. SMF ¶ 3. In fact, the risk of bias is even more remote here. Whereas the agency administrator himself imposed liability and awarded penalties (albeit subject to *de novo* review), the City has done no such thing. And whereas the agency in *Marshall* received direct funding through penalties that the agency itself assessed, the City's law department does not. *Id.* ¶ 12. For example, the City distributed proceeds from the opioid and vaping litigation to its Department of Public Health, and the City's settlement with Uber over its meal-delivery practices directed 100% of the relief to restaurants after paying the City's costs. *Id.* ¶¶ 10, 16.

Other courts have likewise rejected reliance on *Marshall* in similar challenges. In *Nibert*, the West Virginia Supreme Court "summarily reject[ed defendant's] contention that use of special assistant attorneys general violates its due process rights." 744 S.E.2d at 630 n.20. The defendant did "not cite [], nor have we found, *any* case that supports a due process violation claim through the use of special assistant attorneys general in the prosecution of civil cases"—rejecting defendant's contention that *Marshall* "stand[s] for such a proposition." *Id.*; *accord Am. Bankers*, 885 F.3d at 638; *Actavis Pharma*, 167 A.3d at 1284.

## C. Additional Discovery Is Unwarranted.

Defendants will likely argue that this motion is premature because they have served discovery seeking information about the City's control of Cohen Milstein. That discovery is irrelevant under *American Bankers*, which did not turn on governmental control. It is also irrelevant under *Actavis Pharma* and *Purdue Pharma*, which focused exclusively on the retainers

in holding that the governments adequately controlled Cohen Milstein. That focus on retainers is appropriate, absent evidence of misconduct in the public record, because courts "decline to assume that private counsel intentionally or negligently will violate the terms of their retention[s] … or that public attorneys will delegate their fundamental obligations." *Santa Clara*, 235 P.3d at 39.

With one exception, the few courts that have gone beyond the retainer in analyzing whether a government adequately controlled counsel did so based on voluntarily submitted declarations. *Santa Clara*, for example, held that declarations submitted by counsel "establish that such general control and supervision have been exercised." *Id.* at 41. Thus, despite directing the governments to amend the retainers, the court did not demand more evidence of control. *Id.* Although unnecessary, the City followed *Santa Clara* by averring that the City "has maintained control of this matter" in practice, identifying ways in which the City has done so. SMF ¶ 23.

*Merck* is the only case where a court went beyond the retainer and counsel declarations to permit discovery into the government's control of outside counsel. *Merck* is distinguishable for three reasons. First, the company pled "numerous facts" indicating that the Kentucky Attorney General's Office ceded control to outside counsel. 2012 WL 1029427, at *3 (E.D. Ky. Mar. 26, 2012). For example, the company alleged that outside counsel "handled all [court] appearances," the Attorney General's Office attended none, and "all … communications have come from contingency-fee counsel." 2012 WL 1029427, at *3-4; No. 11-51, Dkt. 1 ¶ 18. Although these facts alone do not establish a lack of control, Defendants have not alleged—and cannot allege—similar facts. A City lawyer has represented the City at all hearings in this case. SMF ¶ 18. City lawyers have taken the lead at most of these hearings: Judge Gilbert thus observed that City lawyer Peter "Cavanaugh, again, has been the one who has been speaking mostly at the status." Dkt. 94-1, Ex. Q at 7:20-21. A City lawyer has signed all letters sent to Defendants and participated in all

discovery conferences. *Id.* ¶¶ 19-20. Defendants' own actions confirm their understanding that the City controls this litigation: Defendants have on multiple occasions (and appropriately) called a City lawyer directly without involving Cohen Milstein. *Id.* ¶ 21.

Second, *Merck* concluded that the action was "penal" under Kentucky law. 947 F. Supp. 2d at 739. The court explained that the State sought only "penalties," so the statute's "remedial provisions" were "not implicated." 861 F. Supp. 2d at 814. The case thus fit in a "small" class of cases in which government lawyers must "be 'absolutely neutral.'" *Id.* at 813-14 (quoting *People ex rel. Clancy v. Superior Court*, 705 P.2d 347 (Cal. 1985)). By contrast, the City's consumer-protection ordinances are modeled after the Illinois Consumer Fraud Act, which is "remedial." *People ex rel. Fahner v. Walsh*, 461 N.E.2d 78, 84 (Ill. App. Ct. 1984). Although "a penalty may be imposed as an aid to enforcement … , this does not render the Act a penal statute." *Id.* Moreover, in addition to civil fines, the City seeks restitution, disgorgement, and injunctive relief. Dkt. 1-1 ¶¶ 12, 210. Therefore, even if the fines sought by the City are penal, this action as a whole serves a remedial purpose. The "absolute neutrality" required by *Merck* thus does not exist here.

