IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| City of Chicago, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| ) | Case No. 1:21-cv-05162 |
| v. ) | |
| ) | Hon. Jeremy C. Daniel |
| Door Dash, Inc. and Caviar LLC, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION'S
AMENDED MOTION FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON DEFENDANTS' FIFTEENTH AFFIRMATIVE DEFENSE (DUE PROCESS)**

The International Municipal Lawyers Association (IMLA) respectfully requests that the Court grant IMLA leave to file the attached amicus curiae brief in support of Plaintiff's Motion For Partial Summary Judgment on Defendants' Fifteenth Affirmative Defense (Due Process). For the reasons explained below, IMLA submits that it can provide this court with "ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs," in accordance with the amicus brief criteria set forth in *Choices v. Illinois Bell Telephone Co.*, 339 F.3d 542, 544-45 (7th Cir. 2003).

1. On August 27, 2021, Plaintiff City of Chicago filed its complaint against Defendants Door Dash, Inc. and Caviar, LLC in the Circuit Court of Cook County, alleging deceptive and unfair business practices by Defendants in violation of provisions of the Municipal Code of Chicago, seeking injunctive relief and statutory penalties.

1

2. On September 9, 2021, Defendants removed that action to this Court, alleging that, in its retention of contingency-based outside counsel, the City violated due process by failing to maintain control of the case; in parallel with these assertions, Defendants served on the City expansive discovery requests seeking production of privileged City documents and suggesting their intent to depose City lawyers.

3. As an organization with a membership of more than 2,500 local governments, IMLA is uniquely qualified to provide this court a different and broader perspective on how local governments use legal resources and how local governments, large and small, handle their legal matters, including affirmative litigation. Through its workgroups, webinars, conferences, publications, and other means, IMLA assists its members in identifying current issues in which affirmative litigation may be helpful to achieving the local government's public purposes and policy objectives, and providing these forums for members to stay up-to-date on developments in major local government affirmative litigation matters nationwide. With this framework of ongoing activities in mind, IMLA can explain the merits of affirmative litigation at the local government level, particularly in the context of contingency arrangements with outside law firms. IMLA's amicus brief does not reprise the City of Chicago's legal arguments; rather, IMLA's purpose is to illustrate for this court the significant benefits contingent fee outside counsel bring to local government affirmative litigation efforts, and the detriment to local governments and their constituents that will result from overreaching discovery sought by Defendants in this case.

4. IMLA provides its amicus brief in this case out of concern that, if improperly allowed to proceed with its expansive discovery demand, Defendants will become a role model for other entities seeking to avoid local governments' legitimate affirmative litigation activities. The amicus brief will discuss that many of IMLA's members are smaller communities and lack

the resources to handle affirmative litigation matters in-house. IMLA seeks to represent the interests of all of its members through the filing of this amicus brief, by helping the court understand the manner in which local governments use outside counsel and the importance of local governments' use of outside counsel in holding corporate wrongdoers accountable.

5. IMLA has requested the parties' consent to this motion. The City consented, but Defendants have not. Accordingly, IMLA requests that this Court grant IMLA leave to file the accompanying *amicus curiae* brief.

Dated: August 30, 2023      By:     */s/ Barbara A. Adams*

                                     Donahue & Rose, P.C.
                                     9501 West Devon Avenue, Suite 702
                                     Rosemont, Illinois 60018
                                     Telephone: (312) 541-1077
                                     Email: badams@drlawpc.com

                         By:     */s/ Erich R. Eiselt*
                                     Deputy General Counsel
                                     International Municipal Lawyers Association
                                     51 Monroe Street, Suite 404
                                     Rockville, Maryland 20850
                                     Telephone: (202) 742-1017
                                     Email: eeiselt@imla.org

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| City of Chicago, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| ) | Case No. 1:21-cv-05162 |
| *v.* ) | |
| ) | Hon. Jeremy C. Daniel |
| Door Dash, Inc. and Caviar LLC, ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

