**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| City of Chicago, | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:21-cv-05162 |
| DoorDash, Inc. and Caviar, LLC, | Hon. Jeremy C. Daniel |
| *Defendants*. | Magistrate Judge Jeffrey T. Gilbert |

**<u>JOINT STATUS REPORT</u>**

The parties file this Joint Status Report pursuant to the Court's guidance in the parties' February 13, 2024 status conference and subsequent Minute Order (Dkt. 283), wherein the Court directed the parties to more clearly explain the disputes regarding the discovery issues set forth in the parties' January 23, 2024 Joint Status Report (Dkt. 252). The discovery requests at issue are either requests issued by DoorDash as to which this Court partially denied the City's motion for a protective order (Dkt. 206) or narrowed versions of those requests. Accordingly, this updated report sets forth the parties' disputes side by side, and grouped by subject matter.

Section (II) concerns requests for certain of the City's investigation-related documents. Section (III) concerns requests for certain documents related to the City's Third-Party Food Delivery Services Rules ("Third-Party Rules"). Section (IV) addresses requests for the City's internal communications about the Chicago Fee. Section (V) relates to a request for internal City documents relating to guidance the City provided to DoorDash. Section (VI) concerns a request for internal City documents and communications relating to the BACP's determination that DoorDash violated the City's consumer protection ordinance.

## I.      Introduction

**DoorDash:** Since August 2023, DoorDash has been seeking a compromise with the City relating to the requests at issue in the City's motion for a protective order ("MPO"). *See* Dkt. 206. These include requests relating to the City's pre-suit investigation of DoorDash, the City's enforcement of the Third-Party Rules against DoorDash, and the Chicago Fee. The City admits it has in its possession "broad swaths" of unproduced, investigation-related documents (Dkt. 252 at 22). With the fact discovery cutoff looming, DoorDash seeks the Court's guidance in obtaining documents critical to its case.

After the Court partially denied the City's MPO, DoorDash issued new requests on September 27, 2023, which, as it explained in a September 18 letter, were meant to replace broader requests addressed in the Court's Order, related to the City's investigation of DoorDash and the Third-Party Rules. Most of these requests are tailored to a specific meeting in a two-month time period. The City protests that these requests "sow confusion." Yet instead of communicating that purported confusion to DoorDash, the City wrote, "We interpret your service of the 16 RFPs on September 28, 2023 to mean you no longer wish to meet-and-confer on these [new] requests . . . . The City also deems RFP Nos. 6, 8, 11, 50, 54, and 65, and Interrogatory No. 2 mooted by the new requests." City's 10/5/23 Ltr. at 2. The City thereby shut down negotiations as to the new, narrowed requests, as well as the requests they were meant to replace–even though DoorDash clarified in multiple letters that the requests were meant to replace broader requests. As to the new narrowed requests, in its objections and responses, the City provided not a single substantive response and for months has flatly refused to respond.

Worse, in its March 1 privilege log, the City confirmed that it will not log investigation-related documents, even categorically, until "the parties agree to a search in response to any of these RFPs, or if the Court overrules the City's unresolved objections to any of these RFPs."

Through this report, DoorDash is asking for a few, narrowly targeted categories of documents, as to which the Court partially denied the City's MPO, and which are directly relevant to the claims and defenses at issue. DoorDash seeks the City's communications about:

- (1) The City's investigation of DoorDash.

  - DoorDash narrowly targets only the parts of that investigation relating to DoorDash and this case. Investigation-related documents are undisputedly relevant, and DoorDash is aware that non-privileged documents exist given that the City identified many nonlawyers who worked on this investigation.

- (2) The Third-Party Rules.

  - These Rules govern the same conduct, and are based on the same two ordinances, at issue in this case. A finding by the City that DoorDash did not violate these Rules, just a few months before it sued DoorDash, would show that DoorDash's fee practices were not in fact deceptive, contrary to the City's allegations here. DoorDash limited its inquiry to a few meetings and a two-month period for each.

- (3) The Chicago Fee.

  - The City's position that all of its internal communications about the Fee are irrelevant is untenable, and DoorDash is entitled to understand the City's factual basis for its allegation that the Fee was deceptive, through narrow requests.

- (4) The City's guidance to DoorDash.

  - DoorDash is entitled to the City's internal communications about this guidance, as they are highly likely to be relevant to this case and underlie the City's own allegations.

- (5) The BACP's decision to bring this case.

  - Internal documents about this decision will shed light on the factual basis of the allegations in the Complaint, and test the nature of the City's compliance with the MCC § 2-25-090 pre-suit investigation requirement.

After months of back and forth, just hours before this report was due to be filed (on March 15), the City agreed to provide documents responsive to certain of the requests at issue. DoorDash appreciates these compromises, though they do not moot the parties' disputes, including because the City does not disclose the full search methodologies it intends to use for these requests.

So that the Court and the parties can finally resolve these disputes, DoorDash respectfully requests that the Court schedule a status conference regarding the issues raised herein. DoorDash further requests that the Court order the City, two weeks before that conference, to disclose any additional compromises it is willing to make, including all search methodologies it will use for the requests here at issue.

**City of Chicago:** The City has met and conferred in good faith with DoorDash on the discovery requests the Court identified in its order. In response to some requests, the City produced additional documents; in response to others, the City confirmed to Defendants that its production was complete. Most of Defendants' revised requests, however, were objectionable for the same reasons set forth in the City's motion for a protective order. *See* Dkt. 110. Nevertheless, in the spirit of concluding these matters where possible, the City has identified below searches it can conduct and productions it can make to resolve RFP Nos. 43, 88-89, 91-93 and one aspect of No. 98. The City maintains its full objections to RFP Nos. 83-87, 95-97, 41, and other aspects of No.98, as set forth below.

The City moved for a protective order on certain discovery requests because (a) DoorDash lacked a colorable basis for discovery on its selective prosecution and First Amendment retaliation defenses, and (b) DoorDash's requests were otherwise irrelevant, unduly burdensome, and not proportional to the needs of the case (Dkt. 110). The Court granted the motion in part, but it identified certain discovery requests that might benefit from further meet-and-confer efforts. Dkt. 206 at 52-53. These requests were Interrogatory No. 2 (identification of third parties with whom City communicated in its investigation) and the following RFPs: No. 6 (all documents related to City's decision to sue); No. 8 (all communications related to DoorDash); No. 11 (all documents related to the City's investigations of DoorDash); No. 41 (all documents related to the BACP

Commissioner's determination that DoorDash violated MCC § 2-25-090); No. 42 (all documents related to City regulations on fees that delivery companies charge restaurants); No. 43 (all City communications regarding the Chicago Fee); No. 50 (all City communications related to third-party delivery companies); No. 54 (all City communications related to DoorDash's initial public offering); and No. 65 (all documents related to BACP's 2020 correspondence with DoorDash regarding its compliance with the Third-Party Rules).

Defendants proposed revised discovery requests in September 2023. They narrowed RFP No. 41, accepted the City's narrowing of RFP No. 42, and asked the City to expand its searches for RFP No. 43. As to the other requests (Interrogatory No. 2 and RFP Nos. 6, 8, 11, 50, 54, and 65), Defendants did not simply propose narrowed parameters. Rather, they replaced the requests with 16 new RFPs (Nos. 83-98). The City timely objected and responded to RFP Nos. 83-98 and met and conferred in good faith with Defendants thereafter regarding its objections.

Defendants described RFP Nos. 83-98 as "narrowed" requests that would reduce the City's burden. In practice, they sowed confusion about what the parties previously agreed to and what discovery the City already completed. Further, in addressing these requests, the City incurred significant effort—to little avail—explaining to DoorDash that certain meetings were not about the topic DoorDash believed they were, or were otherwise irrelevant. Now that the parties are litigating these requests, the City has in some instances not just run a search to assess relevance and burden but at least partially reviewed that search. The result, as to certain of DoorDash's document requests, is that the City has found it easiest to commit to produce the documents rather than litigate further, despite the requests' irrelevance to this case. The City did not wish to further extend the length of this briefing with detailed search methodologies, but in response to DoorDash's request above, the City is happy to set those forth in a letter. The City views its offers

set forth in this briefing as significant concessions and not the starting point for yet more searches, but will nevertheless confer with DoorDash.

The City, however, maintains its objections to the relevance, scope, and burden of other requests—for example, those that seek the City's investigative correspondence and files on the investigation, beyond what the City has provided. DoorDash continues to imply that the City has not produced documents underlying the investigation that led to this lawsuit. In fact, the City has produced all non-privileged documents upon which the Complaint is based, including news reports, information from the DoorDash and Caviar platforms, surveys, academic studies, market data, test DoorDash orders, communications with restaurants and other third parties, and complaints about DoorDash. What the City objects to producing is the entire contents of its investigative files. As described below, the categories of materials the City has not produced are of marginal relevance and are either privileged or would require the City to search large volumes of privileged email to find.

DoorDash has further faulted the City for not categorically logging its privileged, investigation-related documents requested in RFP Nos. 95 and 96. In preparing its privilege log, the City conscientiously followed the principles set forth in the Court's May 2023 order granting in part and denying in part DoorDash's motion to compel. *See* Dkt. 163 at 9. Because the City has unresolved objections to the relevance, scope, and burden of RFP Nos. 95 and 96, the City understood that it "need not produce a privilege log [as to those requests] until the court has ruled on its other discovery objections." *Id.* (quoting *MOL (Am.), Inc. v. Carolina Cas. Ins. Co., EICC, Inc.*, 2006 WL 8461734, at *5–6 (N.D. Ill. Nov. 1, 2006)). In connection with its burden arguments, the City has provided herein certain components of a log, including the date ranges and number of emails involved. Nevertheless, if the Court would find provisional categorical log entries helpful

in adjudicating RFP Nos. 95 and 96, then the City can prepare log entries for the broadest possible scope of those document requests and supplement its log by March 22, 2024—the same date DoorDash's privilege log is due.

## II. DoorDash's Requests Related to the City's Investigation of DoorDash

## A. Overview

**DoorDash:** The City cites the findings of its investigation throughout its Complaint, including in connection with allegations related to menu pricing, disclosures, refunds, and restaurant affiliation. *See, e.g.*, Compl. ¶¶ 73, 129, 134, 138, 144. The City even seeks in damages "its costs of investigation," including attorneys' fees. *Id.* ¶ 199.

As this Court has determined, documents from the City's investigation of DoorDash are relevant. Dkt. 206 at 45 ("The City does not dispute (nor could it) that documents and communications collected during its investigation of DoorDash are relevant[.]"); see also *In re Marriott Int'l Customer Data Sec. Breach Litig.*, 2020 WL 6064589, at *1 (D. Md. Oct. 14, 2020) (in case where pre-suit investigation was also at issue and City of Chicago was defendant, finding it appropriate to order production or logging of "all documents and communications related to any investigation [the City] conducted"); *Spell v. McDaniel*, 591 F. Supp. 1090, 1115 (E.D.N.C. 1984) ("Information from investigations . . . is by definition highly relevant").

