UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| City of Chicago,<br><br>    *Plaintiff,*<br><br>  v.<br><br>DoorDash, Inc. and Caviar, LLC,<br><br>    *Defendants.* | Civil Action No. 1:21-cv-05162<br><br>Honorable Jeremy C. Daniel<br>Magistrate Judge Jeffrey T. Gilbert |

### PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL DOCUMENT DISCOVERY FROM FOUR ADDITIONAL CUSTODIANS

 The City of Chicago established in its motion to compel that the further discovery it seeks—from four DoorDash custodians whose importance has been confirmed by initial discovery—is relevant to the City's claims and proportional to the needs of the case, particularly given Defendants' modest production thus far. Although it is Defendants' burden to show why the discovery is *not* warranted, Defendants appear to concede the relevance of these custodians' information—and argue against the proportionality of the discovery only by contorting the City's motion, the proportionality standard, and the history of the parties' discovery negotiations.

 From the start of those negotiations, Defendants insisted that they could satisfy their discovery obligations with a small slate of custodians and that others would merely be duplicative. The scope of this law enforcement action—spanning at least five years, millions of transactions in Chicago, and five distinct forms of misconduct—has always belied that notion. The City acceded to a narrow slate of custodians to get discovery started, with the understanding and expectation that it could come back for more if Defendants' assurances proved unfounded. During the more than eight months it took Defendants to produce approximately 4,000 custodial documents, the

City was met with stonewalling when it inquired how much discovery, and from whom, remained to be produced. Ultimately, Defendants' custodial production—which they pronounced substantially complete in January 2024—showed that the City's concerns were well-founded. As just one example, Defendants produced just 17 documents from one custodian whom they initially put forward as the only custodian for two categories of misconduct.

Defendants' production, however, highlighted several key decisionmakers and participants in the conduct at issue—all of whom have relevant information that has not been produced. The City's motion showed that Jonathan Berk, Jessica Lachs, and Charlton Soesanto have documents about the driver pay and consumer fee conduct, and that most *were not* passed on to any agreed custodian. The City's motion also showed that DoorDash CEO Tony Xu, whom Defendants have described as too removed from the practices at issue to be an appropriate custodian, was actively involved in the consumer fee, driver pay, menu price, and non-partner listing deceptions. Defendants appear to acknowledge that all four proposed custodians have relevant information, and that production from Mr. Berk, Mr. Lachs, and Mr. Soesanto would not be duplicative.

Defendants' arguments against adding these custodians are unavailing. First, Defendants argue that the City's request is not proportional because these custodians do not have specific types of documents the City complains about. But the City's motion seeks to remedy a thin production across the board, which can be buttressed by custodians who possess demonstrably relevant and important information on driver pay, menu price inflation, non-partner listings, and consumer fees generally. Although Defendants' production contains a dearth of platform appearance and Chicago Fee documents, those are just symptoms of the larger problem and require separate, targeted solutions—about which the City has been conferring with Defendants. Second, Defendants inappropriately seek to shield their CEO's documents, once again invoking—in principle if not in

2

name—non-existent protection for "apex custodians." The City showed not only that Mr. Xu was deeply involved in the conduct alleged in the Complaint, but also that as CEO he likely discussed this conduct with colleagues other than existing custodians. Third, while there is some burden associated with reviewing documents of additional custodians, Defendants have not shown that the burden outweighs the benefit of discovery. Indeed, the burden Defendants describe only confirms that their custodial discovery was not fulsome to begin with. Finally, Defendants accuse the City of "shifting discovery demands" over the course of 18 months. Dkt. 286 at 3. In reality, while the City certainly desired a robust slate of custodians from the outset, negotiations over custodians ended nearly a year ago, after which the City awaited Defendants' full production.