Third, the Kentucky Attorney General's Office apparently did not submit declarations or other evidence demonstrating control of counsel in practice, making a deposition necessary to obtain that information. By contrast, the City already provided that information. SMF ¶ 23.

Beyond these distinctions, *Merck* incorrectly relied on *Clancy*, which invalidated a government's retention of outside counsel under California law. *Clancy* "did not base any part of its holding on notions of due process; rather, the court acted under its general authority 'to disqualify counsel.'" *Int'l Paper*, 445 S.W.3d at 391-92; *accord Am. Bankers*, 885 F.3d at 638 n.12. Moreover, in sharp contrast to the facts here, "the private attorney in *Clancy* acted independently of the city's attorney and had absolute control of the litigation." *Nibert*, 744 S.E.2d

at 639; *see also Priceline.com*, 103 Cal. Rptr. 3d at 531; *City & Cnty. of S.F. v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1135 (N.D. Cal. 1997).

In addition, the California Supreme Court has limited *Clancy* to its facts. *Clancy* involved a public-nuisance action against a bookstore that "implicated interests akin to those inherent in a criminal prosecution," causing the court to invoke "disqualification rules applicable to criminal prosecutors." *Santa Clara*, 235 P.3d at 31. *Clancy* also "revealed a profound imbalance" between the government's resources and "an outmatched individual defendant" with "limited means." *Id.* at 32, 34. By contrast, this case is not "akin" to a criminal prosecution, and Defendants "are large corporations with access to abundant monetary and legal resources." *Id.* at 31-32, 34. Indeed, Defendants have retained three law firms to represent them in this case.

*Merck* itself shows why more discovery is pointless. The company deposed a lawyer in the Attorney General's Office about its control over outside counsel. The court found it "troubling" that the lawyer did not know basic facts such as whether Kentucky had retained experts and "perform[ed] poorly" in answering other questions about the case. 947 F. Supp. 2d at 745-46. The court nevertheless held that the Attorney General's Office demonstrated sufficient control, explaining that requiring the government to do "the in-depth work that the contingency-fee counsel was hired to do … would not only be too onerous a standard for 'maintaining control over the litigation,' it would also defeat the purpose of hiring outside counsel to begin with." *Id.* at 748.

Defendants' discovery requests are no more likely to generate material information. For example, Defendants' demand for documents related to the City's supervision of Cohen Milstein would require reviewing thousands of emails—nearly all privileged—just to identify the handful that might be discoverable. SMF ¶ 22. Defendants' request to identify the City counsel responsible for supervising Cohen is an obvious prelude to deposing the four lawyers whom the City named.

"Deposing an opponent's attorney is a drastic measure. It not only creates a side-show and diverts attention from the merits of the case, its use also has a strong potential for abuse." *M & R Amusements Corp. v. Blair*, 142 F.R.D. 304, 305 (N.D. Ill. 1992). Deposing counsel "risks disrupting a party's preparation of its case and delving into areas protected by the attorney-client privilege and … work-product" doctrine. *Lincoln Nat'l Life Ins. v. TCF Nat'l Bank*, 2011 WL 13119407, at *1 (N.D. Ill. Dec. 12, 2011). Deposing the City's lawyers is unlikely to provide detailed evidence about control, precisely because that control is exercised through privileged communications. Courts thus permit depositions of opposing counsel "'only … in limited circumstances'" where the testimony is "'relevant'" and "'crucial to the preparation of the case.'" *Seipler v. Cundiff*, 2011 WL 4954224, at *5 (N.D. Ill. Oct. 18, 2011). That is far from true here: courts have uniformly rejected Defendants' theory, which is a side-show from the merits.

## II. Defendants' Ethics Theory Fails As A Matter Of Law.

The second basis for Defendants' due-process theory asserts that Cohen Milstein "is improperly acting as a City official or employee," violating MCC § 2-156-030(a) and Defendants' due-process rights. Dkt. 61 at 143. Section 2-156-030(a) provides:

> No **official or employee** shall make, participate in making or in any way attempt to use his position to influence any city governmental decision or action in which he knows or has reason to know that he has any financial interest distinguishable from its effect on the public generally, or from which he has derived any income or compensation during the preceding [year] or from which he reasonably expects to derive any income or compensation in the following [year].

(emphasis added). The City is unaware of any support for the notion that a violation of section 2-156-030(a) violates due process. Regardless, Cohen Milstein is not in violation of the ordinance.

As an initial matter, Defendants lack standing to enforce section 2-156-030. The City's Governmental Ethics Code—of which section 2-156-030 is part—authorizes the City's Board of Ethics to penalize violators. *See* MCC §§ 2-156-465. It does not create a private right of action.

*See Actavis*, 167 A.3d at 1284 (companies lacked private right of action under New Hampshire Ethics Code to challenge contingency-fee contract between Attorney General and Cohen Milstein).