**BRIEF OF *AMICUS CURIAE*
INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION (IMLA)
IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON DEFENDANTS' FIFTEENTH AFFIRMATIVE DEFENSE (DUE PROCESS)**

**IDENTITY AND INTEREST OF *AMICUS CURIAE***

The International Municipal Lawyers Association ("IMLA") is a non-profit, nonpartisan professional membership organization comprised of more than 2,500 local government entities as represented by their chief legal officers, state municipal leagues, and individual attorneys. Established in 1935, IMLA's mission is to advance the responsible development of municipal law through education and advocacy, by providing the collective viewpoint of local governments before the United States Supreme Court and in state and federal courts in appropriate cases. IMLA intends that this brief will provide this court with "ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs," in accordance with the amicus brief criteria set forth in *Choices v. Illinois Bell Telephone Co.*, 339 F.3d 542, 544-45 (7th Cir. 2003).

1
**PROPOSED *AMICUS CURIAE* BRIEF OF IMLA**

As an organization with a membership of more than 2,500 local governments, IMLA is uniquely qualified to provide this court a different and broader perspective on how local governments use legal resources and how local governments, large and small, handle their legal matters, including affirmative litigation. Through its workgroups, webinars, conferences, publications, and other means, IMLA assists its members in identifying current issues in which affirmative litigation may be helpful to achieving the local government's public purposes and policy objectives, and providing these forums for members to stay up-to-date on developments in major local government affirmative litigation matters nationwide. With this framework of ongoing activities in mind, IMLA's brief will explain the merits of affirmative litigation at the local government level, particularly in the context of contingency arrangements with outside law firms. IMLA's amicus brief does not reprise the City of Chicago's legal arguments; rather, IMLA's purpose is to illustrate for this court the significant benefits contingent fee outside counsel bring to local government affirmative litigation efforts, and the detriment to local governments and their constituents that will result from overreaching discovery sought by defendants in this case.

While IMLA typically limits its *amicus* support to cases in advanced stages of appellate activity including at the United States Supreme Court and the federal Circuit Courts of Appeal, the defendants in this case present an argument that, if allowed to succeed, could impact local governments more broadly. IMLA therefore speaks to refute the defendants' allegations that Chicago's contingent-fee-based retention of an outside law firm to mount an aggressive affirmative litigation campaign is unethical or works to deprive defendants of due process. Such engagements have been immensely beneficial to local governments and to the public across the nation and are essential in their prosecution of civil actions to obtain compensation for harm inflicted on their constituents and to enjoin further bad behavior.

# ARGUMENT

Local governments, large and small, rely on outside law firms for a wide spectrum of services. Nowhere is this more visible than in context of affirmative litigation, where local governments' use of outside law firms has been hugely beneficial in remedying the harm inflicted on communities by corporate wrongdoers. In the past, localities may have opted to exercise restraint in mounting affirmative litigation campaigns against those causing injury to their constituents, relying instead on federal or state forces to take the lead. Today, local governments harness the acumen, experience and resources of outside firms to redress a wide range of wrongs, forcing corrective action and generating funds for local abatement activities. The range of defendants who are being held accountable to local governments is broad: those responsible for pharmaceutical antitrust, climate change, ghost guns, opioids, PFAS, disposable wipes, vaping, theft-prone automobiles – and falsely marketed food delivery services – cannot avoid accountability for local harms.

Contingent fee arrangements with outside firms enable much of this local initiative. While defendants may attempt to paint such relationships as unethical – a strategy being used by the defendants in this case to justify overreaching and dilatory discovery strategies – these arrangements do not violate ethical rules. This Court should not be diverted by such assertions. A ruling in favor of defendants, accommodating their blatant efforts to defuse the City's legitimate prosecution of dishonest marketing practices by seeking to obtain privileged internal documents and depose government counsel, will incentivize other defendants to pursue abusive discovery tactics. Properly, Chicago is refusing to countenance such overreach, but smaller local governments may not be able to stave off that subterfuge. This Court should therefore rule in favor

**PROPOSED *AMICUS CURIAE* BRIEF OF IMLA**

of Chicago and reaffirm local governments' abilities to hold bad actors accountable for harm inflicted on their communities, free from coercive discovery tactics.