As DoorDash has stated *repeatedly*, we do not seek the City's "entire investigative file" (Dkt. 252 at 22). Instead, we seek non-privileged documents related to the City's investigation of DoorDash alone, only to the extent relevant to the City's allegations in this case.

**City of Chicago:** In directing the parties to meet and confer on RFP Nos. 8 and 11 ("[a]ll communications with any person relating to DoorDash" and "[a]ll documents related to investigations … relating to DoorDash"), the Court rejected DoorDash's argument that it is entitled to "all investigation-related documents." Dkt. 206 at 46 n.13. The Court distinguished the *Marriott*

case on which Defendants once again rely, finding that the circumstances of *Marriott* "do not clearly support the proportionality of DoorDash's broad requests for all communications related to the City's investigation here, including to the extent a significant amount of any responsive documents are likely to be privileged." *Id.* (explaining that in *Marriott*, "the requests related to the defendant's affirmative defense that the City had failed to conduct a pre-suit investigation and there were no burden or relevance objections in dispute; instead, the issue was clarification of whether the City had withheld any documents on privilege grounds"). The broad scope of RFP Nos. 95 and 96—DoorDash's replacements for RFP Nos. 8 and 11—presents the same relevance, burden, and proportionality concerns.

      **B.**    **RFP No. 95:** For the time period January 1, 2019 through June 28, 2021, DOCUMENTS RELATING TO YOUR investigation of DOORDASH, only to the extent the DOCUMENTS PERTAIN TO one or more of the allegations in YOUR COMPLAINT.

      **DoorDash:**  To obtain relevant investigation-related documents, DoorDash issued RFP No. 95. The City objects on grounds of burden, privilege, and relevance. The City admits it has "thousands of investigation-related emails" that have not been produced. City's 1/5/24 Ltr. at 3.

      As to burden, DoorDash is seeking a small part of the City's investigative file: namely, the subset of non-privileged documents that relate to the City's investigation of DoorDash alone, only to the extent they relate to the allegations in the Complaint.

      As to the City's date range objection, DoorDash first learned of this objection when the City shared a draft of this filing with DoorDash on March 11. Upon receiving the objection, DoorDash promptly sent the City a compromise, offering to narrow RFP Nos. 95 and 96 to the date range September 1, 2020 through June 28, 2021. The City refused to accept this compromise.

      As to privilege, the Court stated at the February 13 status conference that the City should not rely on a blanket assertion of privilege in lieu of reviewing its internal documents. 2/13/24 Hr.

Tr. at 17:12-16.  The Court also set the date for submission of this report for March 15, in part so that DoorDash could review and respond to the City's privilege assertions.  *Id.* at 75:6-16. Nevertheless, and despite the City's representation to the Court that its privilege log would contain "a combination of individual entries and assertions of categorical privilege" (*id.* at 10:24-25), the City's March 1 privilege log does not contain *any* categorical entries, and instead contends that the City will only log documents responsive to DoorDash's investigation-related requests "[i]f the parties agree to a search in response to any of these RFPs, or if the Court overrules the City's unresolved objections to any of these RFPs."  This response prevents DoorDash from assessing the City's claims of privilege as to relevant documents, which defeats, in significant part, the Court's effort to set the deadline for this report after the City's production of its privilege log.

The City once again states that the population DoorDash seeks is "principally" privileged, without providing any specifics and in spite of the Court's order denying the City's motion for a protective order as to investigation-related materials.  Dkt. 206 at 45-47.  Indeed, it is clear that the City has been asserting its burden objection without conducting even basic searches.  For example, as late as March 11, when the City shared a draft of its portion of this filing, it only included placeholders for the parameters of the searches it might run (but had not yet run) to determine the alleged burden.  The City cannot escape its obligation to produce investigation-related documents with a conclusory assertion that a privilege review would be too burdensome. After months of objecting on grounds of burden and privilege, the City's search ultimately returned only about 2,200 documents—a reasonably-sized population.

DoorDash is aware that responsive and non-privileged documents exist, given that the City has confirmed that nonlawyers participated in its investigation of DoorDash.  And, as this Court

has counseled, just because a communication involves a lawyer does not mean it is privileged. *See* 2/13/24 Hr. Tr. at 17:17-25.

As to relevance, the City admits that, "[t]o be sure, some evidence that the City collected during its investigation is relevant to the City's case-in-chief." Dkt. 110 at 9. DoorDash seeks just that: evidence that the City gathered about DoorDash, which informed this lawsuit and issues raised therein. The City says it need not search internal communications because the opinions of individual City employees are not relevant. But factual observations reflected in City communications are relevant both to the City's claims and DoorDash's defenses, and discoverable. Indeed, "internal emails among a company's employees have become a critical and highly persuasive form of evidence that invariably appears in modern litigation *in all types of cases*" and should not be categorically excluded. *H Guys, LLC v. Halal Guys Franchise, Inc.*, 2020 WL 3578026, at *2 (N.D. Ill. July 1, 2020) (emphasis added).

Contrary to the City's assertion below, DoorDash is not just seeking the documents the City "may have seen" but "did not use or rely upon" in drafting the Complaint. DoorDash is seeking internal communications from the City's investigation that form the basis of the allegations in the Complaint, including those relating to the evidence cited in the Complaint, as well as communications about topics in the Complaint, even if the specific evidence discussed was not cited in the Complaint. Again, nonprivileged communications are likely to exist given that the City itself has identified several nonlawyer City employees who were involved in the investigation that gave rise to this lawsuit. To date, the City has not produced any internal communications about its investigation of DoorDash beyond documents reflecting test orders the City placed.

The City's search population of 2,211 documents strikes DoorDash as a reasonable number of documents to search in response to this request, and we ask that the City do so.

**City of Chicago:**  RFP No. 95 is not meaningfully narrower than the request it replaced, as it relates to the City's investigation of DoorDash. The new request continues to require the City to search the entire contents of its investigative files. Specifically, RFP No. 95 seeks two categories of materials the City objects to searching for and reviewing:

First, the request encompasses the broad category of DoorDash-related documents in the City's possession that an attorney or investigator may have seen but that the City did not use or rely upon in any way for the allegations of the Complaint. These documents mainly consist of news articles or screenshots of the DoorDash site or other Internet materials. The relevance of such materials is limited because they did not inform the City's claims. The City has further objected to the time period of RFP No. 95—January 1, 2019 through June 28, 2021—since, as the City has informed Defendants, its investigation began in October 2020. The City appreciates DoorDash's willingness to narrow the search to comport more closely with the timeframe of the City's investigation. However, narrowing the timeframe does not resolve the fundamental problem with RFP No. 95. This request is not proportional to the needs of the case because the search for many of these materials, while not privileged themselves, would require the City to undertake the burdensome project of sifting through voluminous privileged emails related to the investigation.

Second, the request encompasses the investigation-related correspondence itself—principally, privileged emails. These documents are privileged and work product because they necessarily comprise: (1) communications among the Law Department, Cohen Milstein, and BACP lawyers conducting the investigation; (2) communications between those lawyers and BACP investigators and other client personnel; and (3) communications among BACP investigators who were carrying out a lawyer-directed investigation in anticipation of litigation. Apart from being privileged, work product-protected, or both, this correspondence is of marginal

relevance—since, for example, attorney opinions and legal strategy do not tend to prove or disprove the salient facts. DoorDash insists that it is entitled to the "factual observations" found in the internal emails of the opposing party's employees, but the case DoorDash relies on was a private commercial dispute between a franchisor and franchisee, in which those employees were witnesses. *See H Guys LLC v. Hallal Guys Franchise, Inc.*, 2019 WL 3337116, at *1 (N.D. Ill. July 25, 2019). That is not the circumstance in this law enforcement action, where the City's attorneys and investigators (other than in placing test orders) are not witnesses, generally do not have firsthand knowledge of the underlying facts, and therefore do not have discoverable "factual observations."[1]

For purposes of assessing the burden of the full scope of RFP No. 95, the City searched emails of 20 participants in the City's investigation, for the full period requested, using "DoorDash," "Caviar," "meal delivery," "third-party delivery," and variants.[2] That search identified 2,211 documents in the period from September 1, 2020, when the City's investigation began, through August 27, 2021, when the City filed its Complaint. The search limited these to

---

[1] In speaking to the burden of combing through a large volume of privileged material, the City is mindful of the Court's statements at the hearing that there are "gradations" in the privilege analysis. 2/13/24 Hearing Tr. at 16:13-17 ("A communication between lawyer and lawyer, or lawyer to client, decisionmaker and client … I view a lot differently than lawyer communication with another lawyer and some City businesspeople because then I start to wonder, was the communication about legal advice?"). In this circumstance, the communications are privileged or work product because they were in service of a law enforcement investigation. This was not a situation in which "dual hat" lawyers may have been providing the City policy or business advice rather than legal advice.

[2] The search included Law Department attorneys Stephen Kane, Elie Zenner, and Rachel Granetz; Law Department law clerk Deirdre McCall; Cohen Milstein attorneys Betsy Miller, Chloe Bootstaylor, Johanna Hickman, Brian Bowcut, Peter Ketcham-Colwill, Caitlin McGowan, and Maya Sequeira; Cohen Milstein paralegals Amelie Clemot, Camila Zubieta Ferreira, and James Melvin; BACP attorney Tamara Starks; and BACP client personnel Rosa Escareno, Miguel Campos, Jaime Martinez, Ivan Capifali, and Sherry Cianciarulo.

lawyer-to-lawyer communications and City lawyer communications to City personnel.[3] The City estimates that reviewing these documents for responsiveness and logging them for privilege would take 88-111 hours.[4] That project is unwarranted given the limited relevance of these materials.

Contrary to Defendants' claim, the City is not "asserting its burden objection without conducting even basic searches." The City's counsel are personally familiar with the volume of privileged email the City's investigation generated, and the City previously provided a burden estimate based on a related search.[5] Here, and as to other requests, the City has done its best to present refined numbers to the Court within the City's technical constraints. As the City noted at the status conference, there is some lag time associated with the City's centralized process for searching and exporting emails. 2/13/24 Hearing Tr. at 74-76.

Because the City has unresolved objections to the relevance and breadth of RFP No. 95, the City did not include a categorical privilege objection for this request in its log.[6] In doing so, as

---

[3] Any communications solely among non-lawyer participations in the investigation would be work product because the investigation was at the direction of attorneys and in anticipation of litigation. However, the City does not believe there were an appreciable number of such emails and has not included them in the burden analysis.

[4] The City has not submitted a declaration in support of its search results and hit counts in this informal briefing, but the City can do so upon request of the Court.

[5] In its motion for a protective order in April 2023, the City sought relief from a combination of requests that, collectively, sought the City's investigation correspondence not just for the investigation of DoorDash but for investigations of other meal delivery companies as well. The City reported then that a test search of company names and meal delivery-related terms, in the files of four City attorneys involved in the investigation, had returned more than 5,700 documents for the investigations collectively. Dkt. 110 at 15.