The contrast between the posture of Defendants' discovery responses and those of the City is evident. As reflected in the parties' March 15, 2024 Joint Status Report, Defendants are engaged in *follow-up* discovery, much of it related to specific meetings, in several instances pushing the City to do steadily more burdensome searches to prove that particular meetings were about irrelevant topics. *See* Dkt. 299. At the same time, Defendants vigorously oppose producing significant volumes of indisputably relevant discovery from key custodians. Having consumed more than a year warding off more fulsome custodial discovery and making a thin production from their narrow slate of custodians, Defendants are attempting to run out the clock on legitimate, basic discovery. The Court should grant the City's motion to compel.

## ARGUMENT

I. **The Discovery the City Seeks from These Custodians Is Relevant and Proportional.**

The City demonstrated in its motion that the four custodians at issue all possess relevant information that the City likely does not have. As to Mr. Berk (consumer fees), Ms. Lachs (consumer fees and driver pay), and Mr. Soesanto (consumer fees and driver pay), the City proved that each has relevant documents and information that were not shared with agreed custodians.

3

*See, e.g.*, Dkts. 257 – 260, 262 – 267 (Exs. J – M, O – T). As to Mr. Xu, the City showed that he was personally involved in discussions and decision-making regarding the company's consumer fee, driver pay, menu price inflation, and non-partner listing conduct. *See, e.g.*, Dkts. 268 – 271 (Exs. U – X.) The City also showed that Mr. Xu discussed these matters with company personnel who are not agreed custodians. It is reasonable to believe, given his broad remit as CEO, that he discussed these matters with others in the company—including other executives.

The City further showed that this discovery is proportional to the needs of the case. The issues at stake are critical: This is not a commercial dispute, but a law enforcement action in which the City alleges that Defendants engaged in potentially millions of deceptive transactions. Because the City may recover fines and restitution for each transaction, the amount in controversy readily exceeds $100 million. Defendants' resources are not in doubt. The City does not have access to these documents—and they are necessary to show key elements of the City's claims (*e.g.*, misrepresentations, tendency to mislead, materiality, intent that consumers rely). The burden also does not outweigh the likely benefit: The 12 existing custodians never were an undue burden for a case and defendant of this size; neither are four more custodians. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2023 WL 4181198, at *10 (N.D. Ill. June 26, 2023) (adding 11 custodians to existing 12, where case involved "a matter of public importance," the amount in controversy was "many millions of dollars," the parties had "significant resources," and the information was relevant, "which indicates that the requested discovery is important to resolving the issues").

In opposing the City's motion, Defendants appear to acknowledge that these four custodians have documents relevant to the City's claims. *See* Dkt. 286 at 12.[1] Defendants contend,

---

[1] Defendants merely posit that Mr. Xu's emails will be "largely irrelevant." Dkt. 286 at 13. The City interprets this assertion—unsupported by a declaration or data—as an acknowledgment that Mr. Xu has at least some relevant documents, which could be captured with search terms.

4

instead, that the City's requested discovery is not proportional to the needs of the case. Even then, Defendants do not engage with the full set of proportionality factors, which individually and collectively support the City's requested discovery as set forth above. Rather, Defendants contend only that the burden of the discovery outweighs its benefit. Specifically, they argue that the discovery will not address deficits the City identified, that discovery of Mr. Xu would be duplicative and otherwise improper, and that the discovery will be too expensive. These arguments are unavailing.

### A. The Discovery Will Address Evident Deficiencies in Defendants' Production.

The City brought this motion because Defendants' patently thin production disclosed that the four custodians at issue had relevant documents—pertaining to at least four of the five categories of misconduct in the Complaint—that likely were not cumulative of documents from agreed custodians. Defendants argue, however, that the burden outweighs the benefit because none of these custodians likely has documents on the Chicago Fee, the appearance of the app and website, or DoorDash's conduct in 2016. This misconstrues the City's motion. The City referenced these specific deficiencies in describing ways Defendants' production had proven inadequate. But the City expressly stated: (1) that the problems with the production required "multiple solutions"; (2) that the City was conferring with Defendants to address discrete deficiencies (including Chicago Fee and platform appearance documents); and (3) that a critical solution, to the *overall* dearth of production, touching *all* claims, was to add custodians the City had identified as having relevant, non-duplicative information. Dkt. 253 at 2 & n.1. These custodians' documents are important to show that Defendants engaged in unlawful practices across the board—not just that the custodians have documents about the Chicago Fee or platform appearance—including: that Defendants knew their conduct was material to consumers, that Defendants knew their conduct harmed restaurants and drivers, and intended consumers to rely on their representations. *Id.* at 12-

5

13. Whether or not these custodians could provide information on the Chicago Fee or the platform's appearance—a principal focus of Defendants' opposition—is largely beside the point.