Defendants' theory also fails on the merits, as Judge Alonso held in *Purdue Pharma*. Judge Alonso relied on an opinion by the City's Board of Ethics concluding that Cohen Milstein did not violate section 2-156-030 in representing the City on a contingency-fee basis in the opioid litigation because the firm's personnel are not City "officials" or "employees" subject to the ordinance. 2015 WL 920719, at *3-4. The municipal code defines "employee" to mean "an individual employed by the City … , whether part-time or full-time, but excludes elected officials and city contractors." MCC § 2-156-010(j). "Official" means "any person holding any elected office … or any appointed, non-employee member of any city agency." *Id.* § 2-156-010(q). And "city contractor" means anyone other than a City official or employee "who is paid by the City or any City agency or pursuant to City ordinance, for services to any City agency." *Id.* § 2-156-010(e).

Applying the ordinance's "plain language," the Board of Ethics concluded that Cohen Milstein "fits squarely within the definition of 'City contractor.'" SMF ¶ 7. The Board explained that "the nature of the work being done by Cohen Milstein and the manner in which the firm is to be compensated establish that its attorneys are independent contractors working under a personal services contract." *Id.* Cohen Milstein was not an "official" because the firm's personnel were "not elected"; their work was "defined solely by the terms of their contract and not by any appointment or enabling ordinance"; and they were "not appointed by the Mayor and/or confirmed by the City Council." *Id.* Moreover, "not one" of the factors that the Board considers in deciding whether a person is an "employee" existed. *Id.* ¶ 8. Cohen Milstein personnel (1) "do not hold classified City positions," (2) "are not paid from the City payroll," (3) "do not receive health [or pension] benefits," and (4) will not be subject to "federal income tax withholding" upon any payment. *Id.*

Judge Alonso "agree[d]" with the Board of Ethics and stated that "[t]he result is the same under Illinois common law." 2015 WL 920719, at *4 & n.3. Judge Alonso observed that in determining if someone is a government official, courts consider "'characteristics of a public office,'" such as whether the position is "'continuing'" rather than "'contractual.'" *Id.* at *4 n.3 (quoting *Midwest Television, Inc. v. Champaign Urbana Commc'ns, Inc.*, 347 N.E.2d 34, 38 (Ill. App. Ct. 1976)). This test does not encompass outside counsel retained only "through trial" against specified companies and who are subject to the City's "control." SMF ¶¶ 24-25 & Kane Decl., Ex. 4 at 2; *see Wargo v. Indus. Comm'n*, 317 N.E.2d 519, 521 (Ill. 1974) (public officers are not hired for a single act; "the duties of the position are continuous"); *PawChak v. Long*, 234 N.E.2d 85, 86 (Ill. App. Ct. 1968) (a municipal officer's "duties are continuing and not limited to a single transaction").

Courts from other jurisdictions are in accord. *E.g.*, *New Hampshire v. Actavis Pharma, Inc.*, 2016 WL 1463904, at *11-16 (N.H. Super. Ct. Mar. 8, 2016) ("Cohen Milstein is not a public employee"); *Nibert*, 744 S.E.2d at 634; *Conant v. Robins, Kaplan, Miller & Ciresi, L.L.P.*, 603 N.W.2d 143, 149 (Minn. Ct. App. 1999); *cf.* Office of the Ill. Att'y Gen., 1978 WL 17636 (Sept. 22, 1978) ("a member of a law firm which advises and represents a municipal corporation on particular matters is neither a public officer nor a public employee"). Once again, then, Defendants lack any on-point authority supporting their due-process theory.

## CONCLUSION

The City respectfully requests that the Court enter summary judgment for the City on Defendants' Fifteenth Affirmative Defense (Due Process).

DATED: August 24, 2023

Respectfully submitted,

**CITY OF CHICAGO DEP'T OF LAW,
AFFIRMATIVE LITIGATION DIVISION**

By: /s/ Stephen J. Kane
Stephen J. Kane
Peter H. Cavanaugh
121 N. LaSalle Street
Room 600
Chicago, IL 60602
Phone: (312) 744-6934
stephen.kane@cityofchicago.org
peter.cavanaugh@cityofchicago.org

**COHEN MILSTEIN SELLERS &
TOLL PLLC**

By: /s/ Brian E. Bowcut
Brian E. Bowcut (*pro hac vice*)
Betsy A. Miller (*pro hac vice*)
Peter Ketcham-Colwill (*pro hac vice*)
Lisa M. Ebersole (*pro hac vice*)
1100 New York Avenue, NW, Suite 500
Washington, D.C. 20005
Phone: (202) 408-4600
bbowcut@cohenmilstein.com
bmiller@cohenmilstein.com
pketcham-colwill@cohenmilstein.com
lebersole@cohenmilstein.com

*Attorneys for Plaintiff City of Chicago*