I. **LOCAL GOVERNMENTS' USE OF PRIVATE LAW FIRMS IS BOTH COMMONPLACE AND ESSENTIAL**

There are more than 38,000 general purpose local governments in the United States, including more than 3,000 counties, parishes, and boroughs and more than 35,000 cities, towns, villages, and townships.[1] While the largest, including municipalities like Chicago, include populations in the hundreds of thousands or even millions, fewer than 800 cities number more than 50,000 residents, and the vast majority of localities serve constituencies of fewer than 10,000 people.[2] IMLA members include local governments across this entire spectrum of population. Whether these jurisdictions are massive or miniscule, their residents expect – and are entitled to – the performance of governmental functions. Among the most fundamental of these is the provision of legal services.

### A. Smaller Local Governments Routinely Rely On Outside Law Firms to Act as Law Departments

Most smaller jurisdictions do not have the resources to employ a dedicated law department or full-time city or county attorney. For tens of thousands of American local governments, the retention of independent outside law firms or lawyers is essential to providing critical legal services to their residents, ensuring that ordinances are properly drafted, that council meetings and other decision-making processes afford transparency, that constituents' statutory and constitutional

---

[1] United States Census 2017, published in 2019: 2017 Census of Governments – Organization - https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html

[2] Annual Estimates of the Resident Population for Incorporated Places of 50,000 or More, Ranked by July 1, 2022 Population: https://www.census.gov/data/tables/time-series/demo/popest/2020s-total-cities-and-towns.html

rights are respected, and much more. These relationships are so elemental that IMLA provides a "Model City/County Attorney Retainer Agreement" for the engagement of outside law firms within its online resource materials for members, defining the terms and conditions of retention and the scope of services to be performed.[3] All such engagements are subject to the ABA Rules, including Rule 1.2: Scope of Representation & Allocation of Authority Between Client & Lawyer, discussed more fully below.

### B. Virtually All Local Governments Rely On Outside Law Firms For Specialized Legal Expertise

Unlike the vast number of smaller localities that fully outsource their local government legal functions, many larger jurisdictions employ robust internal legal teams able to undertake the majority of issues that routinely arise in any community – land use, permitting, code enforcement, city council advisory services, public contracts and so on. But virtually all local governments, large and small, rely on outside firms for matters that are not ordinary course. This is particularly true with respect to affirmative litigation matters such as the subject of this lawsuit. When seeking to hold to account large and defiant corporate wrongdoers, even the largest local governments turn to the expertise and resources of outside firms skilled in dueling adversaries who routinely use every vehicle conceivable, including asserting imaginative grounds for removal and raising encyclopedic and baseless affirmative defenses – in order to delay and avoid responsibility for the harms they have caused to local residents.

Because so many local governments rely on outside law firms to handle their affirmative litigation, the discovery dispute in this case takes on heightened significance. While Chicago may have the resources to object to abusive discovery requests to depose one of the city's attorneys,

---

[3] https://imla.org/resource/library/imla-model-city-county-attorney-retainer-agreement/

**PROPOSED *AMICUS CURIAE* BRIEF OF IMLA**

smaller communities may buckle under this type of pressure tactic. It is therefore imperative that this Court sends a clear message that corporate defendants that harm communities, both large and small, must answer for their actions in court and may not resort to abusive discovery requests that would prevent communities from relying on the resources of outside law firms.