[6] In describing the log the City intended to provide, counsel indicated at the hearing that the log would contain some categorical entries. 2/13/24 Hearing Tr. at 10-11. The City does view a handful of DoorDash's 115 document requests as seeking categorically privileged material. However, in completing the log in the weeks following the hearing, the City determined that there were no such requests for which other objections were resolved, such that the City could identify the scope of responsive materials and prepare a corresponding privilege log entry.

noted above, the City followed the approach the Court described in its May 2023 order on

DoorDash's motion to compel:

> The rules require a sufficient privilege description where a party is withholding "information otherwise discoverable". FED.R.CIV.P. 26(b)(5). In *Philip Morris*, the court held, citing the 1993 Advisory Committee Notes to Rule 26(b)(5), "if a broad discovery request includes an allegedly privileged document, and if there is an objection to the scope of the request, the court should first decide whether the objection covers the document. If the court finds that the document is within the scope of the objection, and the court overrules the objection, it must then give the party an opportunity to list the document on a privilege log pursuant to Rule 26(b)(5)." *See also MOL (Am.), Inc. v. Carolina Cas. Ins. Co., EICC, Inc.*, No. 05 C 5562, 2006 WL 8461734, at *5–6 (N.D. Ill. Nov. 1, 2006) (where defendant argued "it need not produce a privilege log until the court has ruled on its other discovery objections," the court, relying on *Philip Morris*, 347 F.3d at 954, ordered the defendant "to produce an appropriate privilege log consistent with the discovery rulings" following the court's ruling on the defendant's objections).

Dkt. 163 at 9. Nevertheless, the City can provide a privilege log entry, assuming the full scope of

RFP No. 95, if that would be helpful to the Court.

C.    **RFP No. 96:** For the time period January 1, 2019 through June 28, 2021, DOCUMENTS (including COMMUNICATIONS between CITY OF CHICAGO employees) RELATING TO or reflecting COMMUNICATIONS between YOU and restaurants in the course of YOUR investigation of DOORDASH, only to the extent they PERTAIN TO the allegations in YOUR COMPLAINT.

**DoorDash:** As part of its investigation of DoorDash, the City interviewed restaurants.

DoorDash issued RFP No. 96 to obtain communications about those interviews. The City

represents that it has produced "documents exchanged with those restaurants," but that other

materials related to interviews are "overwhelmingly likely" to be privileged. Dkt. 252 at 19-20.

DoorDash is seeking the City's non-privileged internal communications about those interviews,

which would shed light on the restaurants' feedback and/or the City's factual findings. Such

materials are likely to exist given that many nonlawyers were involved in the City's investigation.

*See* 2/13/24 Hr. Tr. at 69:13-22 (Court indicating that nonlawyer communications about the

interviews are likely to be relevant).

As to relevance, internal documents about the City's communications with restaurants incident to its investigation are likely to shed light on facts that formed the basis for this lawsuit, as this Court has agreed. Dkt. 206 at 47 ("[A]s to restaurant interviews, the City does not appear to dispute these are relevant and responsive[.]"). For example, restaurants' responses to the City's interview questions are directly relevant to DoorDash's defense against the City's allegations about DoorDash's non-partner restaurant practices.

The City's claim of burden is unavailing. This request is limited in time to cover only the period the City started investigating DoorDash and is further limited to the allegations in the Complaint. The request is also not duplicative, as it only asks about the City's interviews of restaurants, specifically in connection with its investigation of DoorDash. To date, the City has only produced 26 documents relating to the restaurant interviews, the bulk of which are non-substantive emails in which the City requests or follows up on a call. Further, in the draft report it sent us on March 11, the City included placeholders for the results of the searches it planned to run to substantiate its burden and privilege claims. It is clear that the burden objection the City has been raising since October is not grounded in fact.

The City's proposed population of 559 documents appears manageable to DoorDash, and we ask that the City review them, and produce or log responsive documents.

**City of Chicago:** In response to RFP No. 96 and several overlapping requests, the City identified the restaurants with which it communicated, produced its communications with those restaurants, and produced documents provided by or to those restaurants. The City further identified on its privilege log its summaries of 36 interviews with restaurant owners and managers, which are work product reflecting attorney mental impressions. What remain are internal City communications "relating to" communications with those restaurants.

15

The City objects to this aspect of RFP No. 96 as overbroad, unduly burdensome, and not proportional to the needs of the case. The City also objects to the January 1, 2019 – June 28, 2021 timeframe, since its investigation began in October 2020. Because RFP No. 96 concerns communications in the course of the City's investigation of DoorDash for the Complaint, these internal communications "relating to" communications with restaurants are overwhelming likely to be privileged or work product. They consist principally, if not exclusively, of: (1) communications among the Law Department, Cohen Milstein, and BACP lawyers conducting the investigation; (2) communications between those lawyers and BACP investigators and other client personnel; and (3) communications among BACP investigators who were carrying out a lawyer-directed investigation in anticipation of litigation. Although the City cannot rule out that there may have been some small number of responsive, non-privileged communications from non-lawyers, solely to other non-lawyers outside the investigation team, that does not justify the broad search of privileged materials demanded here.

To assess the burden of the full scope of RFP No. 96, the City searched emails among 20 participants in the City's investigation for (1) "DoorDash" and variants, in association with (2) the names of restaurants and restaurant owners and managers the City communicated with. That search identified 559 documents in the period from September 1, 2020 through August 27, 2021, when the City filed its Complaint. The City estimates that reviewing these documents for responsiveness and individually logging them for privilege would take 23 to 28 hours. The City disagrees with DoorDash that this project is warranted.

As with RFP No. 95, the City did not include a categorical privilege objection for RFP No. 96 on its log. The City has unresolved objections to the scope and burden of RFP No. 96, the resolution of which would impact the necessity for and parameters of an assertion of categorical

privilege. Nevertheless, if the Court would find a categorical log entry helpful in adjudicating RFP No. 96, then the City can prepare one for the broadest possible scope of this request and supplement its log by March 22, 2024.

### III. DoorDash's Requests Related to the Third-Party Rules

#### A. Overview

**DoorDash:** The BACP's Third Party Food Delivery Services Rules, published on May 12, 2020 ("Third-Party Rules"), regulated the form of food delivery services' fee-related disclosures to consumers—the very same conduct at issue in this litigation.

The City's documents about the Third-Party Rules, and its determination that DoorDash complied with those rules, are critical to DoorDash's defense of this matter. The Third-Party Rules govern food delivery companies' consumer fee transparency, and a violation of the Rules constitutes a violation of the same two ordinances under which the City brought this case. Thus, a finding by the City that DoorDash was complying with the Third-Party Rules, just months before it filed this case, would provide very compelling evidence that DoorDash's fee disclosures were sufficiently transparent to consumers. *See Washington v. Hyatt Hotels Corp.,* 2020 WL 3058118, at \*5 (N.D. Ill. June 9, 2020) ("clear and conspicuous" disclosures are a defense to liability).

Until March 15, 2024, the City refused to produce any internal communications about the Third-Party Rules beyond a handful of emails. Through narrow, meeting-specific requests, DoorDash seeks the City's internal communications about the Rules, which would shed light on DoorDash's compliance with those Rules, any facts on which the City relied to make that determination, and other facts in the City's possession relating to consumer understanding of fee disclosures or the purported harm of existing fee practices. Under the law, the factual similarities between the Third-Party Rules and the Complaint's allegations confirm that this is an appropriate avenue for discovery. *See Diamond Servs. Mgmt. Co., LLC v. C&C Jewelry Mfg., Inc.*, 2021 WL

1165091, at *5 (N.D. Ill. Mar. 26, 2021) (a party should produce documents related to the claims or defenses at issue "unless [they are] somehow so far beyond the scope of Rule 26(b)(1) relevancy that they have no bearing at all on any claim or defense in the case for discovery purposes").

The City makes much of the fact that it produced documents responsive to RFP No. 42 ("all documents related to [the City's] proposed and actual regulations, rules, or policies related to [Third-Party Rules]"). While DoorDash did state that it would consider RFP No. 42 satisfied if the City complied with the parties' negotiated search methodology (DoorDash's 9/18/23 Ltr. at 6), it also stated *in the same letter* its intent to propound additional requests (RFP Nos. 83-90 and 92-93) to target specific meetings related to the Third-Party Rules, and included the text of those RFPs, to make clear to the City that it was not abandoning discovery into the Third-Party Rules. DoorDash issued these narrowed requests to reduce Plaintiff's discovery burden, and in recognition of the Court's finding that RFP No. 42 was overbroad as written. Dkt. 206 at 41. Neither the fact that DoorDash considered one request satisfied, nor the fact that the City has produced *some* discovery, means that the City can foreclose further discovery into this issue.

**The Third-Party Rules concern the *same ordinances* that are at issue in this case.** Third-Party Rule 1.06 provides that "[f]ailure to comply with these rules is declared to be a deceptive practice under Municipal Code of Chicago Sections 2-25-090 and 4-276-470." CityofChicago_DD_ProdVol6_0008451, at -57.[7] In this case, the City alleges that DoorDash violated the same two ordinances. Compl. ¶¶ 188-210.

---

[7] *Also available at*:
https://www.chicago.gov/content/dam/city/depts/dol/rulesandregs/Third%20Party%20Delivery%20Servic es%20Rules.pdf.

**The Third-Party Rules govern the *same conduct* addressed in the City's Complaint.**

The chart below details the many similarities between the Third-Party Rules and this case:

| **Third-Party Rule 1.01:** "[B]efore a transaction occurs . . . the third-party food delivery service shall disclose to the customer, in plain and simple language and in a conspicuous manner": | **City's Parallel Allegations in this Action** |
|---|---|
| "(1) the menu price of the food" | The City alleges that some menu prices on the DoorDash platform are artificially inflated or otherwise inaccurate. *See, e.g.,* Compl. ¶ 95. |
| "(2) any sales or other tax applied to the transaction" | The City alleges that DoorDash misled consumers about the source of fees by combining taxes with other fees. *See, e.g.*, Compl. ¶ 6(a) ("DoorDash and Caviar hide [certain consumer fees] by grouping them with taxes, suggesting that the fees are government-imposed."); *id.* at ¶¶ 48, 52, 55, 56. |
| "(3) any delivery charge or service fee, imposed on or collected from the customer by the third-party food delivery service or by the covered establishment, in addition to the menu price of food" | The City alleges that DoorDash's presentation of delivery fees, service fees, and other fees is deceptive. *See, e.g.*, Compl. ¶¶ 6(a), 48 (claiming that DoorDash's Small Order Fee and Service Fee "do not appear anywhere at checkout, by name or amount, even though they have been added to the consumer's total"); *id.* at ¶¶ 52, 55. |
| "(4) any tip that will be paid to the person delivering the food, and not to the third-party food delivery service, that was added into the transaction when it occurred" | The City alleges that DoorDash failed to disclose that DoorDash purportedly took a portion of the tip paid by the consumer to the delivery person ("Dasher"). *See, e.g.*, Compl. ¶¶ 169, 173, 176, 178. |
| **Third-Party Rule 1.02:** "After a transaction occurs for the purchase and delivery of food from a covered establishment through a third-party food delivery service, and when the food is delivered to the customer, if the third-party food delivery service provides a printed receipt to the customer, the receipt shall disclose, in plain and simple language and in a conspicuous manner," the price, tax, delivery or service fee, tip, and commission." | The City alleges that DoorDash trains Dashers to withhold printed receipts. Compl. ¶ 139. |

The City also used the exact same investigators and investigative techniques to determine DoorDash's compliance with the Third-Party Rules and with the MCC ordinances at issue in this case. In both investigations, BACP investigators Miguel Campos and Jaime Martinez placed test orders on DoorDash, supervised by Sherri Cianciarulo and Ivan Capifali of the BACP.