Further, although the point of these custodians is to supplement Defendants' production of liability discovery generally, the City has no reason to accept Defendants' unsubstantiated assertion that these custodians lack information for 2016. Mr. Berk, Ms. Lachs, and Mr. Soesanto all had senior roles at DoorDash in 2016. Dkts. 277-2, 277-8 & 277-9 (Exs. B, H & I). Mr. Xu co-founded DoorDash in 2013 and has been there ever since.[2] Although Defendants have the burden to show that the requested discovery improper, they have submitted no declarations from these custodians, no hit counts for documents in 2016, and no other information beyond their conclusory statement.[3] Similarly, Defendants have not supported the assertion that these custodians lack Chicago Fee documents; they easily could have searched for the phrase "Chicago Fee" but have not asserted that they did so. Nor have Defendants' past expectations—*e.g.*, that Peter Esmond, from whose files they produced only 17 documents, could sufficiently address menu price inflation and non-partner listings—proven correct. The Court should disregard Defendants' speculation.

### B. The Requested Discovery Will Not Be Duplicative.

When the parties met-and-conferred on the City's request for these custodians, Defendants argued—as they have from the beginning—that any further discovery would be duplicative of information already supplied through the custodians they agreed to search. Notably, however, they

---

[2] *See* https://ir.doordash.com/governance/board-of-directors/default.aspx.

[3] Defendants posit, again without evidence, that because they have already produced documents from Stanley Tang from 2016, "the City has executive-level documents from that time period … and so Mr. Xu's addition is unlikely to materially increase the number of documents from 2016." Dkt. 286 at 14. That assumption is unfounded. Mr. Tang is a custodian only for the consumer fees conduct, whereas the City seeks to add Mr. Xu as a custodian for four areas of conduct (driver pay, menu price inflation, non-partner listings, and consumer fees). Even after the production from Mr. Tang's files, the City has only 330 documents from 2016. Dkt. 255 ¶ 22.

appear to have dropped that argument as to Mr. Berk, Ms. Lachs, and Mr. Soesanto. For good reason: In its motion, the City documented multiple examples of each custodian discussing the consumer fee and/or driver pay misconduct in emails that were not sent or received by an agreed custodian. Dkts. 258 – 260 (Exs. K – M re Berk), Dkts. 261 – 264 (Exs. N – Q re Lachs), Dkts. 265 – 267 (Exs. R – T re Soesanto). The City also submitted data showing that 64% of these employees' custodial documents—which, again, the City has only because Defendants produced a limited subset of them in response to a request for documents from other litigation—were not sent or received by an agreed custodian. *See* Dkt. 255 ¶ 30. It is thus undisputed that these three proposed custodians likely possess relevant, non-duplicative information that Defendants have not produced to the City.

Defendants do, however, contend that Mr. Xu "will not have unique documents relevant to the parties' claims and defenses" and that "to the extent Mr. Xu has relevant information, the City is likely to already have it because he would have communicated with existing custodians on the workstreams they were more directly involved in." Dkt. 286 at 13-14. Once again, Defendants do not provide any declaration of Mr. Xu or any other affirmative evidence to support this statement, even though it is their burden to establish why discovery is improper. The sole support they offer for these statements is to point out that in *one* of the City's exhibits, an agreed custodian (Ryan Parietti), is one of the people copied on the email from Mr. Xu. *See* Dkt. 271 (Ex. X).