### C. Through Affirmative Litigation, Local Governments Have Delivered Major Successes for Constituents

Local governments' affirmative litigation efforts, often leveraging outside law firms, have yielded significant benefits for local constituents. That success may be one rationale for an affirmative defense often asserted by defendants: that the issue at hand is a matter of "statewide concern" and can only be litigated by the state Attorney General. There are numerous reasons for defendants to circumvent locally initiated litigation. First, local governments may be able to act more rapidly than states to bring suit redressing such harms. One need only look at the leadership of Chicago in the opioids litigation. More than nine years ago, long before any state took action, the City retained outside counsel to demand accountability for the emerging epidemic, naming Purdue Pharma, Johnson & Johnson, and other manufacturers and distributors in litigation to redress such harms.[4]

Chicago's action was the precursor to similar suits filed by more than 3,000 localities across America. That multiplicity – another attribute of locally driven affirmative litigation, given that defendants would prefer to litigate in a limited number of forums rather than facing hundreds or thousands of governments – has been particularly effective in the opioid arena. Leveraging the expertise of outside law firms, local governments have already achieved more than $50 billion in settlements in opioid litigation. Those settlements reveal perhaps what is the most compelling merit

---

[4] *City of Chicago v. Purdue Pharma LP*, no. 1:14-cv-04361 (Cir. Ct. Cook Cty., July 14, 2014).

**PROPOSED *AMICUS CURIAE* BRIEF OF IMLA**

to local government affirmative litigation: the ability to direct benefits to local constituencies. The opioid settlement agreements have, for example, improved dramatically on inadequacies of the 1998 tobacco Master Settlement Agreement negotiated by state Attorneys General.[5] That tobacco settlement has resulted in scant amounts flowing to localities and diversion of significant monies to non-tobacco related purposes. In contrast, the recent multi-district opioid settlements require local government buy-in and direct major percentages to localities, mandating that those dollars will be targeted solely for opioid-related remediation.[6] Without the use of outside law firms, most local governments would not have been able to achieve this level of success for their communities to address the opioid epidemic.[7]

## II. CONTINGENCY FEE ARRANGEMENTS ARE CENTRAL TO LOCAL GOVERNMENT AFFIRMATIVE LITIGATION AND DO NOT BREACH ETHICAL RULES ON CONTROL OF LITIGATION

Local government success in holding to account opioid defendants – now including retailers and pharmacies who provided the "last mile" in delivery of opioids – has been mirrored in numerous other arenas: addressing injury caused by theft-prone autos, obtaining clean-up costs for PFAS and PCBs, penalizing and enjoining the sale of ghost guns, stopping the marketing of vapes to minors, and many more.[8] Many of these victories have arisen from contingent fee

---

[5]https://www.naag.org/our-work/naag-center-for-tobacco-and-public-health/the-master-settlement-agreement/

[6]*See for example* the Illinois opioid spending plan: https://www.civicfed.org/civic-federation/blog/illinois'-spending-plan-opioid-settlement-funds

[7]Contrast the multi-district settlements, resulting from suits by thousands of local governments, with the results of the AG-driven action in *State of Oklahoma v. Purdue Pharma L.P.*, no. 2017-816 (Dist. Ct. Cleveland Cty.), in which, out a a $270 million settlement with Purdue Pharma, $200 million went to Oklahoma State University and $12.5 million was made available to local governments.

[8]*See In re National Prescription Opiate Litigation*, no. 17 md 2804 (N.D. Ohio); *In re Aqueous Film-Forming Foam*, no. 18 mn 2873 (D. S.C.); *Mayor and City Council of Baltimore v. Polymer80 LLC*, no. 24-C-22-002482 (Cir. Ct. Balt. City); *Commissioners of the Public Works of the City of Charleston v. Costco Wholesale Corporation*, no. 21 cv 00042 (D. S.C.); *In Re: Juul*

arrangements, which have rarely been challenged by defendants and for good reason: they do not breach ethical rules, much less due process.

### A. Contingency Fee Arrangements Have Been Central to Local Government Retention of Outside Counsel

It should be obvious that the task of litigating against well-financed and powerful corporate interests which resolutely seek to avoid injunction and payment of compensation is an immense undertaking. Virtually no local government has the budget to underwrite the hourly fees, discovery costs, expert testimony charges and the like, often stretching over years as defendants resort to delay and attrition; it is highly unlikely that a county commission or city council would authorize such a massive use of public funds when facing many more immediate needs for public funding. The only viable financial structure that will enable such local government action, short of obtaining outside litigation financing – a relatively new and yet-to-be evaluated mechanism – is to enter into a contingent fee arrangement. On that basis, the outside firms forgo hourly compensation and incur the extensive expenses needed to prosecute the case. If the firms succeed, they are handsomely rewarded; if they fail, huge amounts of time and expenditures are written off. Defendants' firms take no such risk and are in many cases are actually rewarded financially by prolonging litigation, sometimes employing dubious and dilatory tactics.