The City's recitation of other conduct contained in the Complaint, not addressed by the Third-Party Rules, is irrelevant. The fact remains that there is significant overlap between the conduct regulated by the Third-Party Rules and that cited in the Complaint.

**The BACP represented on *multiple occasions* that DoorDash was complying with the Third-Party Rules, which provides a defense to the bulk of the City's claims.** For example, in September 2020, in response to a Consumer Reports inquiry into "whether clear disclosure of all fees and commissions required by the new rules were being disclosed to consumers," BACP Director of Public Information Isaac Reichman stated that, "[a]t this point, DoorDash and Beyond Menu have proven to BACP that they are substantially compliant." CityofChicago_DD_ProdVol9_0010661, -0672. Consumer Reports' repeated reference to "rules" plural indicates that Consumer Reports' inquiry—and BACP's response—related to whether DoorDash was compliant with all or at the very least multiple of the Third-Party Rules. Further, in a November 17, 2020 Chicago City Council, BACP Commissioner Escareño stated, "I will tell you since the implementation of the [May 2020 Third-Party] rule, that the companies have been compliant, and we've been working with them very closely on this issue."[8]

To determine whether a business practice is deceptive, the finder of fact must consider "the totality of the information" available to a reasonable consumer. *Benson v. Fannie May Confections*

---

[8] *Joint Committee: Finance; License and Consumer Protection*, CHICAGO COUNCILMATIC (Nov. 17, 2020), https://chicago.councilmatic.org/event/joint-committee-finance-license-and-7d0bbe5331e7/, at 41:19.

*Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019). A "clear and conspicuous" disclosure made to consumers as part of the checkout process is a defense to liability. *See, e.g., Washington*, 2020 WL 3058118, at *5. Because the Third-Party Rules require food delivery companies to disclose fees to consumers in a transparent way, documents supporting the finding that DoorDash complied with the Third-Party Rules are relevant evidence that DoorDash's fees were clearly disclosed to consumers. The City now admits that DoorDash's compliance, at minimum, is a "potentially relevant merits question." The City asks us to take its word that "BACP's investigation of DoorDash, and BACP's determination regarding DoorDash's compliance, were limited to the [commission cap rules]." But DoorDash is entitled to test this assertion through discovery.

**The BACP gathered relevant information about consumer disclosures by third-party delivery companies before finalizing the Third-Party Rules.** The City's document productions indicate that the BACP considered even more types of consumer disclosures than were included in the final version of the Third-Party Rules. On April 28, 2020, a few weeks before the Rules were finalized, the BACP issued a Third Party Delivery Regulation Brief, stating that the BACP planned "to research best practices and recommend long-term policy goals or the City of Chicago which will require ongoing dialogue with affected parties." CityofChicago_DD_ProdVol6_0008222 at -23. In a June 2020 email, Commissioner Escareño indicated that the City had discussions with interested parties about how to regulate the different models and commissions used by different third-party delivery companies. CityofChicago_DD_ProdVol11_0011964. Documents showing industry best practices approved of or endorsed by the BACP regarding consumer disclosures are relevant to determine whether a reasonable consumer would be deceived by the practices at issue here. *See Fuchs v. Menard, Inc.*, 2017 WL 4339821, at *4 (N.D. Ill. Sept. 29, 2017). The City admits that, in drafting the Third-

Party Rules, the City considered whether material information had not been adequately disclosed to consumers by third-party delivery companies.

For these reasons, the City's documents regarding the Third-Party Rules, the City's information-gathering before passing the rules, and the determination of DoorDash's compliance with those rules are directly relevant to the parties' claims and defenses, and should be produced.

**City of Chicago:** DoorDash has vastly overstated the relevance of the Third-Party Food Delivery Services Rules, mischaracterizing those rules—and this enforcement action—in key respects. Nevertheless, in response to RFP Nos. 42 and 65, the City conducted an agreed search for internal communications, over a six-month period, regarding BACP's inquiry into DoorDash's compliance with the Third-Party Rules. Defendants' additional requests for documents relating to specific meetings about DoorDash's compliance in that same period are duplicative. The City stands by its objections that requests relating to development of the Rules are irrelevant, unduly burdensome, and not proportional to the needs of the case.

BACP adopted the Third-Party Rules in May 2020, based on findings that the commissions that meal delivery companies charge restaurants "may not be obvious or transparent to the consumer" wishing to directly support local businesses. Rules for Third-Party Food Delivery Services, § 1, Purpose of Rules. Although the Rules impose certain specific requirements regarding disclosure of consumer fees and prices, the Rules' overarching purpose is to ensure that meal delivery companies "disclose commissions or other fees that are charged *to the restaurant* in connection with the transaction … to consumers." *Id.* (emphasis added). Like a number of other City regulations, the Rules provide that failure to comply will constitute a deceptive practice under the City's broad-based consumer protection ordinances, MCC §§ 2-25-090 and 4-276-470. *Id.*,

Rule 1.06. However, compliance with the Rules is not a safe harbor against enforcement of those ordinances based on other forms of deceptive or unfair conduct.

The Third-Party Rules do not govern the City's enforcement action. The City alleges freestanding violations of MCC §§ 2-25-090 and 4-276-470 and does not base any of its claims on the Rules. Contrary to DoorDash's arguments above, the Rules do not "govern the same conduct" recited in the Complaint, as the Court recognized in its order on the City's motion for a protective order. Dkt. 206 at 17 ("DoorDash … fails to acknowledge that the City's Complaint in this case alleges misconduct by DoorDash beyond fee disclosures …."). Specifically:

- The Rules do not address meal delivery companies' listings of non-partner restaurants. The City alleges that DoorDash deceptively and unfairly listed non-partner restaurants without their consent. Compl. ¶¶ 112-62.

- The Rules do not address the advertisement of discounts. The City alleges that DoorDash deceptively advertised discounts in unqualified terms, without disclosing that there was a minimum order requirement. Compl. ¶¶ 96-111.

- Rules 1.01 and 1.02 require meal delivery companies to disclose, before purchase and in the receipt, the amount of the tip that will be paid to the delivery driver. The City does not allege that DoorDash failed to disclose the amount of the tip. Rather, the City alleges that DoorDash used those tip payments to reduce its own payment obligations to drivers, while representing to consumers that the tip amount was 100% over-and-above the drivers' contract pay—an independently deceptive and unfair practice. Compl. ¶¶ 163-87. This conduct also predated the Rules. *See id.* ¶ 163.

- Rules 1.01 and 1.02 require meal delivery companies to disclose, before purchase and in the receipt, the menu price charged for the food. The City does not allege that DoorDash failed to disclose the menu price of the food. Rather, the City alleges that DoorDash advertised menu prices that were higher than those available directly from the restaurant, without disclosing that fact to consumers—an independently deceptive practice. Compl. ¶¶ 69-95.

- Rules 1.01 and 1.02 require meal delivery companies to disclose, before purchase and in the receipt, the delivery fee for the food. The City does not allege that DoorDash failed to disclose the delivery fee at checkout or in the receipt. Rather, the City alleges that DoorDash engaged in a bait-and-switch by advertising a delivery fee on its home page and restaurant landing pages that was not the full price of delivery—an independently deceptive and unfair practice. Compl. ¶¶ 23-47.

The City acknowledges that DoorDash's compliance with the Third-Party Rules potentially has some relevance. DoorDash has pointed to public communications by BACP, including to *Consumer Reports*, that DoorDash was "substantially compliant" with the Rules. What BACP personnel meant by that phrase is disputed. DoorDash believes that if BACP found the company compliant with the consumer fee provisions of Rules 1.01 and 1.02, then that could be a defense to the City's allegations that DoorDash failed to clearly disclose its service fee and small order fee. *See* Compl. ¶¶ 48-56. The City maintains that BACP's investigation of DoorDash, and BACP's determination regarding DoorDash's compliance, were limited to the Rule 1.03 provisions regarding restaurant commission disclosure—the main thrust of the Rules.[9] Indeed, the Court's order on the City's motion for protective order recognized that the June and July 2020 correspondence between BACP and DoorDash related to Rule 1.03. Dkt. 206 at 17 ("The much broader variety of alleged deceptive acts and conduct alleged in the Complaint go far beyond the narrow issue of [restaurant] commission disclosures that DoorDash addressed with the City … and as to which it was reportedly compliant.").

Regardless, the City recognizes that this is a potentially relevant merits question. Therefore, in response to RFP Nos. 42 and 65, the City searched for and produced internal communications regarding BACP's inquiry into DoorDash's compliance with the Third-Party Rules. Contrary to DoorDash's claim that the City "has refused to provide details regarding its determination … beyond a couple emails with DoorDash," the City searched the emails of seven BACP and Law Department custodians for the period April 1 – September 30, 2020. The City did not limit this

---

[9] DoorDash's partial quotation of this position above confuses the Rule 1.03 commission disclosure provision with "commission cap rules"—separate "commission cap" or "fee cap" ordinances that limited the restaurant commission amounts meal delivery companies could charge, which are not relevant to this discussion.

search to compliance with Rule 1.03. As DoorDash acknowledges above, it agreed in September 2023 that this search methodology satisfied RFP No. 42.

The City objects, however, to discovery requests seeking its internal communications regarding drafts and development of the Third-Party Rules. By their nature, draft rules do not reflect the official position of the City and do not govern any company's conduct. Further, internal discussions about rules in development could not possibly bear on whether DoorDash's conduct in this case—which is not even predicated on the final Third-Party Rules—is unlawful. As the Court noted in the status conference, "from what I can tell, meetings about drafts, even meetings about rules that are coming into [e]fect, I think have very little bearing on the issues that are going to be important in this case." Feb. 13, 2024 Hearing Tr. at 60:13-17. In response to that assessment, the only argument DoorDash proffers above is that the City "considered how to regulate" the meal delivery companies and "industry best practices approved of or endorsed by the BACP … are relevant to determine whether a reasonable consumer would be deceived by the business practices at issue." But that is the point: the City could not possibly approve best practices, against which to assess DoorDash's conduct in this case, in internal communications and draft rules. Only the inquiry into DoorDash's compliance with the final Third-Party Rules is potentially relevant.