The City, however, did not base its request for discovery of Mr. Xu's files on emails between him and company personnel that omit agreed custodians. Because the City does not have any custodial files of Mr. Xu, the emails of Mr. Xu the City does have generally include an agreed custodian as a sender or recipient. That is the reason they were produced. Rather, the basis of the City's request is Mr. Xu's personal and substantial involvement in at least four of the five

7

categories of misconduct alleged in the Complaint. Although Defendants have previously asserted, without evidence, that Mr. Xu was not involved in the development or decision-making regarding these practices, the City demonstrated otherwise in its motion. *See* Dkts. 268 – 272 (Exs. U – Y).

In response to the City's showing, Defendants now take a different tack: They insist that Mr. Xu's emails (produced by agreed custodians) show only that he had "high-level involvement" in the practices at issue. Dkt. 286 at 15. "High-level involvement," however, is not irrelevant; it is *especially* relevant. What Mr. Xu knew, discussed with others, and approved is potentially powerful evidence of corporate knowledge and intent. Further, the examples the City cited in its motion demonstrate that Mr. Xu's involvement in the practices at issue was informed and detailed. For example, the City cited an exchange in which a DoorDash ████████████████ ████████████████████████████████████████████████████████████████ Dkt. 272 (Ex. Y). This is a direct reference to ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Mr. Xu's response demonstrated ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Dkt. 272 (Ex. Y).

In support of their argument that Mr. Xu is not an appropriate custodian, Defendants describe his emails as mostly (a) forwards to other employees with no accompanying text, (b) emails of encouragement, or (c) one-sentence emails. This taxonomy, they argue, shows that the burden of reviewing and producing Mr. Xu's documents outweighs any benefit. The *length* of Mr. Xu's emails, however, is not an indicator of their relevance or importance. Even one word

8

authorizing the company to engage in the conduct (*e.g.*, "yes" or "approved"), or one sentence showing corporate awareness of consumer confusion, is highly probative. Further, the City has established that Mr. Xu, as a public face of the company, had ███████████████ that are relevant. In a 2018 email that the City has only because ███████████████████████████████████████████████████████████████████████ ███████ in the City's complaint. Dkt. 270 (Ex. W); Compl. ¶¶ 164-70. ███████████ relevant to show that the driver pay model was misleading to consumers and unfair to drivers.

It is telling what evidence is missing from Defendants' argument that Mr. Xu has no unique documents. Defendants could have provided an analysis of the extent to which Mr. Xu's documents overlap with those of agreed custodians. Defendants could have provided a declaration of Mr. Xu in support of their arguments—*i.e.*, that, as a matter of practice, an agreed custodian was generally included in (or received a forward of) his communications about the conduct alleged in the Complaint—if he could so attest. Defendants did neither. They cannot credibly contend—not having offered such proof—that their CEO generally included one of the agreed custodians on his communications about these topics. In particular, given Mr. Xu's demonstrated engagement with the practices at issue, the City is entitled to discover any communications about these practices at the executive level. Defendants are not entitled to withhold this evidence based on unsupported claims about whom Mr. Xu did and did not communicate with. Indeed, as the City illustrated with examples in its motion, Defendants' past representations about duplication have proven false.

Defendants appear to believe that there is a unique burden associated with discovery of Mr. Xu's documents, describing the City's request to add him as a custodian as a "pressure tactic" and "harassment." Once again, they substantiate neither argument. For good reason: it is false. The City's request is supported by evidence of Mr. Xu's personal involvement. This request imposes

9

no burden on Mr. Xu, and the burden on the company is the same as it would be for producing documents of any other witness. Although Defendants do not use the term "apex," they are, in essence, attempting to use the apex deposition doctrine to shield Mr. Xu from document discovery. As the Court has recognized, that doctrine does not apply to custodial discovery. Dkt. 144, Ex. 16 at 9:12-22, 10:7-12. In light of Mr. Xu's demonstrated knowledge and information, the City's request is appropriate discovery, not "harassment."

        **C.    The Burden of the Proposed Discovery Is Appropriate to the Case.**

It is of course understood that searching for and producing documents from the four custodians the City requests will require some expense and attorney time. Defendants have not established, however, that the burden of the proposed discovery would outweigh the likely benefit. As documented above and in the City's motion, this discovery it critical to remedying a production that is thin across the board and manifestly missing information from key decision-makers and participants in the conduct alleged in the Complaint.