### B. Contingency Fee Arrangements Do Not Result in a Loss of Control or Violate Rules of Ethics

The implication that local governments' use of outside firms, and in particular those retained on a contingency basis, creates a conflict of interest or otherwise results in a loss of control by the client is baseless. All such arrangements are governed by the ABA Rules which provide,

---

*Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, no. 19 md 02913 (N.D. Cal.).

among other things, that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued."[9] More fundamental is the express requirement that "[a] lawyer shall abide by a client's decision whether to settle a matter."[10]

That provision, however, does not prevent an outside law firm from using its particular expertise to promote the client's objectives. The Comments to ABA Rule 1.2 make clear that the client's retention of authority over ultimate decision-making does not eliminate the lawyer's independence in determining how to accomplish success. To the contrary, the ABA Rule contemplates that the lawyer may take the lead in terms of tactics and strategies:

> [1] Paragraph (a) confers upon the client the ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. The decisions specified in paragraph (a), such as whether to settle a civil matter, must also be made by the client. See Rule 1.4(a)(1) for the lawyer's duty to communicate with the client about such decisions. With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client as required by Rule 1.4(a)(2) and may take such action as is impliedly authorized to carry out the representation.
>
> [2] . . . Clients normally defer to the special knowledge and skill of their lawyer with respect to the means to be used to accomplish their objectives, particularly with respect to technical, legal and tactical matters.[11]

Here, the defendants are attempting to recast a client's deference to an outside firm's means – a process fully contemplated in the ABA Rules – as an unethical abdication of control over the case. That assertion is both legally and factually groundless. Allegations by defendants about ethical breach and deprivation of due process resulting from the contingency-based retention of a

---

[9] American Bar Association Rule 1.2, "Scope of Representation & Allocation of Authority Between Client & Lawyer"
[10] *Id.*
[11] ABA Rule 1.2, Comments.

**PROPOSED *AMICUS CURIAE* BRIEF OF IMLA**

plaintiff's firm by a governmental client exercising its police powers are not new. While this *amicus* brief will not reprise the legal arguments made by the City, we note that similar assertions were made more than seven years ago in an opioid case being prosecuted by the State of New Hampshire, in a case referenced by Chicago. There, as here, the defendants argued that the government's contingency-based retention of the outside firm violated ethical standards. That posture was flatly rejected by the New Hampshire Supreme Court.[12] Such an argument should not be accommodated here, and this Court should not allow an unwarranted and abusive discovery strategy to proceed.

## CONCLUSION

IMLA urges this Court to reject defendants' arguments that Chicago's retention of outside counsel on a contingency basis works a deprivation of defendants' due process and is an unethical delegation of control by Chicago over the litigation.

Dated: August __, 2023   By:   */s/ Barbara A. Adams*

  Donahue & Rose, P.C.
  9501 West Devon Avenue, Suite 702
  Rosemont, Illinois 60018
  Telephone: (312) 541-1077
  Email: badams@drlawpc.com

  By:   */s/ Erich R. Eiselt*

  Deputy General Counsel
  International Municipal Lawyers Association
  51 Monroe Street, Suite 404
  Rockville, Maryland 20850
  Telephone: (202) 742-1017
  Email: eeiselt@imla.org

---

[12] *State of New Hampshire v. Actavis Pharma, Inc.*, no. 2016-0199 (N.H. June 30, 2017).

## CERTIFICATE OF SERVICE

      I certify that on August 30, 2023, I electronically filed the foregoing Motion with attached proposed *amicus curiae* brief with the Clerk of the United States District Court for the Northern District of Illinois using the Court's CM/ECF system, which will automatically send notification of this filing to all counsel of record.

      */s/ Barbara A. Adams*