**B.** __RFP Nos. 83-90 and 92-93__ (Documents Concerning Meetings Related to the Third-Party Rules)

- **RFP No. 83:** "DOCUMENTS from April 1, 2020 through May 30, 2020 RELATING TO the April 28, 2020 meeting titled 'Briefing w/ Chicago Alderman Vazquez, Waguespack, Reilly & Mitts on Fee Cap Proposal.' *See* CityofChicago_DD_ProdVol6_0008772."

- **RFP No. 84:** "DOCUMENTS from April 1, 2020 through May 30, 2020 prepared for, discussed in, and/or generated as a result of the April 28-29, 2020 meeting titled 'Receipt Transparency Discussion with Mayor's Office & BACP.' *See* CityofChicago_DD_ProdVol6_0008774."

- **RFP No. 85:** "DOCUMENTS from April 1, 2020 through May 30, 2020 prepared for, discussed in, and/or generated as a result of the April 30, 2020 meeting titled 'DoorDash:

Food Delivery Consumer Transparency Rules Discussion.' *See* CityofChicago_DD_ProdVol6_0008773."

- **RFP No. 86:** "DOCUMENTS from April 4, 2020 through June 4, 2020 prepared for, discussed in, and/or generated as a result of the May 4, 2020 meeting titled 'Food Delivery Rules and Discussion.' *See* CityofChicago_DD_ProdVol6_0008844."

- **RFP No. 87:** "DOCUMENTS from April 4, 2020 through June 4, 2020 prepared for, discussed in, and/or generated as a result of the May 4, 2020 meeting titled 'Food Delivery Rules – Final Draft Discussion.' *See* CityofChicago_DD_ProdVol6_0008779."

- **RFP No. 88:** "DOCUMENTS from June 7, 2020 through August 7, 2020 RELATING TO the July 7, 2020 meeting titled 'DoorDash – Third Party Rules Compliance Discussion.' *See* CityofChicago_DD_ProdVol6_0008777."

- **RFP No. 89:** "DOCUMENTS from September 30, 2020 through November 30, 2020 RELATING TO the October 30, 2020 meeting titled 'Economic Relief Discussion for Chicago Restaurants.' *See* CityofChicago_DD_ProdVol6_0008778."

- **RFP No. 90:** "DOCUMENTS from October 24, 2020 through December 24, 2020 RELATING TO the November 24, 2020 meeting titled "Third Party Servicer Compliance with New Regulations." *See* CityofChicago_DD_ProdVol6_0008776."

- **RFP No. 92:** "DOCUMENTS from April 13, 2021 through June 13, 2021 prepared for, discussed in, and/or generated as a result of the May 13, 2021 meeting titled 'App-Based Industry Discussion.' *See* CityofChicago_DD_ProdVol6_0008786."

- **RFP No. 93:** "DOCUMENTS from June 14, 2021 through August 14, 2021 prepared for, discussed in, and/or generated as a result of the July 14, 2021 meeting titled 'Third Party Food Delivery Meeting.' *See* CityofChicago_DD_ProdVol6_0008168."

**DoorDash:** DoorDash issued RFP Nos. 83-90 and 92-93 to reveal the facts that informed the BACP's assessment of DoorDash's compliance with the Third-Party Rules. For months, the City refused to respond to these RFPs at all, arguing they were burdensome and irrelevant. Only on March 15, the day of this filing, did the City produce search results indicating its purported burden in connection with these requests, and agree to review and produce certain documents related to RFP Nos. 88-89 and 92-93. These concessions, while appreciated, come too late for DoorDash to meaningfully respond in the few hours before this filing is due—though we've done our best herein to describe the remaining gap between the parties.

As to burden, each of RFP Nos. 83-90 and 92-93 spans just two months and asks about one BACP meeting that the City has identified. The requests even refer to the calendar invites the City produced that list the meetings' attendees, all but providing the City with a search methodology.

The City continues to claim that searching for these materials is burdensome. However, in its searches for RFP Nos. 84-87, it lumps multiple requests together, expands the relevant date range beyond that requested by DoorDash, and uses a broad set of custodians rather than simply using the meeting attendees of each meeting referenced in the cited documents. Thus, these searches overstate the burden of the City's review.

As to RFP No. 88, DoorDash appreciates the City's agreement, disclosed for the first time today, to review and produce relevant documents. Yet the parties' dispute is not resolved until the parties agree to a search methodology. We ask the City to disclose one by March 22.

As to RFP Nos. 89 and 92-93, DoorDash appreciates the City's willingness, as of March 15, 2024, to review and produce documents from its searches described below, and asks that the City do so. However, the City's proposed searches for those RFPs are insufficient to conclude that these meetings were not related to the Third-Party Rules. The City states that it has searched iterations of each idiosyncratic meeting name, but did not run searches for key terms like "transparency" or "fee" over the relevant custodians and two-month time period of each request.

As to relevance, DoorDash explained the relevance of the Third-Party Rules in section (A). Further, RFP Nos. 83-90 and 92-93 are narrowly tailored to obtain relevant information for the following additional reasons: (1) each meeting invitation referenced in the requests shows that

individuals whom the City has identified as having relevant information were in attendance[10]; (2) the title of each meeting suggests a relationship with specific issues raised in the City's complaint[11]; and (3) the meetings occurred during lead-up to the City's decision to sue DoorDash.

In its March 11, 2024 objections and responses to DoorDash's Third Set of Requests for Admission, moreover, the City admitted that the Third-Party Rules were discussed at the meeting referenced in RFP No. 83, and said of the meeting referenced in RFP No. 90 that "the City cannot rule out that the Third-Party Food Delivery Services Rules came up at the meeting."

The City's purported search burden for RFP Nos. 84-87, of 1,701 documents, appears reasonable to DoorDash, though DoorDash asks that the City additionally run searches over the time period and custodians specific to the meeting in each of these requests. Similarly, the City's purported search burden for RFP No. 90, of 421 documents, and its search for other Third-Party Rule-related documents, generating 553 documents, seems manageable. DoorDash asks that the City review these searches and produce or log responsive documents. Finally, DoorDash appreciates the City's proposal to produce documents responsive to RFP Nos. 88-89 and 92-93, but asks that the City propose and run more fulsome searches as to those requests, as requested above, by March 22, 2024.

**City of Chicago:** RFP Nos. 84-87 all concern April and May 2020 meetings about the development of the Third-Party Rules. In addition, RFP No. 83 concerns an April 26, 2020 meeting about a separate topic—caps on fees meal delivery companies could charge restaurants—in which

---

[10] *See* City's 8/14/23 Resp. to Interrogatory Nos. 1-2 (identifying Matthew Allee, Tiffany Brooks, Max Budovitch, Jennie Cruz, Rosa Escareño, and Shannon Trotter, among others, as being "[i]nvolved in [the] BACP inquiry into DoorDash's compliance with" the Third-Party Rules).

[11] *See, e.g.*, RFP 84 ("[M]eeting titled 'Receipt Transparency Discussion with Mayor's Office & BACP); Compl. ¶ 139 (alleging DoorDash trained drivers to hinder receipt transparency).

the draft Third-Party Rules came up in passing.[12] Internal communications about the draft Rules are irrelevant for the reasons discussed above.[13] But even assuming some marginal relevance of such communications, these requests are unduly burdensome and not proportional to the needs of the case. Although DoorDash purports to reduce the burden of these requests by targeting communications relating to specific meetings, it negates any burden reduction by asking about a two-month period surrounding each meeting. The difficulty that presents is that April and May 2020 were an extremely active period in the development of the Third-Party Rules, which were published on May 12, 2020. It is not feasible to distinguish documents that might "relate to" these specific meetings from documents that relate to development of the Rules generally.

To assess the burden of RFP Nos. 83-87, the City searched the emails of 11 BACP and Law Department custodians who were involved in development of the Rules. The search covered the full period of the requests, April 1, 2020 – June 4, 2020, and used common referents to the Third-Party Rules as search terms, including "receipt transparency," "transparency rules," "food delivery rules," "third party rules," and variants. The search identified 1,701 documents.[14] The

---

[12] In response to DoorDash's request for admission, the City admitted that proposed Third-Party Rules were discussed at the meeting because the notes of an attendee reflect that they came up briefly at the start of a meeting that was otherwise about fee caps. Internal discussions about the draft Rules, whether brief or extensive, are not relevant to the issues in this case.

[13] As an example of the stretches DoorDash makes to connect the Third-Party Rules to conduct alleged in the Complaint, DoorDash equates the "receipt transparency" meeting referenced in RFP No. 84 with what it describes as a "receipt transparency" allegation. The meeting concerned the Third-Party Rules, the final version of which required meal delivery companies to clearly disclose certain charges on the receipt. In its Complaint, the City alleged that DoorDash hid price discrepancies in its unauthorized, non-partner listings by instructing drivers to remove the restaurant receipt from the delivery bag. Compl. ¶ 139. These are unrelated issues.

[14] Hit counts for this RFP and certain others provided to DoorDash in a preliminary draft of this joint status report inadvertently reflected a range of formats (attachments included or not included, search results de-duplicated or not duplicated). In this document, the City has standardized its presentation of all search results: attachments are included in the counts; duplicates have been removed from the counts.

City estimates that reviewing the documents for responsiveness and logging any privileged documents would take 57-85 hours. This effort is not proportional to the needs of the case. DoorDash complains that the City has "lumped multiple requests together" for RFP Nos. 83-87, but that is perfectly appropriate given the tightly overlapping timeframes (all either April 1 – May 30, 2020 or April 4 – June 4, 2020) and custodians for these requests.

The meeting referenced in RFP No. 90 does not relate to the Third-Party Rules and is therefore irrelevant. Although the subject line of the meeting invitation references "Third Party Servicer Compliance with New Regulations," the text included in that invitation makes clear it relates to a fee cap enacted by the City Council on November 23, 2020 and effective December 3, 2020. *See* SO2020-5705, "Temporary emergency regulation of third-party food delivery service fees to restaurants and food dispensing establishments." The City conveyed this information to DoorDash, which has continued to insist that this document relates to the Third-Party Rules (which were administratively adopted, not enacted by the City Council).

To assess the burden of further searches in response to RFP No. 90, the City searched the emails of the five BACP custodians listed as attendees of the meeting. The search covered the full period of the request, October 24, 2020 – December 24, 2020, and used the term "third-party servicer" and a variant without the hyphen. The search identified 421 documents that have not been produced. The City reviewed a sample of 30 emails in this set, and all were either duplicates of the meeting invitation or discussion of the new fee cap ordinance in connection with the meeting. The City estimates that reviewing the documents for responsiveness and logging any privileged documents would take 14-21 hours, which is not proportional to the needs of the case given the demonstrable irrelevance of the meeting in question. While DoorDash notes that the City recently admitted that it could not rule out whether the Third-Party Rules came up at this meeting,

30

that is simply a reflection of the fact that the meeting occurred more than three years ago, and attendee memories of everything that came up at the meeting have faded.