Defendants do not fully describe or substantiate the burden they associate with further custodial discovery. Although Defendants provide a declaration of counsel asserting that the project will involve review of an estimated 40,500 documents—at an estimated expense of $400,000 and 2,000 hours of attorney time—Defendants indicate that these documents have not been de-duplicated. A count including duplicates artificially inflates the burden, yet Defendants do not explain why they cannot de-duplicate, as the City did in the burden estimates it submitted to the Court regarding Defendants' document requests. *See* Dkt. 299 at 29 n.14. Citing Paragraph 14 of Ms. McCloskey's declaration, Defendants assert that this project will require them to "re-review tens of thousands of documents in this matter's database that cannot easily be de-duplicated"—but counsel's declaration is silent on de-duplication. Dkt. 286 at 12; Dkt. 289 ¶ 14. It is equally unclear why Defendants must "re-collect and re-review tens of thousands of

10

documents," since Defendants have never agreed to review the custodial files of Mr. Xu, Ms. Lachs, and Mr. Soesanto, and reviewed Mr. Berk's files only as they relate to consumer fees. Counsel's declaration does not explain that, either. *Id*. Moreover, Defendants cannot have it both ways: If they wish to argue that further discovery would be duplicative, then they need to show how much duplication there is. In any event, handling of duplicates is a technical issue on which to hold a meet-and-confer, not a basis on which to oppose discovery altogether.

Even accepting at face value the burden Defendants claim, that burden merely offers further confirmation of the inadequacy of their existing custodial production. Defendants assert that the City's request for additional custodians "would double the cost and time DoorDash has invested to date to conduct fulsome discovery in response to the City's request." Defendants have reviewed and produced documents from 12 custodians to date. The claim that reviewing *three* new custodians, and expanding the search terms on a fourth (Mr. Berk, for consumer fees), would "double" Defendants' costs suggests that the proposed custodians have a much higher proportion of relevant documents than the custodians Defendants initially agreed to.

In any case, while the figures Defendants cite are sizeable, they are warranted in a case of this size and magnitude. As noted above, the amount in controversy in this case easily exceeds $100 million. The City's allegations cover five separate categories of misconduct, occurring over more than five years, in potentially millions of DoorDash transactions. As the Court noted one year ago, "in the grand scheme of this case, given what the City is alleging, even the time period that DoorDash thinks is responsive to this, to say nothing of a longer time period, where I have about a multibillion dollar company in terms of revenues … if there's at least … a reasonable argument for why people should be included, I just don't think you're going to be able to hit the undue burden it's not proportional to the needs of the case." Dkt. 277-6 (Ex. F) at 11:9-11:18.

**II.     Additional Custodians Are Appropriate Based on the Course of Discovery.**

The likelihood that the City would need to seek additional custodians was set a year ago, when Defendants steadfastly rebuffed the City's efforts to obtain agreement on a broader slate of custodians. During the parties' negotiations, which took place between December 2022 and March 2023, the City made its best efforts to remedy Defendants' initial—and obviously deficient— proposed slate of just four custodians. Dkt. 255 ¶¶ 3-5 (Bowcut Decl.). In the course of those four months, Defendants rejected some custodians the City proposed (including Charlton Soesanto and Jonathan Berk for consumer fees) and accepted others. *Id.* ¶¶ 6-7, 11. But Defendants never agreed to a slate of more than 11 custodians, insisting that broader discovery would merely be duplicative. *Id.* As the City's motion showed, that proved not to be the case.

Defendants now decry the City's initial requests as its "shifting discovery demands," Dkt. 286 at 3, suggesting that the City's motion should be denied because it cannot decide on the custodians it wants. That rewrites history. In reality, the City has always asked for the same thing: a robust slate of custodians, including senior decision-makers, to cover each area of alleged misconduct and the full, relevant time period for that conduct. The fact that the City requested various custodians at the start of discovery reflects nothing more than that the City was working diligently to *avoid* having to come back to the Court for more custodians.