RFP No. 88 concerns a July 7, 2020 meeting regarding "DoorDash – Third Party Rules Compliance Discussion." Defendants have this document because the City produced it in the broader search for documents relating to BACP's inquiry into DoorDash's compliance with the Third-Party Rules. On further consideration, however, the City will withdraw its objection to RFP No. 88 as cumulative and will conduct a search, of all seven meeting attendees' files for the time period requested, to identify documents relating to the referenced meeting.

RFP Nos. 89, 92, and 93 concern meetings about "Economic Relief Discussion for Chicago Restaurants," "App-Based Industry Discussion," and "Third-Party Food Delivery," respectively. On the face of the referenced meeting invitations, the City had no reason to believe that these meetings related to DoorDash's compliance with the Third-Party Rules, and accordingly objected to the relevance of the requests. The City also made internal inquiries and communicated to Defendants that these meetings were not related to the Third-Party Rules.

To conclusively resolve these disputes, however, the City conducted searches for documents potentially responsive to each request. For RFP No. 89, the City searched the five City custodians on the meeting invitation, for the full period covered by the request, using the term "economic relief" within four words of "restaurant." The search returned 217 documents. The phrase "Economic Relief Discussion for Chicago Restaurants" appears to have been a subject line that City personnel and representatives of the meal delivery industry, including DoorDash, used to discuss the City's draft restaurant commission fee cap proposals and a City promotional campaign titled "Take Out Chicago"—neither of which is relevant to this case. The search pulled in only incidental references to the Third-Party Rules, in a forward of an email used to identify contacts

31

for DoorDash and in an attachment that was part of a voluminous FOIA response. However, now that the City has identified these documents, it will review these documents for privilege, produce the non-privileged documents to DoorDash, and log any privileged documents. The City disagrees with DoorDash that yet more searches are necessary.

For RFP No. 92, the City searched the three City custodians on the meeting invitation, for the full period covered by the request, using the term "app-based" and a variant. The documents identified in that search reflect that this meeting concerned general discussion about ways that app-based business, including but not limited to meal delivery companies, could support Chicago businesses, workers, and consumers as the City emerged from the pandemic. Other documents from the search, not demonstrably related to the meeting but containing the term "app-based," reflect discussion of the City's regulatory program, including for app-based businesses, but not the Third-Party Rules. The City considers these documents irrelevant, but now that it has identified them, it will review them for privilege, produce the non-privileged documents, and log the others. The City again disagrees with DoorDash that yet more searches are necessary.

Finally, RFP No. 93 concerned a July 14, 2021 meeting on the general topic "Third Party Food Delivery." To understand whether this meeting may have been about a relevant topic, the City searched the three custodians identified in the meeting invitation, for the month of July 2021, using the term "third party food delivery" and a variant with a hyphen. That search did not turn up any documents relating to DoorDash's compliance with the Third-Party Rules. The search identified only the meeting invitations already produced, other versions of the meeting invitation that likewise do not disclose the specific topic of the meeting, copies of draft and final fee cap ordinances, documents containing passing references to proposed fee cap ordinances or meal delivery company licensing issues not at issue in this lawsuit, communications with another meal

delivery company (not DoorDash) and a handful of privileged documents relating to the City's meal delivery lawsuits. Now that the City has identified these documents, it will review them for privilege, produce the non-privileged documents, and log the others.

The City also searched these custodians and period for "DoorDash" and variants in association with terms for the Third-Party Rules, including "transparency rules," "food delivery rules," "third-party rules," and variants. That search identified zero results, indicating that this meeting was unlikely to be about the Third-Party Rules. Because of the general nature of the meeting topic, a more exhaustive search would pull in voluminous documents. For example, the City searched nine BACP custodians it identified as being involved in third-party meal delivery issues, for the full period requested by DoorDash, using the search term "DoorDash" and variants. That search returned 553 documents. The City estimates that reviewing these documents for responsiveness and logging any privileged documents would take 18-27 hours. This effort is not proportional to the needs of the case, given that the City could find no indication this meeting related to the Third-Party Rules.

    **C.**    <u>**RFP No. 97:**</u> Documents from February 1, 2020 through April 30, 2020 relating to the research, drafting, or interpretation of BACP's April 28, 2020 Third Party Delivery Regulation Brief. *See* CityofChicago_DD_ProdVol6_000822[2].

<u>**DoorDash:**</u> On April 28, 2020, the BACP published a three-page "Third Party Regulation Brief," which outlined the Third-Party Rules. The Brief explained the purpose of the rules, stating that "[t]he delivery commission fee [on food delivery platforms] is not transparent to the customer at the time of the transaction," and explaining various provisions of the Third-Party Rules themselves. CityofChicago_DD_ProdVol6_0008222 at -22, -23. The Brief also stated that BACP planned to "research best practices and recommend long-term policy goals for the City of Chicago which will require ongoing dialogue with affected parties." *Id.* at -23.

DoorDash issued RFP No. 97 to get at the facts informing, and the research findings referenced in, the Brief. Given the Brief's focus on consumer transparency, those documents are likely to reveal facts about the kinds of disclosures reasonable consumers found to be misleading. The City refuses to respond to this request, arguing that the Brief "principally concerned fee cap policy" and that the request is duplicative because the City has produced documents about DoorDash's compliance with the Rules. Dkt. 252 at 20.

The face of the Brief reveals that it did not principally concern the fee cap ordinance. Rather, the Brief states that the Rules were motivated by a lack of consumer transparency among third-party food delivery services. The longest section of the Brief concerns fee transparency and the form/timing of fee disclosures, and only one paragraph of the Brief addresses commission caps.

The fact that the City has produced limited documents regarding the City's inquiry into DoorDash's compliance with the Third-Party Rules does not satisfy this request. The City's internal communications and research about rules that govern the precise behavior at issue in this lawsuit, just a few weeks before those rules were finalized and after the rules came into effect, is highly likely to reveal relevant information to the City's claims and DoorDash's defenses. The fact that the Brief precedes the passage of the Rules by a few weeks does not render them irrelevant.

DoorDash appreciates the City's offer to log 24 documents and asks that the City do so, but also asks that the City review, at a minimum, the City's proposed population of 503 documents, which strikes DoorDash as a manageable number.

**City of Chicago:** As reflected in the date of the document (April 28, 2020), and DoorDash's description above, the Third Party Delivery Regulation Brief was part of the process that led to adoption of the final Third-Party Rules on May 12, 2020, as well as commission fee caps the City ultimately adopted. The City therefore objects to the relevance of RFP No. 97 for the

34

reasons stated above. Draft presentations and discussions of the Rules do not govern any company's conduct and do not bear on whether the DoorDash conduct alleged in this case is unlawful. Further, DoorDash's argument that internal communications leading up to the brief may shed light on how consumers are misled by disclosures—disclosures relevant to this case—is pure speculation. The brief itself speaks to only one misleading practice, which is not at issue in this case: "The delivery commission fee [charged to restaurants] is not transparent to the customer at the time of the transaction."

To the extent DoorDash seeks to use the Third Party Delivery Regulation Brief as a vehicle to obtain discovery on internal discussions of the draft Third-Party Rules, that would be unduly burdensome and not proportional to the needs of the case for reasons similar to those described above. Running the same search the City ran for RFP No. 84-87, but applying it to the February 1 – April 30, 2020 time frame, the City identified 503 documents. The City estimates that reviewing these documents for responsiveness and logging any privileged documents would take 17-25 hours. That effort is not warranted in light of the attenuated relevance of the draft Rules. The City also ran a narrower search—for "Third Party Delivery Regulation Brief" and a variant the City identified containing a typographical error—and identified 24 documents. These are pre-decisional documents from April 2020 that consist principally of drafts of the brief and accompanying emails, both with legal analysis that would need to be withheld or redacted. The City maintains that these materials are irrelevant, but the City can log this narrower set (and produce documents in redacted form as warranted) if that will bring this issue to conclusion.

### IV. DoorDash's Requests Related to the Chicago Fee

### A. Overview

**DoorDash**: The City alleges that DoorDash's temporary $1.50 fee on certain Chicago orders, which DoorDash implemented to help ensure that it could continue to serve consumers,

restaurants, and Dashers in Chicago while the City's price control was in place, misled consumers. Compl. ¶¶ 8, 57-68. To counter the City's allegations, DoorDash will show that a reasonable consumer would not have been deceived by the term "Chicago Fee." *Benson v. Fannie May Confections Brand, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019). The City has produced next to no support for its contention that the Chicago Fee misled consumers, aside from identifying two posts from anonymous Twitter users who may or may not have been DoorDash consumers. Compl. ¶¶ 60, 62; City's 11/22/23 Supp. Resp. to Rog 11. DoorDash is entitled to documents in the City's possession that show the Chicago Fee's effect on reasonable Chicago consumers.

The City maintains that its own documents about the Chicago Fee are irrelevant because "internal communications about the Chicago Fee do not prove or disprove that the fee was misleading." Dkt. 252 at 18. The City misses the point. DoorDash does not seek to reveal the City's opinion of the Chicago Fee; rather, it seeks facts in the City's possession that informed its allegations that the Fee and related disclosures misled consumers. DoorDash is unable to assess the sufficiency of the City's proposals as to RFP Nos. 43 and 91, moreover, given that the City has not provided its full search methodology as to either. We ask the City to do so by March 22, 2024.

**City of Chicago:** Contrary to DoorDash's representation, its discovery is not directed at "facts … that informed [the City's allegations]" regarding the Chicago Fee; rather, its document requests seek the City's internal communications regarding that fee. As DoorDash acknowledges, the relevant issue on the merits is whether the name of that fee would mislead a reasonable consumer to believe it is a City-imposed fee. The City's internal communications are not relevant to that issue, because they do not tend to prove or disprove that the fee misleads *consumers*. Rather, these requests are relevant only, if at all, to DoorDash's selective prosecution and First Amendment retaliation defenses—on which, the Court ruled, discovery may not be had. Dkt. 206

at 48-49. As for the facts that informed the City's allegations, the City has already produced the documents it relied upon for its Complaint—including not just documents quoted or cited in the Complaint but documents used as source material for the Complaint's allegations.[15]

Nevertheless, as a discovery compromise, the City searched for and produced documents responsive to RFP No. 43, which sought "all communications and public statements by you regarding the Chicago Fee." Specifically, the City searched for and produced the Chicago Fee documents of four BACP custodians for the period November 23, 2020 through August 27, 2021. The City also stated in early 2023 that it is willing to accede to DoorDash's request to search five additional custodians (four from BACP and one from the Mayor's Office) if that would conclude the City's production.

**B.** **RFP No. 43:** All communications and public statements made by [the City] regarding the Chicago Fee.

**DoorDash:** DoorDash issued RFP No. 43 to understand the factual basis for the City's claim that the Chicago Fee misled consumers. Though the City maintains that its internal documents concerning the Chicago Fee are categorically irrelevant, it agreed to a search methodology as to RFP No. 43 and has produced a handful of responsive documents. Yet it refuses, on relevance grounds, to add as custodians three City Councilmembers—Scott Waguespack, Andre Vasquez, and Tom Tunney. Dkt. 252 at 18.