Yet, the City operated from a significant informational disadvantage, as detailed in its motion. Dkt. 255 ¶¶ 8-10. It was at all times Defendants' responsibility to identify appropriate custodians, a burden they have been quick to assign the City but have not taken seriously themselves. *See* Dkt. 299 at 46 ("[I]t is not DoorDash's responsibility to suggest custodians and search terms for documents in the City's possession, as to which DoorDash has limited insight."). Ultimately, the City had little information with which to contest Defendants' representations that (a) more custodians where unnecessary because their documents would simply duplicate

12

documents from the files of agreed custodians, and (b) certain "apex" employees were so removed from the company's day-to-day operations that they would be unsuitable custodians. Dkt. 255 ¶¶ 11-12. Nevertheless, the City agreed to the limited slate of 11 custodians to move discovery forward. *Id.* ¶ 13. However, the City expressly noted its skepticism that the initial slate of custodians would be sufficient. *Id.* As the Court recognized, a narrow, initial set of custodians increased the likelihood that follow-up discovery would be needed:

> I've got people coming in from all around the country in large cases in front of me. If a plaintiff in some of those cases was asking for 13 custodians, the defense counsel would, you know, say a blessing for that person. … [I]t's just if we were talking about they want 45 or 50 custodians ... I'd look at this a whole lot differently. But if I'm looking at it here—and, moreover, what I feel is that if we went forward with a more constrictive group of custodians, and the City started looking at the documents, and what if in that group of documents there are e-mails to some of the people that they wanted to be a custodian, but they weren't on the list, they didn't make the cut. … But I think what we would end up with is we want more custodians. And, you know, if they get custodians they're asking for now, does that mean they can't come back and say, (inaudible) no. That doesn't mean it. But I think we increase the chances of other people, including the people they want now, someone getting back into this mix, after they get a chance to look at your documents.

Dkt. 277-6 (Ex. F) at 12:6 – 13:14. At that point, both parties understood the significant possibility that additional custodians might be necessary down the line.

The only thing that has "shifted" in the meantime is the City's knowledge base. The City now knows that its skepticism was warranted. Defendants have produced a paltry number of custodial documents—approximately 4,000. Contrary to Defendants' argument, the City does not have a pre-determined figure in mind. But a production of 4,000 custodial documents is at odds with Defendants' assurances that the current slate of custodians could satisfy their discovery obligations in a case of this size and magnitude. For example, as noted above, Defendants produced only 17 documents from the files of Mr. Esmond—one of Defendants' original four proposed custodians—whom they had proposed to single-handedly cover conduct regarding menu price

13

inflation and non-partner listings. Dkt. 255 ¶¶ 5, 21. That production raises questions about whether Defendants, who do not defend this choice of custodian, even consulted Mr. Esmond to determine whether he could, in fact, cover those areas. The City also now knows, from its review of the documents Defendants have produced, that it is missing important, non-duplicative discovery from the files of Mr. Berk, Ms. Lachs, Mr. Soesanto, and Mr. Xu.

Defendants also accuse the City of delay in bringing this motion. That argument reimagines events. Defendants did not even begin producing discovery, from the custodians agreed upon in March 2023, until late July 2023. *Id.* ¶ 15. They did not "substantially complete" their production until January 19, 2024. In October 2023, the City requested from Defendants information regarding hit counts and documents left to review for each custodian, but Defendants refused to answer. *Id.* ¶ 18. Thus, before production was substantially complete, the City had no basis to gauge how much more custodial discovery was forthcoming. The City also had no way to assess, in advance, whether the completed discovery would, consistent with Defendants' representations, sufficiently capture information in the hands of non-custodians. Had the City moved to compel before Defendants substantially completed production, Defendants surely would have declared the motion premature.[4] The substance and timing of this motion are a direct result of Defendants' conduct in discovery. Accepting their position would incentivize litigants to stonewall on agreeing to custodians, draw out production, and then claim it is simply too late to add more.