---

[15] DoorDash's assertion that the City "has produced next to no support for its contention that the Chicago Fee misled consumers" mischaracterizes the City's complaint and is, in any event, irrelevant to this briefing. The City need not prove that the Chicago Fee misled particular consumers; rather, the City must show that the name and presentation of the fee were likely to mislead a reasonable consumer. The Chicago Fee allegations withstood DoorDash's motion to dismiss and are now the subject of discovery by the City. Despite the City's documents requests specifically inquiring about this issue, Defendants have produced zero custodial documents relating to the Chicago Fee. The City is in the process of meeting-and-conferring with DoorDash on that issue.

These Councilmembers are likely to possess relevant information about the factual basis for the City's allegations about the Chicago Fee. Each of these councilmembers was a primary sponsor of the Third-Party Rules.[16] All three councilmembers opined publicly about relevant Third-Party Rules and/or the Chicago Fee.[17] The City cited Alderperson Waguespack in its complaint, where he speculated, without support, that consumers "might think" the Chicago Fee could be attributed to the City. Compl. ¶ 59. Accordingly, it is likely that these individuals possess documents that reveal the basis for their purported belief, and the City's allegations in this case, that the Chicago Fee was deceptive.

DoorDash appreciates the City's March 15, 2024 offer to produce certain documents from custodians Waguespack, Vasquez, and Tunney, and asks it to produce those documents. However, given the lateness of the proposal and the fact that we are not in possession of the City's full search methodology, we cannot fully assess the issue until the parties can negotiate such a methodology. We ask that the City provide a search proposal by March 22, 2024.

**City of Chicago:** Further production in response to RFP 43, beyond the City's search of four custodians and willingness to search five more, is unwarranted given the irrelevance of internal communications about the Chicago Fee to any claim or defense. DoorDash, however, has

---

[16] *See, e.g., Joint Committee: Finance; License and Consumer Protection*, CHICAGO COUNCILMATIC (Nov. 17, 2020), https://chicago.councilmatic.org/event/joint-committee-finance-license-and-7d0bbe5331e7/.

[17] *See, e.g.*, *Mayor's Press Office, Mayor Lightfoot and BACP Announce New Rules to Increase Transparency of Third-Party Food Delivery Companies for Consumers*, CITY OF CHICAGO (May 12, 2020), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2020/may/FoodDeliveryTransparency.html; Ashok Selvam, *DoorDash Creates 'Chicago Fee' in Response to City's Third-Party Cap*, EATER CHICAGO (December 9, 2020), https://chicago.eater.com/2020/12/9/22165233/doordash-chicago-fee-third-party-cap-customers; A.D. Quig, Chicago lawmaker wants to permanently limit delivery app fees charged to restaurants, Crain's Chicago (Apr. 21, 2021), https://www.chicagobusiness.com/technology/alderman-wants-permanently-limit-delivery-app-fees.

continued to insist that the City also search the files of Alderpersons Waguespack, Vasquez, and Tunney—notwithstanding the Court's comments at the status conference that such discovery seems to be "overreach … not proportionate to the needs of the case." 2/13/24 Hearing Tr. at 68:2-4. The Court's assessment is correct, given that what any one Chicago elected official believed or understood about the Chicago Fee is not germane to begin with.[18] However, to resolve the matter, the City conducted searches of the three alderpersons' City email accounts for the time requested, using "DoorDash" and related search terms in association with "Chicago Fee" and "regulatory response fee." The search turned up a handful of documents in Alderperson Waguespack's files, all press clippings and a copy of the City's Complaint against DoorDash and the accompanying press release. Now that the City has identified these files, it is willing to produce them. The search turned up no responsive documents in the files of Alderpersons Vasquez and Tunney. The City disagrees that it has not described its search methodology here, which is straightforward, but will discuss the matter with DoorDash.

C. **RFP No. 91:** DOCUMENTS from November 1, 2020 through January 1, 2021 RELATING TO the December 1, 2020 meeting with Commissioner Rosa Escareño RELATING TO the Chicago Fee. *See* CityofChicago_DD_ProdVol6_0005911.

**DoorDash:** Similar to RFP No. 43, DoorDash issued RFP No. 91 to understand the factual basis of the City's allegations that the term "Chicago Fee" and related disclosures were purportedly

---

[18] Alderperson Waguespack was quoted in the press as opining that the Chicago Fee was an evasion of the City's cap on restaurant commission fees that was designed to pad DoorDash's IPO valuation. *See infra* n.10 (*Eater* article). The City's Complaint also quoted Alderperson Waguespack's passing comment that the fee "might" confuse consumers. Compl. ¶ 59. Both quotations are statements of opinion; neither suggests a basis to believe that Alderperson Waguespack possesses evidence of whether the Chicago Fee misleads consumers or why. Chicago Fee discovery directed at Alderpersons Vasquez and Tunney is even farther afield. DoorDash's assertion that "[a]ll three councilmembers opined publicly about relevant Third-Party Rules and/or the Chicago Fee" is misleading. In the three sources DoorDash cites for that statement, only Alderperson Waguespack is quoted about the Chicago Fee. *See infra* n.10. The Third-Party Rules are a separate topic that has nothing to do with the Chicago Fee.

deceptive. RFP No. 91 asks for documents about a BACP meeting titled "Grubhub complaint | SR20-05525963 and DoorDash 'Chicago Fee'" over the span of two months. Among other invitees, the meeting included, from the BACP, Rosa Escareño, Matthew Allee, Tamara Starks, and Shannon Trotter, all of whom the City has identified as having knowledge related to the Complaint and being active in the inquiry into DoorDash's compliance with the Third-Party Rules. City's 8/14/23 Resp. to Interrogatory Nos. 1-2. Commissioner Escareño also requested that the City file this lawsuit. The title of the meeting indicates that participants discussed the Chicago Fee, and perhaps even the purportedly misleading title of the fee. The timing of the meeting—just days after the Chicago Fee was introduced—also suggests that the meeting discussed consumers' initial reactions to the Chicago Fee. *See* Compl. ¶ 57.

Responsive documents likely exist, given that the City's March 1, 2024 privilege log contains dozens of communications about the Chicago Fee among BACP personnel from the days after the fee's rollout in November 2020, suggesting a high volume of both privileged *and non-privileged* internal communications about the Fee.

The City argues that RFP No. 91 is "duplicative" of RFP No. 43, as to which the parties are still negotiating a search methodology. Again, the fact that the City has produced some relevant discovery as to a given topic does not allow the City to shut down discovery on that topic.

DoorDash is unable to assess the sufficiency of the City's search described in the City's portion below, offered for the first time on March 15, 2024, given that the City does not provide its full list of search terms. By March 22, 2024, we ask that the City provide its full search methodology, so that the parties can negotiate it.

**City of Chicago:** RFP No. 91 is merely duplicative of RFP No. 43, as to which the City already searched for and produced documents. The City's RFP No. 43 search, over the period

November 23, 2020 – August 27, 2021, covered most of the period requested in RFP No. 91 and included three of the four BACP custodians DoorDash identifies above—Rosa Escareno, Matthew Allee, and Tamara Starks. That broad search for all documents regarding the Chicago Fee— "Chicago Fee" was the principal search term—necessarily pulled in documents relating to a meeting on December 1, 2020 about the Chicago Fee. That is the reason DoorDash has the meeting invitation reflected in CityofChicago_DD_ProdVol6_0005911, among other emails and duplicate invitations relating to that meeting. *See, e.g.*, DD_ProdVol19_00137562-63, 13794-13797, 13817-13824. The City has conveyed this to DoorDash and does not understand why DoorDash continues to advance this duplicative request. Nevertheless, for the avoidance of doubt, the City conducted a search of the four BACP custodians included on the meeting invitation for the period November 1-22, 2020, and identified zero documents—likely because BACP appears to have learned about the Chicago Fee in late November. The City also conducted a search of the fourth BACP custodian DoorDash identifies above, Shannon Trotter, using its Chicago Fee search terms for the period November 1, 2020 – January 1, 2021. That search identified about 20 documents that have not been produced; they consisted of duplicate meeting invitations and several privileged, investigation-related emails. Now that the City has searched for and identified these, it is willing to review them for privilege, produce the non-privileged documents and log the privileged documents. The City has now searched the four custodians on this meeting invitation for the full time period requested.

## V. DoorDash's Request for Information Behind the City's Guidance to DoorDash

A. **RFP No. 98:** For the time period January 1, 2020 through June 28, 2021, COMMUNICATIONS RELATING TO guidance issued by [the City] to DOORDASH RELATING TO (a) MCC § 4-276-470, (b) MCC § 2-25-090, and/or (c) the THIRD-PARTY FOOD DELIVERY SERVICE RULES.

**DoorDash:** Before suing DoorDash, the City issued guidance to DoorDash, for example by communicating with DoorDash about its compliance with the Third-Party Rules and in the June 28, 2021 cease and desist letter that preceded this lawsuit. RFP No. 98 targets City communications that would shed light on the facts that informed its pre-suit positions on the conduct the City now alleges to be misleading. Although DoorDash has given the City specific examples of the communications referenced in this request, the City says it is unaware of any guidance it issued or of non-privileged communications relating to [the cease-and-desist letter]," without indicating that it ran any searches to support these positions. Dkt. 252 at 22. The City also objects on relevance grounds. *Id.* at 23.

RFP No. 98 seeks relevant information. To the extent the City's pre-suit positions on consumer fee transparency or other practices referenced in the complaint differ from those it now advances, this would support a defense to the City's allegations. Moreover, any information about the facts that informed, for example, the City's statements to DoorDash in summer 2020, when it was enforcing the Third-Party Rules, and/or the City's June 28, 2021 cease-and-desist letter to DoorDash, is valuable to understand the factual basis for the City's allegations in this case. As noted above, the City cannot simply refuse to search internal documents when they are likely to contain relevant information. 2/13/24 Hr. Tr. at 17:12-15. Further, DoorDash is targeting the City's internal documents because the City may have conveyed oral guidance to DoorDash that was not reflected in correspondence with DoorDash, but is in the City's internal communications.

The request also narrowly targets this information, as it is limited to the specific rules and ordinances governing the conduct in this case, and asks only about guidance "to DoorDash." The City once again asserts burden and privilege objections below, without providing specifics.

Internal City communications about DoorDash's business practices prior to this lawsuit are also relevant to DoorDash's estoppel and waiver affirmative defenses. Such communications are relevant to determining whether the City had "reason to believe" that DoorDash would rely upon its statements that DoorDash was in compliance with the City's Third-Party Rules (estoppel), and whether the City intentionally relinquished a known right to sue DoorDash (waiver). *See S.E.C. v. PacketPort.com*, 2006 WL 2798804, at *4 (D. Conn. Sept. 27, 2006).