---

[4] Indeed, Defendants contend that this motion is both too late and too early. They argue that because they have met-and-conferred with the City on additional searches regarding the Chicago Fee and appearance of the platform, the Court should "allow DoorDash to continue working on … alternative means of resolving the City's issues." Dkt. 286 at 15. As discussed above, this motion seeks to address systemic issues in Defendants' thin production, which is missing custodians whom the City has demonstrated are important. Any resolution of the specific issues regarding Chicago Fee and platform appearance documents would not moot this motion.

Finally, Defendants incorrectly suggest that the City unreasonably rejected compromises on additional custodians. Defendants asserted that they "repeatedly offered Mr. Berk" as a compromise on consumer fees custodians. Dkt. 286 at 12. They do not explain the circumstances of those offers, however. Defendants withdrew their March 2023 offer to include Mr. Berk as a custodian after the City moved to compel production of documents from Stanley Tang's files. Bowcut Reply Decl. ¶ 4; Dkt. 137. Defendants then offered Mr. Berk again in May 2023, on the condition that the City acquiesce to Defendants' position on several separate discovery disputes. *Id*. ¶ 6. In December 2024, in response to the City's request to add the four custodians at issue, Defendants offered Ms. Lachs and Mr. Soesanto as custodians on the issue of driver pay only—but only if the City agreed to drop its other custodian requests. *Id.* ¶ 7.[5] The City's position has consistently been that custodians across all major areas of conduct were needed to correct Defendants' deficient production. While the City was open to compromise, Defendants' proposals did not sufficiently address the problems with their production.

## **CONCLUSION**

The City respectfully requests that the Court grant the motion to compel and order Defendants to include as custodians (1) Jonathan Berk, for searches related to consumer fees; (2) Jessica Lachs, for searches related to consumer fees and driver pay; (3) Charlton Soesanto, for searches related to consumer fees and driver pay; and (4) Tony Xu, for searches related to consumer fees, driver pay, menu price inflation and non-partner listings.

---

[5] Defendants further complain that the City "refused to cite any specific bases for its requests" in the parties' January 17, 2024 meet-and-confer. Dkt. 286 at 12. In fact, the City explained the basis cited in its motion—that Defendants' production was sparse across the board, and that the City's review indicated these four custodians all had important, non-duplicative documents. Bowcut Reply Decl. ¶ 8. On January 19, 2024, the City sent Defendants follow-up correspondence identifying examples supporting this view. *Id.* ¶ 9. The City invited Defendants to change their position based on this evidence, but the City never heard back from them. *Id*.

DATED:  March 18, 2024                                  Respectfully submitted,

**CITY OF CHICAGO DEP'T OF LAW,**                       **COHEN MILSTEIN SELLERS &**
**AFFIRMATIVE LITIGATION DIVISION**                     **TOLL PLLC**

By: */s/ Stephen J. Kane*                               By: */s/ Brian E. Bowcut*
Stephen J. Kane                                         Brian E. Bowcut (*pro hac vice*)
Peter H. Cavanaugh                                      Peter Ketcham-Colwill (*pro hac vice*)
121 N. LaSalle Street                                   1100 New York Avenue, NW, Suite 500
Room 600                                                Washington, D.C. 20005
Chicago, IL 60602                                       Phone: (202) 408-4600
Phone: (312) 744-6934                                   bbowcut@cohenmilstein.com
stephen.kane@cityofchicago.org                          pketcham-colwill@cohenmilstein.com
peter.cavanaugh@cityofchicago.org

                                                       Lisa M. Ebersole (*pro hac vice*)
                                                       88 Pine Street, 14th Floor
                                                       New York, NY 10005
                                                       Phone: (202) 408-4600
                                                       lebersole@cohenmilstein.com

                                                       *Attorneys for Plaintiff City of Chicago*

**CERTIFICATE OF SERVICE**

  I hereby certify that on March 18, 2024, I electronically filed the foregoing *Plaintiff's Reply in Support of Its Motion to Compel Document Discovery from Four Additional Custodians* using the CM/ECF system, which will send notice of this filing to all counsel of record.

Dated:    March 18, 2024             /s/ *Lisa M. Ebersole*