The City's offer, first presented to DoorDash on March 15, 2024, to run responsive searches over approximately a one-month period, is insufficient to satisfy this request, and DoorDash asks that the City search for documents responsive to the entire period of the request by March 22, 2024, and ultimately review and produce responsive documents from that search.

**City of Chicago:** To the extent the City provided "guidance" to DoorDash on any pertinent issue before the City filed suit, only the guidance itself—not the City's internal communications about that guidance—could possibly be relevant. DoorDash asserts that such communications are relevant because they may show that the City took a position, regarding fee transparency or DoorDash's business practices, that is inconsistent with the claims the City is advancing in this case. However, internal communications are not the City's "position." They reflect internal opinions, discussions, and deliberations that by definition were never communicated to DoorDash or to the public as the City's position. Nor are internal communications relevant to DoorDash's waiver and estoppel defenses. Even if those defenses may be asserted against the government at all, *see Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60-61 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant"), what "the City had reason to believe" is not an element of waiver or estoppel under Illinois law. *See Mollihan v. Stephany*, 368 N.E.2d 46, 47 (Ill. App. Ct. 1977) (waiver is either express or

"implied from the conduct"); *Meaden v. Meaden*, 2012 WL 6019233, at *3 (N.D. Ill. Nov. 30, 2012) (estoppel requires an act of a party on which the other party reasonably relied).

Even if some internal City communications regarding guidance to DoorDash could be relevant, this request is overbroad and disproportionate to the needs of the case. It sweeps in internal communications not just about the Third-Party Rules, but about any communications, for any purpose, that the City had with DoorDash regarding the City's consumer protection ordinances. Because the City was unaware of any specific "guidance" it had provided that would be responsive, the City asked DoorDash—the recipient of any such guidance—to identify what it was looking for. DoorDash identified three topics, none of which is a basis for further discovery:

First, DoorDash asked for internal communications relating to guidance about "[b]usiness practices occurring in Chicago that prompted … guidance to DoorDash." That is simply too vague and broad a topic for the City to formulate a reasonable search.

Second, DoorDash requested internal communications about guidance in the form of the City's June 2021 cease-and-desist letter identifying the conduct on which the City filed suit. Even if such official law enforcement action could be considered "guidance," that letter reflects the culmination of the investigation that led to this lawsuit. Internal communications relating to that letter are the emails of Law Department attorneys, Cohen Milstein attorneys, a BACP attorney, and BACP personnel who participated in the investigation at the direction of attorneys. These materials are overwhelmingly privileged and/or attorney work product. Requiring the City to search a large volume of protected materials to find any stray responsive, non-privileged documents is not proportional to the needs of the case. The burden of responding to this aspect of RFP No. 98 is the same as that for RFP No. 95, discussed above.

Third, DoorDash requested internal communications about guidance given to the company regarding the Third-Party Rules. On further consideration, the City will conduct a search of relevant custodians, for the period May 12, 2020 (when the Rules were adopted) through June 28, 2020, for communications regarding any guidance the City may have given DoorDash regarding its compliance with the Rules. To the extent this request relates to pre-May 12 guidance about the draft Rules, the City maintains its objections.

## VI.    DoorDash's Request Related to the BACP's Initial Determination of Liability

A.    **RFP No. 41** (As narrowed by DoorDash): Documents and communications from June 1, 2020-June 1, 2021 related to [BACP] Commissioner Rosa Escareño's or Commissioner Kenneth Meyer's determination that DoorDash engaged in a practice prohibited by MCC § 2-25-090.

**DoorDash:** RFP No. 41 seeks documents relevant to several aspects of this case. *First*, MCC § 2-25-090(f) requires the BACP Commissioner to "complete[] an investigation" before "request[ing] the Corporation Counsel to bring an action for injunctive relief or other such equitable relief that the Commissioner deems to be appropriate[.]" Responsive pre-suit communications are important to determine the extent and nature of the BACP's investigation prior to making this request. *See Marriott Int'l*, 2020 WL 6064589, at *1 (ordering production of investigation-related documents to determine compliance with MCC § 2-25-090(f)'s investigation requirement). Given that the City's limited search for responsive documents turned up over 2,100 unproduced documents, it is clear that the City has not satisfied RFP No. 41.

*Second*, responsive documents are relevant to DoorDash's due process defense, which asserts [insert]. If the BACP relied upon the advice of the City's contingency-fee counsel before the Department of Law was involved, it would undermine the City's argument that the Department of Law's supervision and control adequately protected DoorDash's due process rights.

*Third*, documents responsive to this request will reveal the facts considered by the BACP before recommending that the City bring suit, indicating the factual basis for the City's claims.

This request is not burdensome. It identifies a particular procedural prerequisite in this case—the BACP commissioner's determination that DoorDash had allegedly violated MCC § 2-25-090. This should allow the City to focus on specific BACP custodians that the City has identified, in interrogatory responses, as involved in its investigation of DoorDash. Moreover, in September 2023, DoorDash narrowed the date range for this request to a one-year period. Contrary to the City's submission below, moreover, it is not DoorDash's responsibility to suggest custodians and search terms for documents in the City's possession, as to which DoorDash has limited insight.

The City's proposed review population of 2,115 documents, which represents hits from the term "DoorDash" across relevant, nonlawyer BACP custodians during the period of the City's investigation of DoorDash, likely contains documents responsive to this request and DoorDash's other investigation-related requests (RFP Nos. 95-96). DoorDash therefore asks the City to review that search, and produce or log responsive documents.

**City of Chicago:** DoorDash's description above mischaracterizes the City's document production. In response to RFP No. 41, the City produced (1) Commissioner Escareño's letter to the Corporation Counsel pursuant to MCC § 2-25-090(f); (2) the more than 500 non-privileged documents upon which the allegations of the Complaint are based; and (3) non-privileged, responsive documents identified in a search of Commissioner Escareño's emails, for the full period requested, using "DoorDash" and related search terms. The City further determined that Commissioner Escareño maintained no non-email file of responsive documents, and it individually logged privileged documents.

After the City produced Commissioner Escareño's responsive documents in December 2023, the City believed its response to RFP No. 41 to be satisfactory. At no point thereafter, before DoorDash contacted the City about filing a joint status report on these discovery requests, did DoorDash assert that the production described above was insufficient. Even in the January 23, 2024 Joint Status Report, DoorDash appeared to complain mainly that the City had not searched the files of Commissioner Escareño's successor, Kenneth Meyer. Dkt. 252 at 14. In response, the City explained that Meyer had not been involved in the determination under MCC § 2-25-090(f). Dkt. 252 at 18. Only now do Defendants assert that the City should search multiple BACP custodians in addition to Commissioner Escareño, a demand they never discussed with the City after the City advised them its production was complete.

In any event, further searches in response to RFP No. 41 are not proportional to the needs of the case. The Court has distinguished the *Marriott* case on which DoorDash relies, as discussed above. The relevance of this discovery is attenuated at best. DoorDash insists that it needs additional documents to determine whether BACP conducted an investigation as required by MCC § 2-25-090(f). Unlike the defendant in *Marriott,* however, DoorDash has not asserted failure to conduct an investigation as an affirmative defense. *See* Dkt. 61. Moreover, BACP is permitted to conduct an investigation jointly with the Law Department. DoorDash cannot seriously dispute that such an investigation occurred, because the company has the test orders that BACP investigators placed on the DoorDash platform, the voluminous documents the City gathered to support the Complaint, and the City's privilege log documenting numerous witness interviews, among other investigation materials. DoorDash further contends that it needs more discovery to determine whether BACP relied upon Cohen Milstein's advice without the involvement of the Law Department. Even if that contrived scenario had a basis in fact or were relevant to DoorDash's due

process defense—and it is not—what advice BACP relied upon is privileged. Finally, DoorDash argues that further discovery is necessary to "reveal the facts considered by the BACP." MCC § 2-25-090(f), however, does not require BACP to justify its investigation to a defendant. The proper source of the "factual basis for the City's claims"—what DoorDash claims to want to know—is the City's production of the documents it relied upon for its allegations.

Because DoorDash did not raise its request for additional custodians with the City, the City does not know what custodians or search terms Defendants had in mind. For purposes of assessing the burden of this demand, the City searched the emails of four BACP custodians involved in the investigation (Tamara Starks, Miguel Campos, Ivan Capifali, and Jaime Martinez), using the search term "DoorDash" and variants. The City ran the search from October 1, 2020 – June 1, 2021, since the City's investigation began in October 2020, and the June – September 2020 period incorporates other issues. That search identified 2,115 documents. Given the nature of the request, a significant number of the documents are likely to be privileged. The City estimates that reviewing these 2,115 documents for responsiveness and logging them for privilege would take 71-106 hours. In light of the limited relevance of additional RFP No. 41 discovery, this effort is not warranted.

DATED: March 15, 2024                    Respectfully submitted,

**CITY OF CHICAGO DEP'T OF LAW,**        **COHEN MILSTEIN SELLERS & TOLL PLLC**
**AFFIRMATIVE LITIGATION**
**DIVISION**

By:  /s/ *Stephen J. Kane*              By:  /s/  *Brian E. Bowcut*
Stephen J. Kane                          Brian E. Bowcut (pro hac vice)
Peter H. Cavanaugh                       Peter S. Ketcham-Colwill (pro hac vice)
121 N. LaSalle St.                       Lisa M. Ebersole (pro hac vice)
Room 600                                 1100 New York Avenue, NW
Chicago, IL 60602                        Suite 500
Phone: (312) 744-6934                    Washington, DC 20005
stephen.kane@cityofchicago.org           Phone: (202) 408-4600
peter.cavanaugh@cityofchicago.org        bbowcut@cohenmilstein.com
                                         bmiller@cohenmilstein.com
                                         pketcham-colwill@cohenmilstein.com
                                         lebersole@cohenmilstein.com

                                         Attorneys for Plaintiff City of Chicago

**GIBSON, DUNN & CRUTCHER LLP**

By: /s/ *Joshua S. Lipshutz*
Joshua S. Lipshutz (pro hac vice)
1050 Connecticut Avenue NW
Washington, DC 20036
Phone: (202) 955-8500
jlipshutz@gibsondunn.com

Michael Holecek (pro hac vice)
Cynthia Chen McTernan (pro hac vice)
333 S. Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-7000
mholecek@gibsondunn.com
cmcternan@gibsondunn.com

**FORDE & O'MEARA LLP**

By: /s/ *Michael K. Forde*
Michael K. Forde
Brian P. O'Meara
191 North Wacker Drive
31st Floor
Chicago, IL 60606
Phone: (312) 641-1441
mforde@fordellp.com
bomeara@fordellp.com

**RILEY SAFER HOLMES
& CANCILA LLP**

By: /s/ *Patricia Brown Holmes*
Patricia Brown Holmes
Sarah E. Finch
70 W. Madison Street
Suite 2900
Chicago, IL 60602
Phone: (312) 471-8700
pholmes@rshc-law.com
sfinch@rshc law.com

Attorneys for Defendants DoorDash, Inc. and Caviar, LLC